UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAWZI KHALID ABDULLAH FAHAD
AL ODAH, *et. al.*,
        Petitioners,

v.

UNITED STATES OF AMERICA,
   *et al.*,
        Respondents.

Civil Action No. 02-0828 (CKK)

**MEMORANDUM OPINION**
(November 8, 2005)

    Although an emergency motion to amend the present Motion for Preliminary Injunction was raised orally by Petitioner Al Odah's counsel during a joint conference call on November 8, 2005, requesting that Petitioner Al Odah be transferred via immediate medical evacuation to another medical facility based on a further decrease in his weight and altered potassium levels since the pleadings presently under review were filed, the Court will treat Petitioner Al Odah's request for immediate medical evacuation separately from the filed pleadings in this Motion for Preliminary Injunction.

    Petitioners Fawzi Al Odah and Abdulaziz Al Shammari filed [260] Plaintiffs-Petitioners' Motion for Preliminary Injunction to Compel Defendants-Respondents to Provide Access to Medical Records, Timely Reports, and Direct Communications with Family Members Regarding Two Force-Fed Plaintiffs-Petitioners who are in Danger of Dying, and Request for Expedited Consideration ("Motion for Preliminary Injunction") on October 21, 2005,[1] asking the Court to compel

---

[1] While this Motion was not publicly filed until October 24, 2005 after review to redact classified information by the Court Security Officer (CSO), Petitioners filed the Motion with the CSO on October 21, 2005

Respondents to provide access to Petitioners' medical records, to give timely reports of Petitioners' medical condition, and to allow direct communications between Petitioners and family members. On November 4, 2005, Respondents filed [270, 271] Respondents' Notice of Transfer and Supplemental Response to Petitioners' Motion for Preliminary Injunction (Dkt. No. 260), stating that with respect to Petitioner Al Shammari, "the United States has relinquished custody and [Petitioner has] been transferred to the control of the government of Kuwait." Resp'ts' Notice Transf. at 1. Thus Petitioner Al Shammari's requests in the Motion for Preliminary Injunction are rendered moot. After careful consideration of Petitioners' Motion for Preliminary Injunction, [264] Respondents' Opposition to Petitioners' Motion for Preliminary Injunction ("Opposition"), and [266] Plaintiffs-Petitioners' Reply to Respondents' Opposition to Plaintiffs-Petitioners' Motion for Preliminary Injunction ("Reply"), the Court hereby denies without prejudice Petitioner Al Odah's requests.

## I: BACKGROUND

Petitioner Fawzi Al Odah is a Kuwaiti citizen presently held at Guantanamo Bay by the United States government as an enemy combatant. Petitioner has participated in a hunger strike since August 8, 2005. Pet'rs' Mot. Prelim. Inj. at 8.

Petitioner filed a request for a temporary restraining order with the Court on September 19, 2005, seeking judicial oversight and family communications regarding the force-feeding of Petitioner and requesting that the Court hold a hearing allowing Petitioner to present facts to "persuade the Court to order the government to (i) provide it and counsel with periodic reports and access to medical records and (ii) order direct communications with family members." Petitioner's

---

and both the Court and Respondents received sealed courtesy copies of said motion on October 21, 2005 such that the parties have agreed that October 21, 2005 will be considered the date of filing for the purposes of preliminary injunction filing deadlines set forth in D.C. Local Rule 65.1(c) and (d).

request for a temporary restraining order and hearing was denied by the Court on September 30, 2005. The Court's [254] Memorandum Opinion related to its [253] Order denying Petitioner's request for a temporary restraining order further details the factual and procedural history surrounding Petitioner's initial hunger strike-related request for judicial relief.

After the Court denied Petitioner's request for a temporary restraining order, Petitioner's counsel visited Petitioner in Guantanamo Bay on October 10, 2005. Pet'rs' Mot. Prelim. Inj. at 8. Following this trip, Petitioner's counsel filed the present Motion for Preliminary Injunction on October 21, 2005. While the requests contained in the present Motion for Preliminary Injunction are similar to those contained in Petitioner's denied request for a temporary restraining order and hearing, Petitioner alleges that Petitioner's counsel's visit uncovered "new facts showing that an emergency exists warranting the Court's intervention [that] have come to light since the Court denied [Petitioner's] previous request for a temporary restraining order." Pet'rs' Mot. Prelim. Inj. at 1.

### A. *Petitioner's Allegations*

As a general matter, Petitioner states that he "ha[s] fallen into a downward spiral of weight loss, vomiting, and diarrhea that may lead to [his] deat[h]." Pet'rs' Mot. Prelim. Inj. at 1. Petitioner attributes his present medical condition to improper medical care during his detention. *Id*. at 3.

