

FILED WITH THE
COURT SECURITY OFFICER
CSO: A. Straus
DATE: 7/29/09

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KHALID ABDULLAH MISHAL AL MUTAIRI, *et al.* | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil. Action No. 02-828 (CKK) |
| UNITED STATES, *et al.*, | ) ) | |
| Respondents. | ) ) ) ) | |

### CLASSIFIED MEMORANDUM OPINION
(July 29, 2009)

Petitioner Khalid Abdullah Mishal Al Mutairi ("Al Mutairi") has been detained by the United States Government at the Guantanamo Bay Naval Base in Cuba since 2002. He has not been charged criminally and no charges have been referred against him to a military commission. The Government justifies his detention based on the authority granted to President Barack H. Obama by the Authorization for the Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) ("AUMF"), which authorizes the use of force against certain terrorist nations, organizations, and persons. Al Mutairi believes he is unlawfully detained and has filed a petition for a writ of habeas corpus.

This civil proceeding requires the Court to determine whether or not Al Mutairi's detention is lawful. In connection with this inquiry, the Court has considered the factual evidence in the record, the extensive legal briefing submitted by the parties, and the arguments presented during a two-day Merits Hearing held on July 6-7, 2009.[1] Based on the foregoing, the

---

[1] The parties did not present any live testimony at the Merits Hearing. The Court also notes that the Government submitted an unredacted, classified document as Exhibit 58 at the



Court finds that the Government has at best shown that some of Al Mutairi's conduct was consistent with persons who may have become a part of al Qaida or an associated force of al Qaida, but there is nothing in the record beyond speculation that Al Mutairi did, in fact, train with or otherwise become a part of either or both of those organizations. While Al Mutairi's described travels within Afghanistan lack credibility, the Government has not supplanted Al Mutairi's version of his travels with sufficiently credible and reliable evidence to meet its burden of persuasion by a preponderance of the evidence. Accordingly, the Court shall GRANT Al Mutairi's petition for habeas corpus.

## I. BACKGROUND

### A.    *Procedural History*

Petitioner filed his petition for habeas corpus on May 1, 2002, making this case the oldest of the pending Guantanamo Bay habeas cases. After several years of litigation, this case was stayed pending resolution of whether the Court had jurisdiction to hear Al Mutairi's petition. On June 12, 2008, the United States Supreme Court issued its decision in *Boumediene v. Bush*, clarifying that this Court had jurisdiction to consider the petition and advising this and the other judges in this District that "[t]he detainees are entitled to [] prompt habeas corpus hearing[s]." 553 U.S. ___, 128 S. Ct. 2229, 2275 (2008).

Following the *Boumediene* decision, this and most of the other judges in this District agreed to consolidate their Guantanamo Bay habeas cases before former Chief Judge Thomas F. Hogan for issuance of an initial case management order that would expeditiously move these

---

Merits Hearing. The Government subsequently withdrew this exhibit and filed a substitute document. *See* Gov't's Notice at 1 (July 27, 2009). Accordingly, the Court has only considered the Government's substitute document in reaching its decision on the merits in this case.



cases toward resolution. Judge Hogan issued a Case Management Order on November 6, 2008, which he amended on December 16, 2008, and which the Court adopted in this case on December 22, 2008. The Court has relied on the Amended Case Management Order as the backdrop for its subsequent Scheduling Orders in this case.[2]

The Government filed an Amended Factual Return on September 18, 2008, and pursuant to the schedule set by the Court, Al Mutairi filed a Traverse on March 30, 2009. The parties engaged in extensive discovery and motions practice in the interim. Petitioner filed a Motion for Additional Discovery on January 26, 2009, which the Court granted-in-part and denied-in-part on February 12, 2009, after a hearing on February 11, 2009. Petitioner filed a Motion to Produce a Declassified Factual Return on January 9, 2009, which the Government produced on February 6, 2009. The Court also required the Government to provide Al Mutairi with certain discovery from the Guantanamo Bay Joint Task Force database. Additionally, the parties filed six pre-hearing motions, most of which sought rulings concerning the admissibility of particular evidence. By Order dated June 16, 2009, the Court granted the parties' motions to rely on hearsay evidence at Al Mutairi's Merits Hearing, but held their other evidentiary motions in abeyance.[3]

To narrow the disputed issues presented at the Merits Hearing and to focus the parties on the specific documents underpinning their respective arguments, the Court ordered the Government to file a Statement of Facts on which they intended to rely at the Merits Hearing

---

[2] The Court extends its gratitude to Judge Hogan for his considerable investment of time and energy to produce the Case Management Order.

[3] Al Mutairi also filed a Motion for Sanctions against the Government for failing to timely disclose exculpatory evidence. The Court does not find that sanctions are warranted on the present record.

UNCLASSIFIED//FOR PUBLIC RELEASE



(which narrowed the allegations presented in the Amended Factual Return), and instructed both parties to submit Witness and Exhibit Lists. The Court advised the parties that it would likely exclude from consideration any evidence at the Merits Hearing that had not been identified in the Witness and Exhibits Lists by June 29, 2009 (one week prior to the scheduled Merits Hearing).[4] The parties timely submitted these materials and the Court held a two-day Merits Hearing on July 6-7, 2009.

B.      *Evidentiary Approach*

As stated above, the Court granted the parties' motions to rely on hearsay evidence in this proceeding. The plurality in *Hamdi v. Rumsfeld* specifically acknowledged that "[h]earsay . . . may need to be accepted as the most reliable available evidence from the Government." 542 U.S. 507, 534 (2004). The Court finds that allowing the use of hearsay by both parties balances the need to prevent the substantial diversion of military and intelligence resources during a time of hostilities, while at the same providing Al Mutairi with a meaningful opportunity to contest the basis of his detention. The Court is fully capable of considering whether a piece of evidence (whether hearsay or not) is reliable, and it shall make such determinations in the context of the evidence and arguments presented during the Merits Hearing – including any arguments the parties have made concerning the unreliability of hearsay evidence. *Cf. Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008) (explaining, in the context of the Detainee Treatment Act, that the Court was "*not* suggest[ing] that hearsay evidence is never reliable – only that it must be presented in the form, or with sufficient additional information, that permits [the finder of fact] to

_____

[4] The Court noted two exceptions for (1) documents offered for rebuttal purposes, and (2) exculpatory documents, as to which the Government has a continuing obligation to disclose.