Petitioner alleges that the government's protocols are inadequate and being harmfully applied to Petitioner. *Id*. at 2. Petitioner alleges that he is being forcibly fed by guards rather than medical personnel. *Id*. at 1, 2, 9. Petitioner further alleges that the forceful manner in which he has been treated during the insertion of feeding tubes has caused further injury to his health. *See id*. at 8 ("[A] nurse shoved a tube up [Petitioner's] nose so quickly that he began choking, bleeding from the nose, and spitting blood."). In his signed declaration dated October 10, 2005, Petitioner further

claims that an anesthetic was not used when his nasal tube was inserted and that the guards inserting such tubes on a regular basis did not wear surgical gloves. *Id*. at Exh. C ¶¶ 10, 12.

Petitioner also alleges that there was a delay in the onset of his treatment. Petitioner alleges that while he began participating in the hunger strike on August 8, 2005, he did not receive medical care or counseling until August 25 or 26, at which point he "could not move." *Id*. at 8. Petitioner furthermore alleges that now that he is being medically treated, he is infrequently examined by physicians despite his symptoms and fragile condition, and that more frequent examination and blood testing is medically necessary. *Id*. at 2, 9, 12.

Petitioner further alleges that the fact of his extreme weight loss is further indication of his inadequate medical treatment. *Id*. at 1, 8-9. Petitioner states that his weight has dropped from 139 pounds three years ago to 118 pounds at the beginning of September to 112 pounds at the end of September, which he confirms via the government medical record proffered as Exhibit H. *Id*. at 8-9, Exh. H.

### B. *Government's Response to Petitioner's Allegations*

In their Opposition, Respondents refute Petitioner's allegations regarding protocols and actual treatment of Petitioner as well as the onset and frequency of care. While Respondents do not refute Petitioner's weight loss as established in a government medical record by Petitioner as Exhibit H, Respondents maintain that Petitioner has received "comprehensive medical care and that the Guantanamo staff takes medically appropriate and humane measures to preserve the lives and health of detainees engaged in hunger strikes." Resp'ts' Opp'n at 4.

Relying on the declarations of Major General Jay W. Hood and John S. Edmondson, M.D., Respondents state that the policies and procedures applied to treating hunger-striking detainees are actually "applied and followed in a humane and effective manner." Resp'ts' Opp'n at 4. In

particular, Respondents claim that nasogastric feeding tubes are always inserted only by physicians or credentialed registered nurses and are never inserted in a manner to intentionally inflict pain. *Id*. Respondents furthermore state that nurses always use a lubricant upon inserting nasogastric tubes and that a topical anaesthic is always offered, though sometimes refused by detainees. *Id*. at 4, Exh. B at n.4. Respondents further allege that while a two-day protocol involved the reuse of a sanitized feeding tube for the same detainee for which it was previously used, that protocol was replaced by the current policy of using a new sterilized tube for every insertion. *Id*. at 4 n.4. Respondents also indicate that small nasogastric tubes of 3 mm in diameter are presently used on detainees requiring tube feedings, and that while larger tubes of 4.8 mm in diameter consistent with Bureau of Prisons protocol were used on a few patients for a two-day trial period to facilitate faster and higher volume feedings, it was consequently determined that the use of smaller tubes should be the standard. *Id*. at 5. Respondents also contest Petitioner's allegations of overly harsh treatment and restraint by guards and nurses. *Id*. at 6-7.

Respondents state that doctors and nurses "regularly evaluate" the health of all detainees receiving tube feeding, and that physicians see hunger-striking detainees in the detention hospital at least once daily. *Id*. at 5-6. Respondents claim that Petitioner in particular has received counseling regarding the risks of not eating and was provided with the medical graph of his declining weight proffered by Petitioner as Exhibits H as part of the counseling effort to encourage him to eat and increase his weight. *Id*. at 5.

## II: LEGAL STANDARD

In assessing whether to grant preliminary injunctive relief, which is considered an extraordinary remedy in this circuit, *see Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969), a court must balance four factors: (1) whether the movant is substantially likely to succeed

on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction. *See Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In applying this four-factored standard, district courts employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another. *See CityFed Fin.*, 58 F.3d at 747. Thus, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id*. Notwithstanding the fluid nature of this familiar four-part inquiry, "[i]t is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)). If the movant fails to do so, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999).