UNCL                    ASE

assess its reliability") (emphasis in original).

For similar reasons, the Court shall deny the Government's motion to have its evidence admitted with a presumption of accuracy and authenticity. Relying in part on the Supreme Court's statement in *Hamdi v. Rumsfeld* that "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided," 542 U.S. at 534, the Government argues that a presumption as to its evidence is both appropriate and necessary. The Court disagrees. One of the central functions of the Court in this case is "to evaluate the raw evidence" proffered by the Government and to determine whether it is "sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of clarity." *Parhat*, 532 F.3d at 847. Simply assuming the Government's evidence is accurate and authentic does not aid that inquiry. *Cf. Ahmed v. Obama*, 613 F. Supp. 2d 51, 55 (D.D.C. 2009) (rejecting a presumption of accuracy for the Government's evidence and holding that "the accuracy of much of the factual material contained in [the Government's] exhibits is hotly contested for a host of different reasons . . .").

The Court also finds that there are significant reasons why the Government's proffered evidence may not be accurate or authentic. Some of the evidence advanced by the Government has been "buried under the rubble of war," *Hamdi*, 542 U.S. at 532, in circumstances that have not allowed the Government to ascertain its chain of custody, nor in many instances even to produce information about the origins of the evidence. Other evidence is based on so-called "unfinished" intelligence, information that has not been subject to each of the five steps in the intelligence cycle (planning, collection, processing, analysis and production, and dissemination).



UNCLASSIFIED//FOR PUBLIC RELEASE



Based on the Government's own declarations, its raw intelligence has not been fully analyzed for

its "reliability, validity, and relevance" in the context of other intelligence where "judgments

about its collective meaning are made." Gov't's Ex. 1 at 5 (Decl. of

Still other evidence is based on multiple layers of hearsay (which inherently raises questions

about reliability), or is based on reports of interrogations (often conducted through a translator)

where translation or transcription mistakes may occur. In this case, for example, the Government

believed for over three years that Al Mutairi manned an anti-aircraft weapon in Afghanistan

based on a typographical error in an interrogation report. *See* Al Mutairi Classified Traverse at

27-28 (explaining that the Government's initial Factual Return filed on December 17, 2004,

identified Al Mutairi as having manned an anti-aircraft weapon because an interrogation report

mistakenly identified the individual as ISN 213 (Al Mutairi's identifier) instead of ISN ███ (the

individual who was accused of manning the weapon)). Accordingly, the Court shall not accord a

presumption of accuracy or authenticity to the Government's evidence, but shall consider the

accuracy or authenticity of the evidence in the context of the entire record and the arguments

raised by the parties.

Finally, the Court shall use the same approach to consider Al Mutairi's pre-hearing

evidentiary motions that sought to exclude particular pieces of evidence prior to the Merits

Hearing based on their alleged lack of authenticity, reliability, or relevance. Rather than exclude

evidence from consideration *ex ante* by examining it in a vacuum, the Court concludes that the

better approach is to make such determinations after considering all of the evidence in the record

and hearing the parties' arguments related thereto. The Court believes this approach is

particularly useful where, as here, a document viewed in isolation may appear to be irrelevant,

UNCL                    ASE



but when considered in the context of the other evidence in the record its importance may

become clear. Accordingly, the Court's consideration of the evidence proffered by the parties

shall encompass inquiries into authenticity, reliability, and relevance. *Cf. Parhat*, 532 F.3d at

847 (describing the Court's inquiry into whether evidence is "'sufficiently reliable and

sufficiently probative to demonstrate the truth of the asserted proposition with the requisite

degree of certainty'") (quoting *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*,

508 U.S. 602, 622 (1993)).

    C.    *Standard of Detention*

    As Judge Reggie B. Walton accurately observed in a thoughtful opinion considering the

Government's detention authority, "the state of the law regarding the scope of the President's

authority to detain petitioners remains unsettled," *Gherebi v. Obama*, 609 F. Supp. 2d 43, 45

(D.D.C. 2009), even though habeas petitions by individuals such as Al Mutairi have been

pending for over seven years. Guidance in this area is limited because the Supreme Court

acknowledged but did not clarify the uncertain "permissible bounds" of the Government's

detention authority, *see Hamdi*, 542 U.S. at 552 n.1, and the D.C. Circuit has not had occasion to

address the issue. Fortunately, several judges in this District have considered the scope of the

Government's detention authority and have issued well-reasoned opinions on the subject. *See,

e.g., Gherebi*, 609 F. Supp. 2d at 43; *Hamlily v. Obama*, Civ. A. No. 05-1646, 2009 U.S. Dist.

LEXIS 43249 at *1 (D.D.C. May 19, 2009); *Mattan v. Obama*, Civ. A. No. 09-745, 2009 U.S.

Dist. LEXIS 43286 at *1 (D.D.C. May 21, 2009).

    Taking advantage of these prior decisions, the Court shall adopt the reasoning set forth in

Judge John D. Bates's decision in *Hamlily v. Obama*, and shall partially adopt the Government's





proposed definition of its detention authority.[5]  The Court agrees that the President has the

authority to detain individuals who are "part of" the Taliban, al Qaeda, or associated enemy

forces, but rejects the Government's definition insofar as it asserts the authority to detain

individuals who only "substantially supported" enemy forces or who have "directly supported

hostilities" in aid of enemy forces.  While evidence of such support is undoubtedly probative of

whether an individual is part of an enemy force, it may not by itself provide the grounds for

detention.  *Accord Mattan*, 2009 U.S. Dist. LEXIS 43286 at *13-*15.  Accordingly, the Court

shall consider whether Al Mutairi is lawfully detained in the context of the following standard:

> The President has the authority to detain persons that the President determines
> planned, authorized, committed, or aided the terrorist attacks that occurred on
> September 11, 2001, and persons who harbored those responsible for those
> attacks.  The President also has the authority to detain persons who were part of
> the Taliban or al-Qaida forces or associated forces that are engaged in hostilities
> against the United States or its coalition partners, including any person who has
> committed a belligerent act in aid of such enemy armed forces.[6]

---

[5] The Government's proposed definition for its detention authority is found in the
Memorandum that it submitted in this case on March 13, 2009.  According to the Government,

> [t]he President has the authority to detain persons that the President determines
> planned, authorized, committed, or aided the terrorist attacks that occurred on
> September 11, 2001, and persons who harbored those responsible for those
> attacks.  The President also has the authority to detain persons who were part of,
> or substantially supported, Taliban or al-Qaida forces or associated forces that are
> engaged in hostilities against the United States or its coalition partners, including
> any person who has committed a belligerent act, or has directly supported
> hostilities, in aid of such enemy armed forces.