Furthermore, a party seeking preliminary injunctive relief must demonstrate at least some irreparable injury because "[t]he basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Thus, if the movant makes no showing of irreparable injury, "that alone is sufficient" for a district court to refuse to grant preliminary injunctive relief. *Id.*; *see also Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("We believe that analysis of [irreparable harm] disposes of these motions and, therefore, address only whether the petitioners have demonstrated that

6

in the absence of a stay, they will suffer irreparable harm.").

In this Circuit, injury is irreparable only if it is "both certain and great." *Wisconsin Gas*, 758 F.2d at 674. This requires that the alleged harm "be actual and not theoretical" and "'of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)). Furthermore, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (2001).

### III:  DISCUSSION

In his Motion for Preliminary Injunction, Petitioner asks the Court to order Respondents to provide reports on Petitioner's medical condition, provide access to Petitioner's medical records, and allow direct communication between Petitioner and his family. Pet'rs' Mot. Prelim. Inj. at 2. The Court will address each of these requests in turn to see if the standard for injunctive relief has been met.

### A. Request for Reports on Petitioner's Medical Condition and Access to Petitioner's Medical Records

Petitioner requests that the Court order that Respondents provide "timely reports on [Petitioner's] medical condition." Pet'rs' Mot. Prelim. Inj. at 2. Petitioner does not further clarify this request in his Motion for Preliminary Injunction, as he does not specify whether he is requesting such reports on a periodic basis or following some change in Petitioner's medical condition. While it is also unclear from Petitioner's Motion to whom Respondents should provide such reports, the Court infers from Petitioner's Motion that Petitioner would like such reports to be made available to Petitioner's counsel, Petitioner's family, and the Court. *Id.* at 16.

7

Petitioner also requests that the Court provide access to his medical records. *Id*. at 2. Again, while Petitioner does not specify what access to his medical records entails, the Court will infer from Petitioner's motion that Petitioner would like counsel, Petitioner's family, and the Court to have access to such records. *Id*. at 16. Petitioner also implies that he would like counsel to have access to Petitioner's medical records for the purposes of having such records reviewed by doctors outside of Guantanamo Bay. *Id*. at 17; Pet'rs' Reply at 7.

### 1. *Likelihood of Success on the Merits*

Since Petitioner reveals that outside review of Petitioner's medical condition using his medical records is a motive behind his request for such records, the Court will note, as it did in its Order dated September 30, 2005, that courts have developed a body of law addressing the appropriate standard by which to review the conditions of an individual's confinement. Broadly speaking, the courts have held that convicted prisoners are protected by the Eighth Amendment, and conditions of confinement are reviewed under the "deliberate indifference" standard. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). This standard requires a showing that the prison officials "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Id*. at 846. The Supreme Court has ruled that with specific regard to the medical treatment of prisoners, "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). However, mere negligence on the part of medical personnel does not violate the Eighth Amendment under the deliberate indifference standard: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. . . . In order to state a cognizable claim, a prisoner must allege acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *see also Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). The standard for pretrial detention is phrased differently, providing Fifth Amendment protections requiring that "a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law." *Block v. Rutherford*, 468 U.S. 576, 583 (1984) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

The Court will also again note that courts are generally reluctant to involve themselves in the day-to-day operations of correctional facilities. *See Bell*, 441 U.S. at 548, 562 (noting that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial," and cautioning lower courts from "becom[ing] increasingly enmeshed in the minutiae of prison operations."); *see also Inmates of Occoquan v. Barry*, 844 F.2d 828, 841 (D.C. Cir. 1988) (noting that "courts are not to be in the business of running prisons," and that "questions of prison administration are to be left to the discretion of prison administrators.").

It is clear to the Court that the legal standard to apply to medical treatment given to detainees held at Guantanamo Bay has not been further clarified from the above case law relied on by the Court by any precedential authority since the Court issued its Order on September 30, 2005. Petitioner alternatively argues that he is likely to prevail on the merits because the Court has the authority to "take action necessary to preserve the li[fe] of [Petitioner]" under both the common law and the habeas corpus statute. Pet'rs' Mot. Prelim. Inj. at 3, 14. Petitioner argues that pursuant to the habeas statute, 28 U.S.C. § 2243, the Court should enter an order granting Petitioner's requests for medical reports and access to medical records. Both cases cited by Petitioner (which the Court notes are not from within the D.C. Circuit) do deal with the issue of forced feedings. However, *In re*

*Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170 (2d Cir. 1998), deals with constitutional claims not raised in the context of a habeas petition. The other case cited by Petitioner, *In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001), hinges not on the court's authority under the habeas statute, but on the petitioner's constitutional rights vis a vis forced feeding, which is not presently an issue before the Court.