[6] Al Mutairi submitted a response to the Government's proposed detention standard
seeking to have the Court limit the types of organizations that may be considered an "associated
force" or "enemy armed force."  *See* Pet'r's Resp. at 2-11.  The Court declines to engage in a
hypothetical inquiry concerning the types of organizations that may or may not fall within this
definition, but shall instead examine the facts of each case and shall further define these terms in
context if appropriate and necessary.



### D.  Burden of Persuasion

Pursuant to the Amended Case Management Order that the Court adopted in this case on

December 22, 2008, the Government bears the burden of proving by a preponderance of the

evidence that Al Mutairi is lawfully detained. *See In re Guantanamo Bay Detainee Litig.*, Misc.

No. 08-442, CMO § II.A  (Nov. 6, 2008) ("[t]he government bears the burden of proving by a

preponderance of the evidence that the petitioner's detention is lawful") (citing *Boumediene*, 128

S. Ct. at 2271) ("[T]he extent of the showing required of the government in these cases is a

matter to be determined."). Accordingly, Al Mutairi need not prove his innocence. The

Government must come forward with evidence demonstrating by a preponderance of the

evidence that he is lawfully detained, and if the Government fails to meet this burden, the Court

must grant his petition for habeas corpus.

## II. DISCUSSION

The Government advances two theories justifying Al Mutairi's detention:  (1) Al Mutairi

trained with and became a part of the al-Wafa al-Igatha al-Islamia ("al Wafa") organization,

which the Government argues is an associated force of al Qaida; and (2) Al Mutairi trained with

and joined the forces of al Qaida.  The Court's discussion of the evidence presented at the Merits

Hearing with respect to both theories shall proceed in four steps.  First, the Court shall describe

Al Mutairi's version of events leading up to his detention.  Second, the Court shall identify

several of the reasons why Al Mutairi's version of events is not credible.  Third, the Court shall

describe the Government's evidence as it relates to Al Mutairi's alleged activities in Afghanistan.

Fourth, the Court shall explain why the Government has not demonstrated by a preponderance of

the evidence that Al Mutairi trained with and became part of al Wafa, or trained with and joined





the forces of al Qaida.

A.      *Al Mutairi's Version of Events*

Al Mutairi did not submit a declaration or affidavit describing his version of what

occurred during his travels in Afghanistan. Rather, his counsel relied on certain of his statements

in the record to piece together his version of events. Accordingly, the following description is

based on the evidence in the record that was presented by Al Mutairi's counsel at the Merits

Hearing as setting forth Al Mutairi's version of events.[7]

Al Mutairi was born in Kuwait City, Kuwait, in 1975. Gov't's Ex. 10 at 1 (4/8/2002

Interrogation of Al Mutairi). Within days of the September 11, 2001 attacks on the United States

by al Qaida terrorists, Al Mutairi made one-way travel arrangements to visit Afghanistan (he

characterizes the timing as a "coincidence"). *Id.* at 3. On September 21 or 22, 2001, Al Mutairi

left Kuwait with $15,000 in United States currency on a flight to Mashad, Iran. *Id.* at 4. Al

Mutairi then took a taxi from Mashad to Taibat, Iran. *Id.*

Al Mutairi explained that he had originally met ▮▮▮ in Kuwait in 1999, when he had

hired ▮▮▮ as a carpenter to build a small room for him. Gov't Ex. 10 at 3. Al Mutairi told

▮▮▮ that he planned to build a mosque in Afghanistan at some point, and they stayed in touch

over the next few years. *Id.* In the spring of 2001, Al Mutairi called ▮▮▮ and told him that he

wanted to build the mosque they had previously discussed, and it was decided that ▮▮▮ would

---

[7] For this reason, the Court shall cite directly to the evidence in the record. Additionally, the Court shall place dates in parenthesis throughout this section, which are the dates the Court derives based on Al Mutairi's statements.



build it on piece of land in the village of Namruz, Afghanistan, where ▆▆▆ was living. *Id.*
The $15,000 that Al Mutairi carried with him was the amount he anticipated spending on having
the mosque built. *Id.* Al Mutairi explained that he "had not planned to remain long in
Afghanistan, just long enough to give ▆▆▆ the money he needed to get the project started . . . .
[H]e left the return date of the flight open because he did not know how long it would take to
conclude his business in Afghanistan." *Id.* at 4.

Once Al Mutairi met ▆▆▆ at the Afghanistan border, they took a taxi to Namruz and
stayed at Faheem's house for one night (September 22 or 23, 2001). *Id.* at 4. ▆▆▆ told Al
Mutairi that building a mosque would cost only $9,000, so Al Mutairi was left with an
unexpected surplus of $6,000. *Id.* ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆; Gov't Ex. 13 at 4 (1/17/07 Interrogation of Al Mutairi). ▆▆▆ then suggested that
he and Al Mutairi travel to Kabul to visit an al Wafa office where Al Mutairi could donate some
of his remaining funds for al Wafa's charitable projects. *See* Gov't Ex. 10 at 4.