Petitioner also argues that case law from the District of Columbia allows judicial oversight over conditions of confinement, citing *Campbell v. McGruder*, 580 F.2d 521 (D.C. Cir. 1978), *McCall v. Swain*, 510 F.2d 167 (D.C. Cir. 1975), and *Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953). While these cases do reference judicial oversight over prisoners charged with domestic crimes, the circumstances giving rise to such oversight in the cases cited by Petitioner are extremely limited. In *Campbell*, the D.C. Circuit addressed conditions in the District of Columbia jail that violated pretrial detainees constitutional rights. These conditions included severe overcrowding, rampant filth, and shackling mentally ill detainees to their beds for weeks while awaiting transfer to a psychiatric facility. The D.C. jail lacked policies to deal with the above issues such that limited policies ordered by the district court (ordering that inmates have clean clothing at least once a week, for example) were upheld by the D.C. Circuit on the premise that the federal courts have a duty to protect the constitutional rights of pretrial detainees from being infringed by prison regulations or practices. In the present case, however, policies and procedures designed to preserve the health of detainees who have put their own health in jeopardy are in place and have been applied to Petitioner. *McCall* and *Miller* primarily deal with constitutional qualms with the *situs* of detention. In *McCall*, the D.C. Circuit ruled that the district court had exclusive jurisdiction over an inmate held in a District of Columbia detention facility located in Virginia and over his writ challenging the constitutionality of his transfer to a maximum security facility as a form of discipline. In *Miller*, the

district court transfer of a sexual psychopath, who by definition was not insane, out of a ward for the criminally insane and into a different ward at a psychiatric facility was upheld. These cases have little bearing on Petitioner's present requests, which do not challenge in this motion the location of his detention nor a transfer to a particular facility.

Petitioner thus offers no solid alternative legal basis on which to base his claims of entitlement to Petitioner's medical records and reports on Petitioner's medical condition. Since logically the provision of medical records and/or medical reports will not result in any further protection of the life of a detainee without intermediate scrutiny of the records by medical professionals and challenges to the Court based on that scrutiny, and since courts are reluctant to interfere with the medical treatment of prisoners in general, it is unlikely that Petitioner would succeed on the merits given the detailed procedures and practices employed at Guantanamo Bay to preserve the life of Petitioner, who is voluntarily participating in a hunger-strike. Neither the Court nor any counsel dispute that Petitioner is entitled to appropriate and humane medical care and that preserving his life is the goal. However, the present record still does not demonstrate that Respondents' actions meet the deliberate indifference standard for medical care in this setting.

### 2. Irreparable Injury if the Injunction is not Granted

Petitioner argues that regulation of the government's treatment of Petitioner by providing medical records and medical reports is needed to lessen the immediate risk of death that Petitioner faces. Petitioner states that "[t]here can be no injury more irreparable than death, and the annexed declaratio[n] of Al Odah . . . show[s] [he is] at risk of death *due to the government's improper and substandard force-feeding treatment*." Pet'rs' Mot. Prelim. Inj. At 3 (emphasis added).

The Court cannot agree that any risk of death that Petitioner faces is solely "due to the government's improper and substandard force-feeding treatment." Petitioner has eliminated an

important causal link in his analysis–the fact that Petitioner himself is participating in a hunger strike. Without passing judgment on the motives behind Petitioner's participation in the hunger strike, the Court finds that Petitioner, causally, is first and foremost at risk of death of his own accord. Thus the proper question for the Court to consider in determining whether or not to grant Petitioner's request for an injunction forcing Respondents to provide medical reports and access to medical records is whether failure to access such documents will cause irreparable injury above and beyond the state that Petitioner is already in. Since the threshold for judicial intervention into the treatment of detainees is high, and the government has established that its interests, as reflected by its medical procedures, lay in keeping Petitioner alive,[2] the Court concludes that on this record, irreparable injury in this case is caused not by Respondents' treatment of Petitioner but by Petitioner's own actions.

       *3. Substantial Injury to Other Interested Parties and Furtherance of the Public Interest.*

While Petitioner argues that ordering the government to produce timely medical reports and access to Petitioner's medical records will simply ensure that the government is meeting its obligations and as such will not injure the government,[3] the Court need not address this argument or Respondents' claim that provision of such reports and records would be overly burdensome on the government. Petitioner is not entitled to injunctive relief on this record under *CitiFed* because he fails to demonstrate some degree of irreparable injury. *See CitiFed Fin.*, 58 F.3d at 747. Accordingly, the Court also need not address the question of whether the Petitioner's request for

---

[2] "Consistent with the Department of Defense policy the JTF will prevent unnecessary loss of life of detainees through standard medical intervention, including involuntary medical intervention when necessary to overcome a detainee's desire to commit suicide, using means that are clinically appropriate." Declaration of Major General Jay W. Hood, Resp'ts' Opp'n at Exh. A at 1.