The next day (September 23 or 24, 2001), Al Mutairi and ▆▆▆ left for Kabul. *Id.* The
trip took two days to complete by taxi (which resulted in their arrival around September 25 or 26,
2001). *Id.* at 4. Upon arrival, they immediately made their way to the al Wafa Kabul office. *Id.*
After meeting with an al Wafa representative, Al Mutairi agreed to donate $1,000 to assist with
the building of a school. *Id.* After leaving this office, ▆▆▆ took Al Mutairi to a village about
an hour outside of Kabul, where Al Mutairi stayed at the home of one of ▆▆▆ friends whose
name Al Mutairi cannot remember. *Id.* at 5. ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

█████

██████████████████████████ *Id.* at 5; ██████████████. Al Mutairi

also gave $2,000 to ████████ friend to purchase food and clothing for refugees.  Gov't Ex. 10 at

5.

After these four days, Al Mutairi attempted to go home by crossing the border into

Pakistan, but the border was sealed.  *Id.*  Al Mutairi then stayed at the home of ████████ friend

for an additional three weeks (until around October 21, 2001).  *Id.*  After hearing that there was

fighting in Kabul, he decided to leave with ████████ friend for a village near Khowst.  *Id.*  At

some point before he left Kabul, Al Mutairi's bag was stolen, which contained most of his

remaining funds and his passport.  Gov't's Ex. 10 at 5.

Al Mutairi and ████████ arrived at a village near Khowst and stayed at a house belonging

to a friend of ████████ friend, whose name Al Mutairi does not remember.  *Id.*  After one month

(around November 21, 2001), Al Mutairi paid a guide to take him across the border into

Pakistan, a journey that took approximately three days.  *Id.*  Al Mutairi was apprehended by

Pakistani guards and transferred into American custody shortly thereafter.  *Id.* at 5-6.

B.     *The Implausibility of Al Mutairi's Version of Events*

Having reviewed all of the evidence in the record and listened to counsel's arguments

during the Merits Hearing, the Court concludes that Al Mutairi's version of events is implausible

and, in some respects, directly contracted by other evidence in the record.

The first problem with Al Mutairi's version of events is that his chronology creates a

"missing" month.  During the Merits Hearing, the Court requested information concerning when

Al Mutairi was apprehended by a ████████ guard and when he was transferred from ████████

custody into United States custody.  The Government produced an "intake form" that was





completed when Al Mutairi was transferred into United States custody. *See* Gov't's Ex. 47 at 1 (1/3/02 Intake Form). The form indicates that Al Mutairi was apprehended approximately 10-12 days prior to January 3, 2002, which would have been around December 23, 2001. ███████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████

Contrary to Al Mutairi's version of events, the evidence strongly suggests that he remained in or around Kabul approximately one month longer than his version allows (thus accounting for the "missing" month). In particular, among the information provided on the intake form is Al Mutairi's earliest explanation of his travels in Afghanistan. ███████

██████████████████████████████████████████████

███████████████" *See* Gov't's Ex. 47 at 2. The same explanation is contained in the

██████████████████████████████████████████████
██████████████████████████████████████ If Al Mutairi arrived in Kabul on September 25 or 26 and stayed six weeks, he would have left Kabul in mid-November (and not in October as he had stated). The Court takes judicial notice that Ramadan started in mid-November 2001, which is consistent with Al Mutairi leaving Kabul in mid-November. ████████████████████████████████████

██████████████████████████████████████████████
████████████████████████████████ In addition to

13

███████████████████



undermining Al Mutairi's version of events and his reasons for leaving Kabul, this timing is

significant. Kabul fell to the Northern Alliance forces in Afghanistan on November 13, 2001,

and the fact that Al Mutairi stayed in that area until Kabul fell is probative of what Al Mutairi

may have been doing in that area.

      A second problem with Al Mutairi's story is that the evidence in the record reveals that

Al Mutairi gave ███ different versions about what happened to his passport. ███████████



████████████████████████████████ In a third version, Al

Mutairi stated that "[h]e assumed the ███████ have his passport or that they returned it to the

government of ████████" *See* Gov't's Ex. 13 at 4 (1/17/07 interrogation of Al Mutairi).  As the

Court shall discuss in greater detail below, Al Mutairi's non-possession of his passport and

failure to account for how it was lost, is probative of what Al Mutairi may have been doing

during his travels in Afghanistan.

      Finally, the Court notes numerous other inconsistencies and conspicuously unexplained

events by Al Mutairi.  <u>First</u>, neither counsel for Al Mutairi nor the Government has been able to

identify a village called Namruz in Afghanistan (although it is the name of a province in

Afghanistan), and Al Mutairi himself was not forthcoming as to its supposed location. *See* Gov't

Ex. 13 (1/17/07 Interrogation of Al Mutairi) ("When asked how one could get [to Namruz], ISN

UNCLASSIFIED///FOR PUBLIC RELEASE

███

213 [Al Mutairi] replied that if you hailed a taxi and asked them to take you to Namr[uz], they

would simply drive you there."). Second, if Al Mutairi "had not planned to remain long in

Afghanistan, just long enough to give ███ the money he needed to get the project started,"

Gov't Ex. 10 at 4, then it makes no sense that he would take a two-day journey to Kabul one day

after arriving in the location where the mosque was to be built. Third, the notion that Al Mutairi

would have to personally make the two-day journey to Kabul to make a $1,000 donation to al

Wafa is implausible because Al Mutairi supposedly gave ███ $2,000 as charity for refugees,

and then gave another $2,000 to ███ friend (whose name he does not know) for other

refugees. Thus, Al Mutairi was quite willing to make charitable donations through third-parties

and not in person. Fourth, Al Mutairi has given inconsistent statements regarding when he gave

███ the $9,000 for the construction of the mosque. Although he stated that he gave the

$9,000 to ███ in Namruz in a January 7, 2007 interrogation, see Gov't's Ex. 13 at 3, ███

████████████████████████████████████████

███ When asked by an interrogator why he would wait until Kabul to give ███ the

money for the mosque to be built in Namruz, Al Mutairi could not answer the question. Pet'r's

Ex. 2 (3/12/03 Interrogation of Al Mutairi). Fifth, Al Mutairi's memory conspicuously fades

during the most relevant points of his story. Once reaching Kabul, Al Mutairi is unable to

identify the person in whose home he stayed for approximately one month, and he was unable to

identify its location with any degree of specificity. See Gov't's Ex. 10 at 5. His statements about

his location near Khowst are similarly vague, indicating only that he stayed at the home of a

friend of ███ friend, whose name he does not recall. Id. Based on these identified

inconsistences, implausibilities, and in some respects, impossibilities, the Court does not credit

███

UNCL         ASE



Al Mutairi's version of events that occurred while he was in Afghanistan.