[3] Pet'rs' Mot. Prelim. Inj. at 4.

injunctive relief would further the public interest.

### B. Request for Direct Communication between Petitioner and his Family

Petitioner requests that the Court order the government to allow direct communications between Petitioner and his family members. Pet'rs' Mot. Prelim. Inj. at 2. More specifically, Petitioner requests that the Court allow direct and interactive communication (such as via telephone) between Petitioner and his family at this juncture. *Id.* at 19. Petitioner grounds his request on his experts' assessments that family involvement is a critical component in the treatment of individuals on a hunger strike. *Id.* at 18.

#### 1. Likelihood of Success on the Merits

Petitioner claims that the Court should order Respondents to provide direct, interactive communications between Petitioner and his family because certain detainees (those that have been charged with war crimes) are already allowed to have direct communications with their families, Bureau of Prison regulations allow such contact, and direct telephone communications are "expressly authoriz[ed]" in the Amended Protective Order issued by Judge Joyce H. Green on November 8, 2004. Pet'rs' Mot. Prelim. Inj. at 20.

However, Petitioner cites to no legal basis *requiring* the Court to order that such communications be allowed. Judge Green's Amended Protective Order in fact indicates that telephonic access to detainees is the exception rather than the rule: "Requests for telephonic access to the detainee by counsel or other persons will not normally be approved. Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF-Guantanamo." *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 190 (D.D.C. 2004). The government grants or denies such requests on a case-by-case basis, and given the national security concerns at issue, the Court is unwilling to second-guess such determinations.

Furthermore, the Bureau of Prisons regulations cited to by Petitioner in his Reply, 28 C.F.R. § 540.40 and 28 C.F.R. § 540.50, both allow for inmate visitation only with the consent of prison authorities and authorize restrictions for such visits when the security of the institution so requires.

>   *2. Irreparable Injury*, *Substantial Injury to Other Parties, Furtherance of the Public Interest*

Where a movant for a preliminary injunction cannot demonstrate a substantial likelihood of success on the merits, it must demonstrate a strong showing with respect to the irreparable injury that would be caused by the court's failure to grant a preliminary injunction, the lack of substantial injury to related parties, and the furtherance of the public interest. *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999). In this case, Petitioner does not make a particularly strong showing with respect to any of these factors.

In his Motion, Petitioner alleges that "[d]irect and interactive family contact, such as by telephone, is essential to provide a connection of trust and hope [to Petitioner]." Pet'rs' Mot. Prelim. Inj. at 19. Petitioner falls far short of establishing that such contact would have any effect on Petitioner, let alone that the Court's failure to order such contact would be the source of irreparable injury to Petitioner, who at present is able to receive written communications from family members that comply with the terms of Judge Green's November 8, 2004 Amended Protective Order. *See* Resp'ts' Opp'n at 22.

Petitioner also fails to address the harm that would befall the government should the Court order such direct telephone communications between Petitioner and his family. In order for such communications to take place, the government would be required to carefully monitor such conversations to ensure that such conversations did not create a security risk, which would occupy considerable government time, money, and resources. *See* Resp'ts' Opp'n at 20-21. Furthermore,

the real time or near real time nature of a telephone conversation poses a heightened risk that impermissible information could be transmitted from Petitioner to his family or vice versa, posing a real risk of injury to the government and potentially endangering the public interest.

Because Petitioner offers no legal basis requiring the Court to order that the government allow direct interaction between Petitioner and his family, and considering the alternative means of communication available and the inherent security risks involved, the Court will deny without prejudice Petitioner's request.

### IV:  CONCLUSION

In keeping with the foregoing reasoning, [260] Plaintiffs-Petitioners' Motion for Preliminary Injunction to Compel Defendants-Respondents to Provide Access to Medical Records, Timely Reports, and Direct Communications with Family Members Regarding Two Force-Fed Plaintiffs-Petitioners who are in Danger of Dying, and Request for Expedited Consideration shall be DENIED WITHOUT PREJUDICE as to Petitioner Al Odah and RENDERED MOOT as to Petitioner Al Shammari.

Date:   November 8, 2005

                                                /s/
                                           COLLEEN KOLLAR-KOTELLY
                                           United States District Judge