Notwithstanding the Court's conclusions with respect to Al Mutairi's version of events, the Court's inquiry is far from complete. Because Al Mutairi has no burden to prove his innocence, the Court must now assess the Government's evidence to determine whether it has demonstrated by a preponderance of the evidence that during the time for which Al Mutairi cannot account, he trained with or became a part of al Wafa (according to the Government, an associated force of al Qaida), or al Qaida itself.

C. *The Government's Evidence*

The Government offers six areas of evidence in support of Al Mutairi's detention: (1) the timing and path of his travel; (2) the loss of his passport and his related inability to account for its loss; (3) his contacts with al Wafa; (4) ███████████████████ ██████████████ (5) ███████████████████████████████████ ██████ and (6) allegations of earlier experiences with extremist activity. The Court shall separately address each of these areas of evidence.

1. Al Mutairi's Travel Path and Timing



As stated above, Al Mutairi admitted that he traveled through Mashhad, Iran, as part of his journey to Afghanistan. *See* Gov't's Ex. 10 at 4.

16

UNCLASSIFIED//FOR PUBLIC RELEASE



The Government also introduced undisputed evidence that, as the Taliban regime fell,

Taliban and al Qaida fighters fled south en route to the Tora Bora mountains along the

Afghanistan-Pakistan border. *See* Gov't's Ex. 5 (8/29/08 Decl. of ████████ As stated above,

the evidence in the record indicates that Al Mutairi waited until after Kabul fell to Northern

Alliance forces on November 13, 2001, before fleeing South to a village near Khowst, along the

Afghanistan-Pakistan border. *See* Section I.B, *supra* (discussing the chronology of Al Mutairi's

travels).

While the path and timing of Al Mutairi's travels are not direct evidence that he became a

part of al Wafa or al Qaida, the Court agrees with the Government that this evidence is consistent

with someone who may have joined either of those two organizations. Accordingly, the Court

finds that this evidence is probative and shall consider it in the context of the Government's other

record evidence.

### 2. <u>Al Mutairi's Passport</u>

The Government introduced undisputed evidence that al Qaida followed a standard

operating procedure for those entering al Qaida and Taliban-associated guesthouses. *See* Gov't's

Ex. 56A at 3 (Decl. of ████████ According to these procedures, prior to attending a training

camp, trainees surrendered their passports, identification, money, or other travel documents. *Id.*

These items were often placed in a box and labeled with a number or kunya[8] for the trainees. *Id.*

These procedures allowed administrators to exert control over trainees and prevent them from

easily leaving. *Id.* As a consequence, "[m]any detainees were captured without passports or

---

[8] "Kunyas" are assumed names or pseudonyms that are part of traditional Arabic names, but are also used by insurgents, radicals, and terrorists to conceal their true identities. *See* Gov't's Ex. 8 at 2 (9/19/08 Decl. of ████████



UNCL ASE

UNCLASSIFIED//FOR PUBLIC RELEASE



other identification." Gov't's Ex. 5 at 3 (Dec. of ▮▮▮▮

As set forth above, Al Mutairi was apprehended without his passport, and he has offered

▮▮▮▮ different versions of how it was lost. While the loss of his passport is not direct evidence

that Al Mutairi became a part of al Wafa or al Qaida, the Court agrees with the Government that

Al Mutairi's non-possession of his passport and his inability to explain how it was lost are

consistent with someone who may have surrendered his passport in anticipation of attending

training at an al Qaida camp. Accordingly, the Court finds that this evidence is probative and

shall consider it in the context of the Government's other record evidence.

### 3.    Al Mutairi's Contacts with al Wafa

The parties introduced evidence that al Wafa operated simultaneously as both a charitable

organization and a front for al Qaida. *See* Gov't's Ex. 6 at 1 (8/29/08 Decl. of ▮▮▮▮

Stipulations of Fact ¶ 3 ("Al-Wafa engaged in some legitimate charitable activities"). The

Government also introduced undisputed evidence that the two individuals located at the al Wafa

Kabul office whom Al Mutairi acknowledged meeting or otherwise seeing had contacts with al

Qaida. *Id.* at 2. Nevertheless, the Government did not seriously advance the theory at the Merits

Hearing that Al Mutairi's $1,000 donation to al Wafa made Al Mutairi "part of" that

organization, nor did the Government introduce any evidence indicating that Al Mutairi believed

al Wafa was anything other than a charitable organization.[9] Instead, the Government argued that,

---

[9] The Government did make an unsupported assertion that all of Al Mutairi's money ended up at "al Wafa-controlled locations," but never defined what could be considered an "al Wafa-controlled location" and never presented actual evidence showing that any money beyond Al Mutairi's $1,000 donation was actually received by al Wafa. ▮▮▮▮

UNCL           ASE

████████████

with the assistance of his al Wafa contacts, Al Mutairi decided to enter an al Wafa training camp

located in ████████ outside of Kabul.

The Government's allegation is supported by one reference, in a portion of one sentence,

in one interrogation report of ███████████████████████████████ *See*

Gov't's Ex. 6 at 2 (describing ██████ background); ████████████████████████

██████████ stated that:

> he went to visit ██████ and ██████ who were attending the camp. [H]e further
> explained that this visit took place after September 11, 2001 and before the U.S.
> air strikes began.

██████████ There are three problems with the Government's reliance on this allegation.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

████████████

[10] During the Merits Hearing, the Government confirmed that ██████ by referencing
"airstrikes," was referring to October 7, 2001, the date the United States commenced its
operations Afghanistan. *See* Merits Hearing Transcript at 144 (Jul. 6, 2009).

19



██████████

████████████████████████████████████

████████████████████████████ This lack of contextual support is especially

problematic because the Government did not introduce *any* evidence corroborating Al Mutairi's

alleged attendance at this al Wafa camp.

The second problem with this allegation is based on the way it is written in the

interrogation report. It is entirely unclear whether ████ identified Al Mutairi by his ISN

number, and if so, equally unclear how he would know it. In some instances, an interrogation

report will include the actual name used by the detainee to identify another individual, and then

include a ████████████████████████ *See, e.g.*, Gov't's Ex. 51 at 2 (11/26/04

Interrogation of ████). While this procedure is certainly not required, it allows the Court to

consider how the individual was actually identified as part of its inquiry into the reliability of the

identification. For present purposes, the Court finds that there is insufficient information

included with ████ allegation to properly assess whether ████ accurately and intentionally

identified Al Mutairi as one of the two people he visited at this camp.

A third problem with this allegation is that some of ████ statements in the

interrogation reports proffered by the Government lack credibility. For example, in ████

November 1, 2005 interrogation, he states that he "did not know if ████ had another role

other than providing the money for the [alleged al Wafa] camp." Gov't's Ex. 41 at 1 (11/1/05

Interrogation of ████. In a November 26, 2004 interrogation, however, ████ explained how

████████████████████████████████████

████████████████████████████████ *See* Gov't's

Ex. 51 at 2 (11/26/04 Interrogation of ████. In another interrogation, ████ statements

████████████████



For all of these reasons, the Court finds that ████ identification of Al Mutairi at an alleged al Wafa training camp is neither reliable nor credible, and it shall not be considered probative of any issue related to whether or not Al Mutairi is lawfully detained.[12]

One final point about this allegation is warranted. At the Merits Hearing, the Court requested an interrogation report that was referenced in the evidence but was not produced by the Government until requested by the Court. ████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████. This information helps to explain why the Government referred to the alleged camp as "nascent" throughout the hearing, but also underscores how speculative Al Mutairi's role at this camp

---

[11] Al Mutairi submitted a declaration by ████ wherein he states, among other things, that he did not know Al Mutairi or the other petitioners in this case prior to his detention at Guantanamo Bay. *See* Pet'r Ex. 8 ¶¶ 5, 13 (2/22/09 Decl. of ████). The Court affords this statement no weight because, as demonstrated by the Government at the Merits Hearing, his statement is contradicted by the evidence in the record relating to at least one of the other petitioners.

[12] To be clear, the Court is not holding that ████ cannot be considered a reliable witness relating to other matters; indeed, some of the information he provided in his interrogation reports is sufficiently corroborated in the record to be considered reliable. Rather, the Court is finding in this case that ████ s allegation concerning Al Mutairi is not reliable or credible.

UNCLASSIFIED//FOR PUBLIC RELEASE



would have been, even had the Government produced evidence of his attendance (which the Court expressly concludes it has not produced).

     4.    <u>Lists of "Captured Fighters"</u>

    The Government introduced ██████ documents into evidence purporting to list the names and contact information for captured al Qaida fighters. *See* Gov't's Exs. 19, 20, 22, 32, 33, ██████ Two of the documents were published on the internet or in newspapers (and therefore were publicly available), and ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

    Although the appearance of Al Mutairi's name on these lists would appear to be highly probative, Al Mutairi submitted persuasive evidence concerning the origins of these lists that substantially reduces their probative value. Specifically, Al Mutairi's counsel argued at the Merits Hearing that these lists were originally assembled by a ██████ guard who collected the contact information of Al Mutairi and other individuals while they were incarcerated in a ██████ prison to alert their families of their whereabouts. This argument is supported by multiple independent sources (including Al Mutairi) whose statements are not rebutted by the Government.

    For example, Al Mutairi submitted the declaration of ██████████, who was a prisoner in Guantanamo Bay from 2001 to 2006. ██████ explained that he and Al Mutairi gave their contact information to a ██████ guard in 2001:

22



UNCLASSIFIED//FOR PUBLIC RELEASE



After my initial capture in late 2001, I was taken to a ▇▇▇▇▇ prison in ▇▇▇▇ I was detained there for about three weeks with . . . Al Mutairi. We did not know what was going to happen to us, and we wanted our families to know where we were. A ▇▇▇▇▇ officer came into our cells and told us that he would take our names and our families' phone numbers . . . and publish them so that our families could learn where we were . . . [Al Mutairi] [and] myself, and all of the other prisoners gave our names and families' contact information to the officer . . . . Later, I learned from people who were captured and joined us in prison that our contact information and photographs had been posted on the internet and appeared in the news in Kuwait as supposed lists of Al Qaeda fighters.

Pet'r's Ex. 6 ¶ 4 (Feb. 2009 Decl. of ▇▇▇. ▇▇▇▇▇▇▇▇, another Guantanamo

detainee, provided a similar explanation:

At one stage there was a kind guard who did speak Arabic. He told me that I was going to be turned over to the US for a bounty that would be paid to the ▇▇▇▇▇ He was the one who took my name . . . [and] telephone number for my relatives, and my photograph, and promised to put it on the internet so my family might find out what was happening to me.

Pet'r's Ex. 7 at 18 (12/2/08 Decl. of ▇▇▇▇▇.

The information supplied by ▇▇▇▇▇▇ is further corroborated by ▇▇▇

who described his receipt of a list of prisoners prior to his detention at Guantanamo Bay:

One of the other people staying at the flat received a list of names, addresses, and telephone numbers of people who were detained in a ▇▇▇▇ prison in ▇▇▇ . . . . I was the only Kuwaiti in the flat, and I recognized several of the names as being Kuwait names . . . . I decided to call their families and let them know what had happened to their family members.

Pet'r's Ex. 8 ¶¶ 4-5 (2/22/09 ▇▇ Decl.). Although the Court has questioned some of ▇▇'s

statements above, ▇▇▇'s description of the list he obtained is corroborated by ▇▇▇▇

the father of one of the petitioners in this case, who explained that he received a phone call from

▇▇▇ advising him of his son's location:

In late 2001, I received a call from a ▇▇▇ in Pakistan named ▇▇▇▇▇ as well as calls from several other people, who told me that [my son] had been

23

arrested by the ████████ authorities and was in prison in ████ but that his name and home phone number were on a list that was being circulated among the Arab community in ████ so that families of prisoners could be contacted.

Pet'r's Ex. 9 ¶ 7 (2/22/09 Decl. of ████████

Al Mutairi's testimony during an Administrative Review Board Proceeding in 2005 further corroborates this evidence. *See* Pet'r's Ex. 16 at 4 (5/10/05 Al Mutairi Testimony). Al Mutairi testified that during his detention he gave his information to "a Pakistani soldier [who] took . . . the names of the Detainees," and also "gave [his] number to one of the detainees to contact his family [so that] his family would contact the Kuwaiti authorities about his detainment." *Id.* This testimony is not only plausible given the statements by other individuals set forth above, but it is particularly credible given that Al Mutairi's name and family contact information was discovered on a list held by another detainee – just as Al Mutairi described. ████

For its part, the Government does not dispute Al Mutairi's evidence concerning the origins of these lists. Instead ████████████████████████, the Government argues that the origin of the lists is irrelevant because regardless of the initial purpose, the information was collected and maintained by individuals associated with al Qaida, thereby making the lists al Qaida records. During the Merits Hearing, the Government offered the following arguments encapsulating its position:

████████████████ is a leader of al-Qaeda. He's welcome and free to

24

UNCLASSIFIED//FOR PUBLIC RELEASE



receive information from any number of sources, but once he takes that
information and begins to use it [as] his own, he makes it an al-Qaeda record -- he
or his associates make it an al-Qaeda record of a different sort.

\* \* \*

Accurate or not, whatever was going on in the Pakistani prison at the time that
petitioner's counsel is able to offer declarations about, can't be shown to have any
impact on the purpose and the use

\* \* \*

Petitioners aren't controlling what happens with this information. They might
have given it to someone with some hope in mind, but we're not relying on the
fact that Mr. Al Mutairi gave his phone number to somebody to prove that al-
Qaeda kept a record of him as a fighter.

The Court does not find the Government's arguments persuasive in the context of the

evidence in this case because Al Mutairi's name and contact information do not change

Instead, the same publicly available

information that originated from Al Mutairi himself

Two inferences are therefore possible.  On the one hand, the appearance of Al Mutairi's

information on these lists may be taken to mean that an individual affiliated with al Qaida is

purposefully tracking him because Al Mutairi has connections to al Qaida.  On the other hand,

the appearance of Al Mutairi's name could be the result of an individual affiliated with al Qaida

having              Al Mutairi's information along with other names from publicly available

sources, not knowing whether Al Mutairi had any al Qaida connections.  On this record –

UNCL                    ASE



particularly where, as here, there is a lack of evidence supporting any connection between Al

Mutairi and al Qaida – there is simply no way for the Court to decide which is more likely to be

the case.[13]   Accordingly, the Court does not view these lists as probative of whether Al Mutairi is

lawfully detained.

     5.   <u>Passport Lists</u>



---

    [13] To be clear, the Court is not holding that these lists are not probative in all cases.  If a
detainee's name or other information appears on a private but not publicly-available list, or even
if there were sufficient information in the record to support links to al Qaida, these lists might
carry persuasive value.



UNCLASSIFIED//FOR PUBLIC RELEASE



The Government's evidence suffers from three deficiencies that significantly reduce its probative value. The first deficiency is that ███████████ lists do not indicate when they were written, so there is no way to corroborate the Government's speculation that Al Mutairi surrendered his passport ██████████████ Al Mutairi had already been taken into custody by Pakistani authorities, and it therefore directly undermines the Government's theory that Al Mutairi surrendered his passport to individuals associated with al Qaida ████████████ Although the names appear similar, Al Mutairi's counsel explained that ██████ means "brother" or

---

[15] During the Merits Hearing, the Government speculated that "written" might mean "updated" or "saved last." The Government submitted no evidence to this effect, and Court has no basis to credit this argument.

UNCL                    ASE

UNCLASSIFIED//FOR PUBLIC RELEASE



"crusader," an argument that the Government did not dispute.  Neither party provided any

evidence as to the meaning of ▮▮▮▮ and neither party was able to provide the Court with any

other evidence on this issue.  On this record, the Court cannot determine one way or the other

whether the names are sufficiently similar to support the Government's argument that Al Mutairi

likely surrendered the passport himself, or whether they are different names such that someone

other than Al Mutairi could have surrendered the passport to individuals associated with al

Qaida.[16]

The third deficiency is the lack of corroborating evidence supporting these passport lists.

In addition to the fact that none of the lists contain any reference to the alleged camp attended by

Al Mutairi in ▮▮▮▮▮ the Government did not provide evidence that any of the other

individuals named on the lists attended that training camp.  The lack of corroborating

information further undermines the Government's theory that Al Mutairi surrendered his passport

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Based on the foregoing, the Court finds that these passport lists provide little probative

value in connection with the Court's inquiry into whether Al Mutairi is lawfully detained.

6.      Other Allegations

During the Merits Hearing, the Government raised two other allegations against Al

Mutairi, both of which the Court concludes are not credible.

First, the Government argues that Al Mutairi fought with Osama bin Laden in

---

[16] During the Merits Hearing, Al Mutairi's counsel advanced the theory that the person who allegedly stole Al Mutairi's passport in Kabul likely gave it to other individuals who may have been associated with al Qaida.  This argument is based solely on speculation and is not credited by the Court.

UNCL           ASE

Afghanistan in 1991 based on the following passage from his ▮▮▮▮▮▮▮ interrogation

report:



The assertion that Al Mutairi was fighting with Osama bin Laden in Afghanistan in 1991

is not credible.  First, there is no evidence in the record corroborating Al Mutairi's statement

about fighting in Afghanistan in 1991.  Second, the Court takes judicial notice that Iraq invaded

Kuwait in 1990 and the Persian Gulf War continued into 1991, when Al Mutairi would have

been 16 years old.  Al Mutairi's brother became a prisoner of war, and his father was an officer in

the Kuwaiti Ministry of the Interior.  *See* Pet'r's Ex. 4 ¶¶ 1-2.  The Court does not view the

Government's argument as plausible that Al Mutairi would leave Kuwait (and his family) while

the country was under siege to travel to Afghanistan at 16 years old to fight against (presumably)

forces associated with the Soviet Union.[17]  Third, the passage on which the Government relies

---

[17] Al Mutairi's counsel argued at the Merits Hearing that Al Mutairi would have been a
sophomore in High School in 1991, but relies on an interrogation report containing dates given
by Al Mutairi that are ambiguous on this point.  *See* Gov't's Ex. 10 at 1-2.  Al Mutairi's brother
also submitted a declaration explaining that Al Mutairi was in high school in 1991, but the Court
declines to credit his statement because it fails to clarify the ambiguity that was created by Al
Mutairi's own statements in the interrogation report.  *See* Pet'r's Ex. 4 ¶ 2 (2/22/09 Decl. of T. al

████████████████

clearly indicates that Al Mutairi was agitated and that he appears to have been goaded into

making these statements by the linguist in the interrogation room. The evidence in the record

suggests that it was not uncommon for Al Mutairi to react in this way while agitated, as he

subsequently claimed during another interrogation that he *was* Osama bin Laden:

> ISN 213 was uncooperative. He stated that he wished to be called Osama bin
> Laden . . . ISN 213 stated he was an enemy of America because Americans had
> told him so. Americans had cursed his parents. Prior to the war, he'd had no
> problem with Americans. But due to the situation at Guantanamo Bay, Cuba, and
> his detention, America had made him their enemy . . . He stated that with all this
> legal process being so useless, he might as well be Osama bin Ladin, since he was
> never going to be freed from US custody.

Gov't's Ex. 13 at 1. The Government does not rely on Al Mutairi's "admission" that he is

actually Osama bin Laden to support his detention, and the Court finds that its reliance on his

alleged fighting in Afghanistan in 1991 is similarly implausible and unsupported by the record.

The second allegation made by the Government against Al Mutairi is that he attended a

meeting in Pakistan of Lashkar-e-Tayyiba ("LeT"), a designated terrorist organization with ties to

al Qaida. *See* Gov't's Ex. 30 at 1 (4/8/08 Department of State Foreign Terrorist Organization

List); Gov't's Ex. 5 at 2 (8/29/08 Decl. of ████████ The Government's sole support for this

allegation is one interrogation report associated with someone named ████████████

> ████ stated another detainee, whom he knows as ████████ ISN 213, is a
> Kuwaiti with ties to LeT. LeT holds an annual meeting in Punjab, Pakistan,
> which ████ attended. ████████ also had a point of contact at the LeT
> headquarters in Lahore, Pakistan. (Note: ████████ is identified as Khalid
> Abdullah Mijsh'ad Thamir Al-Mutayri, ISN [213].).

Gov't's Ex. 11 at 1-2 (6/24/03 Interrogation of ████████ The Government's reliance on this

allegation is flawed for several reasons.

---

Mutairi).

████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE



The most significant problem with this allegation is that the Government produced no information about █████ or this allegation beyond the submission of this one interrogation report. Thus, there is no evidence in the record explaining how ████ knew Al Mutairi's identity. Also left unexplained is a description of when this meeting occurred, or when Al Mutairi would have even traveled to Pakistan. Further, the Government did not declassify █████ name so that Al Mutairi's counsel could ascertain whether Al Mutairi knew ████ or otherwise had any information about him. This dearth of corroborating evidence supporting █████ allegation is problematic because the Court must "have an opportunity to assess the reliability of the record evidence" which is "not simply a theoretical exercise." *Parhat*, 532 F.3d at 848.

A second problem concerns the allegation itself. In his statement, █████ identifies someone named █████ ' a name that is then attributed to Al Mutairi. The Government identified *no* other evidence in the record where Al Mutairi was known by the name █████ nor is there any explication as to how the Government decided █████ was Al Mutairi. Although the Government identified various portions of the interrogation report during the Merits Hearing that, according to the Government, demonstrate its reliability, the interrogator did *not* confirm Al Mutairi's identity with ████ – such as showing him a photograph of Al Mutairi. Based on the wholesale lack of corroborating evidence in the record and the single obscure reference to Al Mutairi as █████ the Court does not view █████ allegation as reliable or credible.

### D. Evidence Summary

In summary, the Court has credited the Government's evidence that (1) Al Mutairi's path

UNCL ASE

UNCLASSIFIED//FOR PUBLIC RELEASE



of travel into Afghanistan was consistent with the route used by al Wafa to smuggle individuals into Afghanistan to engage in jihad; (2) that Al Mutairi's travel from Kabul to a village near Khowst was consistent (in time and place) with the route of Taliban and al Qaida fighters fleeing toward the Tora Bora mountains along the Afghanistan-Pakistan border, and (3) Al Mutairi's non-possession of his passport is consistent with an individual who has undergone al Qaida's standard operating procedures that require trainees to surrender their passports prior to beginning their training. The Court has also found minimally probative on this record the appearance of Al Mutairi's name and reference to his passport

Taking this evidence as a whole, the Government has at best shown that some of Al Mutairi's conduct is consistent with persons who may have become a part of al Wafa or al Qaida, but there is nothing in the record beyond speculation that Al Mutairi did, in fact, train or otherwise become a part of one or more of those organizations, where he would have done so, and with which organization. While Al Mutairi's described peregrinations within Afghanistan lack credibility, the Government has not filled in these blanks nor supplanted Al Mutairi's version of his travels and activities with sufficiently credible and reliable evidence to meet its burden by a preponderance of the evidence. Accordingly, the Court shall grant Al Mutairi's petition for habeas corpus.[18]

---

[18] Because the Court has found insufficient evidence in the record supporting the Government's theory that Al Mutairi became a part of al Wafa, the Court does not reach Al Mutairi's alternative argument that al Wafa is not an organization that, by definition, could constitute an "associated force" pursuant to the standard of detention adopted by the Court.

32



UNCLASSIFIED//FOR PUBLIC RELEASE

2



## III. CONCLUSION

Because the Government has not met its burden by a preponderance of the evidence, the Court shall GRANT Al Mutairi's petition for habeas corpus. The Court shall issue an Order requiring the Government to take all necessary and appropriate steps to facilitate Al Mutairi's release forthwith.

Date: July 29, 2009

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge

2



33