UNCLASSIFIED//FOR PUBLIC RELEASE.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO
DATE:

|  |  |
|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, *et al.* | ) ) ) ) |
| Petitioners, | ) ) |
| v. | )          Civil. Action No. 02-828 (CKK) |
| UNITED STATES, *et al.*, | ) ) |
| Respondents. | ) ) ) ) |

### CLASSIFIED MEMORANDUM OPINION
(August 24, 2009)

Petitioner Fawzi Khalid Abdullah Fahad Al Odah ("Al Odah") has been detained by the

United States Government at the Guantanamo Bay Naval Base in Cuba since 2002.  He admits

that he traveled to Afghanistan in August 2001 and requested to meet with a Taliban official

upon his arrival; that this same Taliban official brought him to a Taliban-operated camp near

Kandahar, Afghanistan; that he took one day of training with an AK-47 rifle at this camp; that the

Taliban official sent him to stay with an associate in Logar, Afghanistan, after September 11,

2001; that he surrendered his passport and other possessions to this individual; that he met with

individuals who were armed and appeared to be fighters; that he accepted an AK-47 from these

individuals; and that he traveled with his AK-47 into the Tora Bora mountains, remained in the

Tora Bora mountains during the Battle of Tora Bora, and was captured shortly thereafter by

border guards while still carrying his AK-47.  Based on these admissions and other evidence in

the record, most of which is undisputed, the Government asserts that it has the authority to detain

Al Odah pursuant to the Authorization for the Use of Military Force, Pub. L. No. 107-40, § 2(a),

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

115 Stat. 224, 224 (2001) ("AUMF"), which authorizes the use of force against certain terrorist

nations, organizations, and persons. Al Odah believes he is unlawfully detained and has filed a

petition for a writ of habeas corpus.

This civil proceeding requires the Court to determine whether or not Al Odah's detention

is lawful. In connection with this inquiry, the Court has considered the factual evidence in the

record, the extensive legal briefing submitted by the parties, and the arguments presented during

a three-day Merits Hearing held on August 11-13, 2009.[1] The parties did not present any live

testimony at the Merits Hearing, but Al Odah did listen telephonically to the unclassified opening

statements by his counsel and the Government's counsel. Based on the foregoing, the Court

finds that the Government has met its burden to show by a preponderance of the evidence that Al

Odah became part of Taliban and al Qaeda forces. Accordingly, the Court shall DENY Al

Odah's petition for habeas corpus.

## I. BACKGROUND

### A.    *Procedural History*

Al Odah filed his petition for habeas corpus on May 1, 2002, making this case the oldest

of the pending Guantanamo Bay habeas cases. After several years of litigation, this case was

---

[1] The Court notes several developments pertaining to the factual record since the completion of the Merits Hearing in this case. First, the Government withdrew Exhibit 157D and submitted in its place a version that redacted a small amount of information that is not relevant to this case. *See* Gov't's Notice at 1 (Aug. 17, 2009). Second, the Court denied a motion filed by Al Odah to supplement the record with an opinion issued in *Al Adahi v. Obama*, because decisions by other judges of this Court are not evidence and the proper method for notifying the Court of new legal authority is through a Notice. *See* Min. Order dated Aug. 20, 2009. Third, the Court granted an unopposed motion by the Government to supplement the record with evidence associated with Al Odah's passport, which the Government submitted in response to a question the Court had asked during the Merits Hearing. *See* Min. Order dated Aug. 21, 2009.

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

stayed pending resolution of whether the Court had jurisdiction to hear Al Odah's petition. On

June 12, 2008, the United States Supreme Court issued its decision in *Boumediene v. Bush*,

clarifying that this Court had jurisdiction to consider the petition and advising this and the other

judges in this District that "[t]he detainees are entitled to [] prompt habeas corpus hearing[s]."

553 U.S. ___, 128 S. Ct. 2229, 2275 (2008).

Following the *Boumediene* decision, this and most of the other judges in this District

agreed to consolidate their Guantanamo Bay habeas cases before former Chief Judge Thomas F.

Hogan for issuance of an initial case management order that would expeditiously move these

cases toward resolution. Judge Hogan issued a Case Management Order on November 6, 2008,

which he amended on December 16, 2008, and which the Court adopted in this case on

December 22, 2008. The Court has relied on the Amended Case Management Order as the

backdrop for its subsequent Scheduling Orders in this case.[2]

The Government filed an Amended Factual Return on September 8, 2008, and pursuant

to the schedule set by the Court, Al Odah filed a Traverse on March 30, 2009. The parties

engaged in extensive discovery and motions practice in the interim. Al Odah filed a Motion for

Additional Discovery on January 26, 2009, which the Court granted-in-part and denied-in-part on

February 12, 2009, after a hearing on February 11, 2009. Al Odah filed a Motion to Produce a

Declassified Factual Return on January 9, 2009, which the Government produced on February 6,

2009. The Court also required the Government to provide Al Odah with certain discovery from

the Guantanamo Bay Joint Task Force database. Additionally, the parties filed six pre-hearing

---

[2] The Court extends its gratitude to Judge Hogan for his considerable investment of time and energy to produce the Case Management Order.

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

motions, most of which sought rulings concerning the admissibility of particular evidence. By Order dated June 16, 2009, the Court granted the parties' motions to rely on hearsay evidence at Al Odah's Merits Hearing, but held their other evidentiary motions in abeyance.[3]

To narrow the disputed issues presented at the Merits Hearing and to focus the parties on the specific documents underpinning their respective arguments, the Court ordered the Government to file a Statement of Facts on which they intended to rely at the Merits Hearing (which narrowed the allegations presented in the Amended Factual Return), and instructed both parties to submit Witness and Exhibit Lists. The Court advised the parties that it would likely exclude from consideration any evidence at the Merits Hearing that had not been identified in the Witness and Exhibits Lists by August 3, 2009 (approximately one week prior to the scheduled Merits Hearing).[4] The parties timely submitted these materials and the Court held a three-day Merits Hearing on August 11-13, 2009.

B.    *Evidentiary Approach*

As stated above, the Court granted the parties' motions to rely on hearsay evidence in this proceeding. The plurality in *Hamdi v. Rumsfeld* specifically acknowledged that "[h]earsay . . . may need to be accepted as the most reliable available evidence from the Government." 542 U.S. 507, 534 (2004). The Court finds that allowing the use of hearsay by both parties balances the need to prevent the substantial diversion of military and intelligence resources during a time

---

[3] Al Odah also filed a Motion for Sanctions against the Government for failing to timely disclose exculpatory evidence. The Court does not find that sanctions are warranted on the present record.

[4] The Court noted two exceptions for (1) documents offered for rebuttal purposes, and (2) exculpatory documents, as to which the Government has a continuing obligation to disclose.

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

of hostilities, while at the same time providing Al Odah with a meaningful opportunity to contest the basis of his detention. The Court is fully capable of considering whether a piece of evidence (whether hearsay or not) is reliable, and it shall make such determinations in the context of the evidence and arguments presented during the Merits Hearing – including any arguments the parties have made concerning the unreliability of hearsay evidence. *Cf. Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008) (explaining, in the context of the Detainee Treatment Act, that the Court was "*not* suggest[ing] that hearsay evidence is never reliable – only that it must be presented in the form, or with sufficient additional information, that permits [the finder of fact] to assess its reliability") (emphasis in original).

For similar reasons, the Court shall deny the Government's motion to have its evidence admitted with a presumption of accuracy and authenticity. Relying in part on the Supreme Court's statement in *Hamdi v. Rumsfeld* that "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided," 542 U.S. at 534, the Government argues that a presumption as to its evidence is both appropriate and necessary. The Court disagrees. One of the central functions of the Court in this case is "to evaluate the raw evidence" proffered by the Government and to determine whether it is "sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of clarity." *Parhat*, 532 F.3d at 847. Simply assuming the Government's evidence is accurate and authentic does not aid that inquiry. *Cf. Ahmed v. Obama*, 613 F. Supp. 2d 51, 55 (D.D.C. 2009) (rejecting a presumption of accuracy for the Government's evidence and holding that "the accuracy of much of the factual material contained in [the Government's] exhibits is hotly contested for a

5

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

host of different reasons . . .").

The Court also finds that there are significant reasons why the Government's proffered evidence may not be accurate or authentic. Some of the evidence advanced by the Government has been "buried under the rubble of war," *Hamdi*, 542 U.S. at 532, in circumstances that have not allowed the Government to ascertain its chain of custody, nor in many instances even to produce information about the origins of the evidence. Other evidence is based on so-called "unfinished" intelligence, information that has not been subject to each of the five steps in the intelligence cycle (planning, collection, processing, analysis and production, and dissemination). Based on the Government's own declarations, its raw intelligence may not have been fully analyzed for its "reliability, validity, and relevance" in the context of other intelligence where "judgments about its collective meaning" are made. Ex. 1 at 5 (9/19/08 Decl. of ▮▮▮▮▮▮▮▮ Ex. 1-A at 1-2 (5/29/09 Decl. of ▮▮▮▮▮▮▮▮▮ (explaining that the five steps in the intelligence cycle are not "mechanical" and that the process "var[ies] by collection specialty," but not disturbing the conclusion that "unfinished" intelligence has not undergone the same rigorous integration and evaluation process that produces "finished" intelligence).[5] Still other evidence is based on multiple layers of hearsay (which inherently raises questions about reliability), or is based on reports of interrogations (often conducted through a translator) where translation or transcription mistakes may occur. In this case, for example, the Government argues that interrogators and/or interpreters included incorrect dates in *three* separate reports that were submitted into evidence based on misunderstandings between the Gregorian and the Hijri

---

[5] All citations to exhibits (cited as "Ex.") refer to the parties' joint exhibits submitted at the Merits Hearing.

UNCLASSIFIED//FOR PUBLIC RELEASE.

calendars. *See* Ex. 24 at 1██████████████████████ (███████████

████████████████████████████████████████████████,

████████████████████████████████████████████████

████████████████████████████████████████████████

(Unclassified Summary of Admin. Review Board for █████████) (same).  The Government never

attempted to show during the Merits Hearing that these reports were ever corrected.

Accordingly, the Court shall not accord a presumption of accuracy or authenticity to the

Government's evidence, but shall consider the accuracy or authenticity of the evidence in the

context of the entire record and the arguments raised by the parties.

Finally, the Court shall use the same approach to consider Al Odah's pre-hearing

evidentiary motions that sought to exclude particular pieces of evidence prior to the Merits

Hearing based on their alleged lack of authenticity, reliability, or relevance.  Rather than exclude

evidence from consideration *ex ante* by examining it in a vacuum, the Court concludes that the

better approach is to make such determinations after considering all of the evidence in the record

and hearing the parties' arguments related thereto.  The Court believes this approach is

particularly useful where, as here, a document viewed in isolation may appear to be irrelevant,

but when considered in the context of the other evidence in the record its importance may

become clear.  Accordingly, the Court's consideration of the evidence proffered by the parties

shall encompass inquiries into authenticity, reliability, and relevance.  *Cf. Parhat*, 532 F.3d at

847 (describing the Court's inquiry into whether evidence is "'sufficiently reliable and

sufficiently probative to demonstrate the truth of the asserted proposition with the requisite

degree of certainty'") (quoting *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*,

UNCLASSIFIED//FOR PUBLIC RELEASE.

508 U.S. 602, 622 (1993)).

### C.    Standard of Detention

As Judge Reggie B. Walton accurately observed in a thoughtful opinion considering the Government's detention authority, "the state of the law regarding the scope of the President's authority to detain petitioners remains unsettled," *Gherebi v. Obama*, 609 F. Supp. 2d 43, 45 (D.D.C. 2009), even though habeas petitions by individuals such as Al Odah have been pending for over seven years. Guidance in this area is limited because the Supreme Court acknowledged but did not clarify the uncertain "permissible bounds" of the Government's detention authority, *see Hamdi*, 542 U.S. at 552 n.1, and the D.C. Circuit has not had occasion to address the issue. Fortunately, several judges in this District have considered the scope of the Government's detention authority and have issued well-reasoned opinions on the subject. *See, e.g.*, *Gherebi*, 609 F. Supp. 2d at 43; *Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009); *Mattan v. Obama*, 618 F. Supp. 2d 24 (D.D.C. 2009).

Taking advantage of these prior decisions, the Court shall adopt the reasoning set forth in Judge John D. Bates's decision in *Hamlily v. Obama*, and shall partially adopt the Government's proposed definition of its detention authority.[6]  The Court agrees that the President has the

---

[6] The Government's proposed definition for its detention authority is found in the Memorandum that it submitted in this case on March 13, 2009. According to the Government,

> [t]he President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

8

UNCLASSIFIED//FOR PUBLIC RELEASE.

authority to detain individuals who are "part of" the Taliban, al Qaeda, or associated enemy forces, but rejects the Government's definition insofar as it asserts the authority to detain individuals who only "substantially supported" enemy forces or who have "directly supported hostilities" in aid of enemy forces. While evidence of such support is undoubtedly probative of whether an individual is part of an enemy force, it may not by itself provide the grounds for detention. Accordingly, the Court shall consider whether Al Odah is lawfully detained in the context of the following standard:

> The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act in aid of such enemy armed forces.[7]

In the context of this definition, the "key inquiry" for determining whether an individual has become "part of" one or more of these organizations is "whether the individual functions or participates within or under the command structure of the organization – *i.e.*, whether he receives and executes orders or directions." *Hamlily*, 616 F. Supp. 2d at 75.

D.    *Burden of Persuasion*

Pursuant to the Amended Case Management Order that the Court adopted in this case on December 22, 2008, the Government bears the burden of proving by a preponderance of the

---

[7] Al Odah submitted a response to the Government's proposed detention standard seeking to have the Court limit the types of organizations that may be considered an "associated force" or "enemy armed force." *See* Pet'r's Resp. at 2-11. The Court declines to engage in a hypothetical inquiry concerning the types of organizations that may or may not fall within this definition, but shall instead examine the facts of each case and shall further define these terms in context if appropriate and necessary.

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

evidence that Al Odah is lawfully detained. *See In re Guantanamo Bay Detainee Litig.*, Misc.
No. 08-442, CMO § II.A (Nov. 6, 2008) ("[t]he government bears the burden of proving by a
preponderance of the evidence that the petitioner's detention is lawful") (citing *Boumediene*, 128
S. Ct. at 2271) ("[T]he extent of the showing required of the government in these cases is a
matter to be determined."). Accordingly, Al Odah need not prove his innocence nor testify on his
own behalf. The Court has drawn no inference based on Al Odah's decision not to testify or
submit a declaration in this case. *Accord Awad v. Obama*, Civ. A. No. 05-2379, Classified Slip
Op. at 7 (D.D.C. Aug. 12, 2009). The Government must come forward with evidence
demonstrating by a preponderance of the evidence that he is lawfully detained, and if the
Government fails to meet this burden, the Court must grant Al Odah's petition for habeas corpus.

## II. DISCUSSION

The Government's theory of detention is that Al Odah more likely than not became part
of Taliban and al Qaeda forces in Afghanistan. The Court shall evaluate the record evidence
associated with this theory in three steps. First, the Court shall discuss the circumstances
surrounding Al Odah's trip from Kuwait to Afghanistan in August 2001. Second, the Court shall
discuss Al Odah's subsequent travels and activities within Afghanistan until the time of his
capture with an AK-47 while near the Tora Bora mountains in December 2001. Although the
Court finds that the evidence in the first two categories is by itself sufficient for the Government
to meet its burden in this case, the Court shall also discuss a third category of evidence
establishing that the Taliban-run camp that Al Odah admits to visiting in Kandahar, Afghanistan,
is more likely than not Al Farouq, al Qaeda's primary Afghan basic training facility.

10

UNCLASSIFIED//FOR PUBLIC RELEASE.

### A.    Al Odah's Travel to Afghanistan

The evidence related to events prior to 2001 is undisputed. Al Odah was born in Kuwait City, Kuwait, in 1977. Ex. 40 (Al Odah Civil ID Card). He received a degree in Islamic studies from Kuwait University in 1998. Ex. 13 at 1 (6/9/03 Interrogation of Al Odah); Ex. 101 ¶¶ 1-3 (2/22/09 Decl. of ███████████████)  Following graduation, Al Odah worked for ███

████████████████████████████████████████████████████████

███████████  Ex. 9 at 1-2 ████████████████████  Al Odah then██

████████████████████████████████████████████████████████

███████████████  *Id.* at 2. Prior to 2001, Al Odah frequently traveled to neighboring Saudi Arabia to visit holy places or vacation with his family, ████████████████████

████████ and traveled to Pakistan in April and May 2000 to teach along the border of Afghanistan and Pakistan. Ex. 9 at 1; Ex. 10 at 1 (Al Odah Travel Activity); Ex. 99 ¶¶ 3, 6 (2/22/09 Decl. of Khalid al Odah).

In August 2001, Al Odah decided to travel to Afghanistan. According to Al Odah, he decided to make this trip because his grandmother had given him money to do so, and because he believed the Afghan people "would be very receptive to his teachings." Ex. 13 at 1 (6/9/03 Interrogation of Al Odah). He took three weeks of leave from work, Ex. 14 at 1 (6/21/03 Interrogation of Al Odah), and he planned to teach poor or needy people for two weeks. Ex. 16 at 7 (Al Odah's Unclassified CSRT Testimony) ("During my official summer break, I left for Afghanistan for two weeks").[8]

---

[8] The Court located one instance in the record where ██████████████████████
████████████████████████████  Ex. 9 at 3. This statement conflicts with his other statements, including his sworn testimony at an administrative review board proceeding, about

11

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.



Al Odah began his journey to Afghanistan on ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Ex. 9 at 3; Ex. 106, Attach. B at 1 (Al Odah Travel Arrival and

Departure Information).  Al Odah's trip to Dubai raises immediate questions about the reasons

for his travel to Afghanistan. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ Ex. 9 at 3. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ *Id.*  When asked how long he remained in Dubai,

Al Odah initially said that he remained there for one week, Ex. 33 (Dec. 2001 Interrogation of Al

Odah)▮▮▮▮▮▮▮▮▮▮▮ Ex. 9 at 3.  These

statements are demonstrably false.  Al Odah's undisputed travel records submitted into evidence

establish that Al Odah arrived in Dubai on August 13, 2001, bought a one-way ticket to Karachi,

Pakistan, and left on a flight to Karachi on August 14, 2001.  Ex. 106, Attach. B at 1 (leaving

Kuwait on August 13, 2001), Ex. 9 at 3▮▮▮▮▮▮▮▮ Ex. 10 at 1

(arriving in Karachi on August 14, 2001).  Accordingly, Al Odah only stayed in Dubai overnight

despite his statements that he remained there for at least ▮▮▮▮▮ and as much as a week▮

▮▮▮▮▮▮.[9]

    During the Merits Hearing, Al Odah's counsel did not directly address Al Odah's

statements about Dubai, but emphasized that a stop in Dubai could be understood as one part of a

_____

intending to teach for two weeks and taking leave from work for three weeks.  During the Merits
Hearing, Al Odah's counsel did not dispute that Al Odah intended to travel to Afghanistan for
only two or three weeks.

    [9] Because Al Odah's trip to Dubai would only have been the second foreign trip he would
have taken by himself, it is unlikely that Al Odah would have simply forgotten how long he
remained there.

12

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

direct route to Afghanistan from Kuwait. 8/14/01 Merits Hearing Tr. at 4 ("I [am] simply making the point that if you look at a map . . . the route from Kuwait, Dubai, Karachi, Quetta is a pretty direct route"). Nowhere in the record, however, did Al Odah ever explain that he bought a one-way ticket to Dubai because he believed it was the most direct route to Afghanistan, as his counsel conceded. *Id.* ("I'm not basing [this explanation] on something he said"). Accordingly, Al Odah has not offered any credible explanation based on the evidence in the record that would explain his trip to Dubai en route to Afghanistan.



Ex. 9 at 3.

*Id.* at 4. Al Odah visited a mosque in Spin Buldak where he asked to meet someone affiliated with the Taliban "to assist him in traveling to places to teach in Afghanistan." Ex. 14 at 1.

Ex. 9 at 4; Ex. 16 at 2.

Ex. 9 at 4.

*Id.*

Ex. 9 at 4.

Al Odah's decision to accompany ██████ to Kandahar on September 10, 2001, directly contradicts Al Odah's statements that he intended to teach in Afghanistan for two weeks. By the

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

time he traveled to Kandahar, Al Odah would have already taught in Spin Buldak for two weeks, and when combined with his journey to get to Spin Buldak, he would have already exceeded the three weeks of leave he requested from his employer. When considered in the context of Al Odah's inability to describe any details associated with his teaching activities in Spin Buldak, the Court concludes that Al Odah's statements concerning the circumstances of his activities upon arriving in Afghanistan lack credibility.

Seeking to fill the void created by Al Odah's lack of credible statements, the Government submitted evidence that Al Odah traveled to Afghanistan seeking to join the Taliban in its fight against the Northern Alliance. In addition to relying on Al Odah's admissions that he immediately requested to meet with a Taliban official once crossing the border, as well as Al Odah's subsequent transportation through the country at the direction of this Taliban official, the Government submitted evidence that the route traveled by Al Odah -- Dubai, Karachi, Quetta, Spin Buldak, and Kandahar -- was a route followed by some individuals who were seeking to enter Afghanistan for purposes of jihad.

The Government submitted the interrogation report of Mukhtar al Warafi, a Yemini who admitted that he traveled to Afghanistan in August 2001 to train and fight with the Taliban. Ex. 61 at 1-2 (5/20/02 Interrogation of Mukhtar al Warafi). Al Warafi explained that he heard two Fatwas read at the Jamal Al Din Mosque in August 2001 about traveling to Afghanistan and helping the Taliban fight against the Northern Alliance. *Id.* at 2. One of the Fatwas identified the route for individuals to follow to arrive at Quetta, Pakistan, where they would be taken to a large "Taliban center." *Id.* In response to these Fatwas, al Warafi traveled to Afghanistan in August 2001, stopping first in Dubai, then Karachi, Quetta, Spin Buldak, and finally Kandahar --

14

UNCLASSIFIED//FOR PUBLIC RELEASE.

the same route traveled by Al Odah in the same time period. *Id.* The Government submitted multiple other examples of individuals who used this route to travel to Afghanistan for the purpose of jihad. *See, e.g.,* Ex. 68 at 1▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮ Ex. 80 at 1▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮4▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.[10] Although far from conclusive, the Government's evidence suggests that an individual using this travel route to reach Kandahar may have done so because it was a route used by some individuals seeking to enter Afghanistan for purposes of jihad.[11]

The foregoing discussion supports three conclusions. First, Al Odah has admitted that he sought to contact a Taliban official upon reaching Afghanistan and that he subsequently moved around the country at the direction of this official. Second, Al Odah's statements concerning his travel route to Afghanistan and his activities after arriving in Afghanistan are not credible. Third, there is evidence to suggest that some individuals who traveled to Afghanistan using the same route as Al Odah did so because they were entering Afghanistan to engage in jihad. The Court finds that this record supports a reasonable inference that Al Odah may have also been traveling to Afghanistan to engage in jihad, and not to teach the poor and needy for two weeks. While this

---

[10] One of the individuals identified by the Government as using the same path of travel as Al Odah was Mohammed al Adahi, an individual whose petition of habeas corpus was recently granted. *See Adahi v. Obama,* Civ. A. No. 05-280, Classified Slip. Op. (Aug. 17, 2009). In her Opinion, Judge Gladys Kessler identified the same travel pattern▮▮▮▮▮▮▮ which was facilitated in that case by an individual affiliated with al Qaeda, but she reached no specific conclusions about the travel pattern. *Id.* at 16-17.

[11] Al Odah's counsel argued at the Merits Hearing that this evidence constitutes "guilt by association." The Court disagrees. Evidence of why other individuals traveled along the same route as Al Odah is appropriately considered in the context of Al Odah's admissions and his failure to offer a credible explanation for his travel route. The evidence is not aimed at determining guilt or innocence – rather, it is probative of why Al Odah may have used this route in the absence of any other credible explanation supported by record evidence.

15

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

inference standing alone is insufficient to find that Al Odah did, in fact, become "part of" the forces of the Taliban or al Qaeda, the Court finds that this evidence is probative and shall be considered in the context of the other record evidence.

B.    *Al Odah's Travel and Activities in Afghanistan*



███████[12] Ex. 13 at 1; Ex. 9 at 4. Al Odah admitted that this camp was supervised by the Taliban and that he took one day of training on an AK-47 rifle, Ex. 16 at 2, but denied that it was a "training camp" and in later statements characterized it as a camp for children:

Ex. 9 at 4.

> June 9, 2003 interrogation: At this camp where [Al Odah] spent one day, he taught the Koran and also shot AK-47 rifles with the children in the camp . . . [Al Odah] stated that is [sic] was common to shoot rifles during this type of training. [Al Odah] described the camp as being similar to a boy scout camp. The camp was run by a Sheik, whose name [Al Odah] could not remember.

Ex. 13 at 1.

> September 11, 2004 testimony before Administrative Review Board: [I]t was not a training camp. It was just a place for learning for people age twelve to fourteen years old. It was being looked after or supervised by the Taliban . . . The only thing that was taught there was shooting or aiming at targets. That was the training that they had. In Afghanistan, shooting a Kalashnikov is just like throwing stones. It is very common. When I went through the training with the Kalashnikov, it was just out of my wanting to learn how to shoot a Kalashnikov.

---

[12] ████████████████████████████████████ Ex. 9 at 4.

16

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

Ex. 16 at 2.

Al Odah was at this camp or in the Kandahar area when the September 11, 2001 attacks occurred. █████ advised Al Odah that Kandahar would likely be attacked by the United States. Ex. 14 at 1 ("[Al Odah] stated that █████ spoke about the September 11, 2001[] attacks on the United States and how he feared the Americans might attack Kandahar. █████ was uncomfortable about the possibility of this"). ███████████████████████████

████████████████████████████ [13] Ex. 13 at 1; Ex. 9 at 4. ██████████████████████████████████████████████████████

Al Odah's decision not to leave Afghanistan after September 11, 2001, is itself a significant fact in this case. Al Odah's counsel during the Merits Hearing repeatedly emphasized that Al Odah only wanted to leave Afghanistan at this point but that he did not know how to safely exit the country. At first blush, this argument appears to find support in the record. For example, Al Odah stated that "it was very dangerous for an Arab to be in Afghanistan" because "Afghans that were against the Taliban were looking for Arabs to turn over to the Americans." Ex. 13 at 1-2. *See also* Ex. 124 (Leaflet dropped in Afghanistan by American or coalition forces indicating that Afghans would receive money for capturing Taliban leaders). Al Odah also stated that he "realized he would have problems and sought to leave but could not. He heard that the Afghans had closed the border." Ex. 33.

After considering Al Odah's explanation in the context of the entire record, however, the

---

[13] ████████████████████████████████████
████████████

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

Court finds that it lacks credibility for at least two reasons. First, Al Odah was repeatedly questioned about this explanation during an administrative review board proceeding, and his sworn testimony suggests that, far from wanting to leave the country at that point, Al Odah was seeking to avoid detection:

> Tribunal Member: . . . You initially went only for two weeks at the end of August. The September 11[th] attacks took place at the end of those two weeks. There were no US attacks or coalition attacks right after September 11[th]. Why would you have not left at the normal time?

> Detainee: I had a visa for Pakistan. If I would have tried to go back, they would have questioned me as to why I was in Afghanistan. It would have been difficult for me. It would have been complicated. I was afraid of being accused of anything I might not have done.

> * * *

> Tribunal Member: So, at the two-week portion, right at the very end of when you were originally scheduled to go back, it was too dangerous to leave the country at that point?

> Detainee: If I would have gone back to my country at that time, it would have been great embarrassment, or people would have looked at me strangely. I was just coming from Afghanistan and the United States had just accused Afghanistan, so it would have looked bad. I was afraid of the Kuwaiti authorities who would have obviously questioned me.

Ex. 16 at 9, 12. Thus, the explanation offered by Al Odah's counsel that he wanted to leave Afghanistan after September 11, 2001, is undermined by Al Odah's sworn statements in the record indicating that he wanted to stay and avoid detection.

Second, Al Odah's argument that he wanted to leave Afghanistan after September 11, 2001, is undermined by the geography of Afghanistan. ████████████████████

████████████████████████████████████

Ex. 9 at 4. There is a road that links Kandahar to Quetta, over a distance of approximately 124

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

miles. 8/11/09 Merits Hearing Tr. at 45. Al Odah would have just traveled on this road to reach Kandahar. Rather than returning to Pakistan using the road that he had just used, Al Odah instead followed ████ instructions and headed *away* from the border of Pakistan toward Kabul, traveling approximately 350 miles north. *Id.* According to Al Odah, he still would have had his Kuwaiti passport and a visa for Pakistan at that point (albeit not a visa from Afghanistan). There is no logical reason why, if Al Odah wanted to leave Afghanistan, he would not have traveled back toward Quetta instead of moving deeper into country and toward the conflict that he allegedly wanted to avoid. Accordingly, the Court does not credit Al Odah's explanation that his travels and activities after September 11, 2001, were motivated by his desire to leave Afghanistan.[14]

As described above,  Ex. 9 at 4.

Ex. 9 at 4.

*Id.* at 5. While Al Odah explained that he left his possessions with ████ to avoid being viewed as an Arab and that he planned to have ████ send the items to him once he reached safety in Pakistan, Al Odah subsequently explained

---

[14] The Court again emphasizes that Al Odah should not have even been in Afghanistan on September 11, 2001, according to his statements about taking three weeks of leave from work and wanting to teach for two weeks. The undisputed evidence in the record reflects that Al Odah left Kuwait on August 13, 2001. Relying on Al Odah's statements, he should have left Afghanistan on August 27, 2001 (two weeks after he left Kuwait), or at the latest September 3, 2001 (three weeks after he left Kuwait).

19

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

that he lost ▉▉▉ address and that he could not remember any part of it. Ex. 13 at 2.

The Government introduced undisputed evidence that al Qaeda followed a standard operating procedure for those entering al Qaida and Taliban-associated guesthouses. Ex. 2 at 3 (9/19/08 Decl. of ▉▉▉). According to these procedures, individuals were required to surrender their passports, identification, money, or other travel documents when entering a guesthouse or safe-house, particularly if they were planning to attend a training camp. *Id.*; Ex. 3 at 3 (9/19/08 Decl. of ▉▉▉). These procedures allowed administrators to exert control over trainees and prevent them from easily leaving. Ex. 2 at 3. As a consequence, "[m]any detainees were captured without passports or other identification." Ex. 3 at 3. Al Odah's admission that he surrendered his passport to ▉▉▉ associate is consistent with these standard operating procedures.



Ex. 14 at 2; Ex. 9 at 5. ▉▉▉

*Id.* Al Odah admitted that these individuals "carried AK-47s and appeared to be fighters." Ex. 14 at 2. Al Odah admitted that ▉▉▉ offered him an AK-47 rifle, which Al Odah accepted. Ex. 13 at 2. The Government submitted evidence that ▉▉▉

▉▉▉. Ex. 165 (Intelligence Report); Ex. 166 at 4 (Interrogation of ISN 570).

▉▉▉

UNCLASSIFIED//FOR PUBLIC RELEASE.



██████████████████████████████████ Ex. 9 at 5. ████████

████████████████████████████████████████████████████

█████ *Id.* Al Odah stated that going through the Tora Bora mountains was "the only way to

get from Jalalabad to Pakistan." Ex. 16 at 3. ██████████████████████████

████████████████████████████████████████████████

Ex. 9 at 5. American war planes bombed the group, but Al Odah avoided injury. Ex. 13 at 2.

███████████████████████████████████ Ex. 9 at 5. After about ten days, Al

Odah and those with whom he was traveling were captured by Pakistani border guards on or

around December 18, 2001. Ex. 29 at 1. The Government presented credible evidence that one

of the persons with whom Al Odah was captured had substantial ties to al Qaeda. Ex. 56 at 1

(1/3/2002 Information Report) (stating that Al Odah was captured with ISN ████); Ex. 48 at 1

████████████████████████████████████████████████████

██████████████████████████████ Al Odah still had his AK-47 rifle at the

time of his capture.[15] Ex. 29 at 1.

Based on the foregoing narrative, Al Odah's admissions against interest include his travel

to Logar at the direction of a Taliban official, the surrender of his passport and other possessions

to an individual associated with ████, a member of the Taliban, his meeting with individuals

---

[15] ████████████████████████████████ Ex. 9 at 5 █████████████
████████████████████████████████████████ in later reports he said
that he "surrendered." *See, e.g.*, Ex. 16 at 4 ("I was not captured by Pakistani forces. I
surrendered."). Although this distinction is semantic, the Court notes that the other evidence in
the record corroborates Al Odah's initial characterization of a capture. *See, e.g.*, Ex. 29 at 1
("had Kalashnikov when captured . . . surrendered weapon to Pakistani forces"); Ex. 56 at 1
("captured by Pakistani officials"). The Court also notes that Al Odah had numerous
opportunities to travel to the border of Pakistan and surrender prior to arming himself and
traveling through the field of battle.

UNCLASSIFIED//FOR PUBLIC RELEASE.

who appeared to be armed fighters, his acceptance of an AK-47 rifle from one of the fighters, his travel into the Tora Bora mountains with armed men toward the armed conflict, where he remained through the Battle of Tora Bora and where he was ultimately captured while carrying his AK-47. The other evidence surrounding these statements include the recovery of Al Odah's passport at a safehouse in Karachi, Pakistan, where someone named ████████ was captured (the same name as the person who gave Al Odah his AK-47), and the fact that Al Odah was captured along with at least one other individual with ties to al Qaeda. In addition to the foregoing, the Court emphasizes three other aspects of the evidence warranting consideration.

First, Al Odah's statements fail to account for at least one month of his time in Afghanistan following the September 11, 2001 attacks. In particular, Al Odah indicates that



Ex. 9 at 5; Ex. 16 at 9. ████████████

████████████████████████ Ex. 9 at 5. █

████████████████████████

████████████████ *Id.* It is undisputed, however, that Al Odah was captured on or around December 18, 2001. Ex. 29 at 1; Ex. 33. Accordingly, Al Odah's statements create an almost two month gap (between October 21, 2001 and December 18, 2001). The necessary inference is that Al Odah remained in a particular location or locations for at least one month longer than he revealed in his statements.

Second, the Government introduced evidence that Al Odah's travel to Jalalabad and then

---

[16] Al Odah stated in one interview that he stayed in Logar for twenty days and not one month, Ex. 14 at 2, but this discrepancy would only create a larger gap in his story.

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

to the Tora Bora mountains matched the movements of Taliban and al Qaeda fighters after the September 11, 2001 attacks. Specifically, Usama bin Laden began to marshal his forces in the vicinity of Jalalabad in mid-November 2001, Ex. 98 at 97 (United States Special Operation Command History of Operation Enduring Freedom in Afghanistan), which is approximately the same time frame that Al Odah fails to have any explanation to account for his location and activities. Shortly thereafter, bin Laden decided to move his forces into the Tora Bora mountains, approximately 25 miles south of Jalalabad, "to make a stand prior to the onset of winter and to defeat American attempts both to capture senior leaders and destroy the organization." *Id.* After as many as 2,000 fighters entered Tora Bora in December 2001, coalition forces infiltrated the area and American warplanes began a bombing campaign that reached its peak between December 11, 2001 to December 17, 2001 (although the battle is considered to have lasted between December 6, 2001 through December 18, 2001). 8/11/09 Merits Hearing Tr. at 51, 53. Significantly, Al Odah admits that he ███████████████

████████████████████████████████████████████████████

██████████████████████████████████████ Ex. 9 at 5; Ex. 13 at 2.

Third, Al Odah's explanation that he could only reach Pakistan by traveling through the Tora Bora mountains is not credible. The Government introduced evidence that the shortest and simplest route from Jalalabad to Pakistan was through the famed Kyber pass, 45 miles from Jalalabad. 8/11/09 Merits Hearing Tr. at 59. In contrast, the route through the Tora Bora mountains required a difficult climb into and then through bitterly cold mountains where al Qaeda and Taliban fighters were making their stand against coalition forces. *Id.* During the Merits Hearing, the Court asked Al Odah's counsel why Al Odah would choose to travel into the

23

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

Tora Bora mountains instead of the traveling through the Kyber pass:

> THE COURT: Is your position [] that it would have been more dangerous to have
> been an Arab on what looks like a much simpler route [the Kyber pass] than to go
> towards the area where you have Taliban and al-Qaeda where they're likely to be
> attacked by the northern alliance or somebody else?

*Id.* at 66. Ultimately, Al Odah's counsel supplied the following answer:

> COUNSEL: [I]t [was] rational to try to stay in places where the government still
> controls rather than going to places where the government no longer controls.
> And that's basically what the evidence shows . . . it's simply not surprising or
> incriminating that Mr. Al Odah or any other refugee would try to remain in places
> where the Afghani government, the *de facto* Afghani government, the Taliban,
> controlled. The [Government's evidence] showed that there are routes through
> the Tora Bora mountains into Pakistan, [and] that the Taliban was still in control
> of portions of the Tora Bora mountains.

*Id.* at 79-80. This exchange encapsulates one of the most significant problems with Al Odah's

arguments in this case – Al Odah unquestionably had choices. A review of the evidence

demonstrates that he consciously chose to move through Afghanistan at the direction of Taliban

officials and to remain in Taliban-controlled territories (despite being advised that the Taliban

was likely to be attacked), rather than choosing to leave the country knowing that fighting was

likely to occur.

Even if Al Odah's failure to explain his trip to Afghanistan and his initial choice to meet

with a Taliban official after arriving in Afghanistan could be understood as something other than

a decision to join the Taliban's forces, the same cannot be said about Al Odah's choices after

September 11, 2001, when he is advised by a Taliban official that attacks are likely to occur.

From that point forward, Al Odah declined numerous opportunities to leave the country using the

quickest, shortest routes available to him, such as returning to Quetta from Kandahar, traveling to

a border town from Logar, or reaching Pakistan through the Kyber pass from Jalalabad. Al Odah

24

UNCLASSIFIED//FOR PUBLIC RELEASE.

declined to travel these routes to safety despite having knowledge of the border areas from his two months of teaching along the border in 2000, as well as knowledge of the route he used to enter Afghanistan on his August 2001 trip. Even after he separated from ███ his initial Taliban contact, Al Odah continued to take directions from individuals who were associated with the Taliban and continued to meet and travel with individuals who appeared to be fighters, despite knowing that attacks on the Taliban were either imminent or underway. He made these choices while, at the same time, also choosing to surrender his passport, accept a weapon, and travel with a large group of armed men into the Tora Bora mountains.

At bottom, this evidence reflects that Al Odah made a conscious choice to ally himself with the Taliban instead of extricating himself from the country. His explanation that he chose to avoid the fighting in Afghanistan but mistakenly ended up carrying a weapon in the Tora Bora mountains during the Battle of Tora Bora becomes increasingly incredible each time the evidence reveals that he moved ever closer to the fighting and repeatedly accepted directions from those affiliated with the Taliban. Based on all of the evidence in the record, the Court concludes that the only reasonable inference is that Al Odah made a conscious decision to become a part of the Taliban's forces, and not that he became innocently ensnared in fighting after unsuccessfully attempting to leave the country.

* * *

In summary, Al Odah has admitted that he sought to meet with a Taliban official upon his arrival in Afghanistan; that he was subsequently brought by a Taliban official to a Taliban-operated camp near Kandahar, Afghanistan; that he took one day of training with an AK-47 rifle at this camp; that the Taliban official sent him to stay with an associate in Logar, Afghanistan,

25

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

after September 11, 2001; that he surrendered his passport and other possessions to this individual; that he met with individuals who were armed and appeared to be fighters, that he accepted an AK-47 from these individuals; and that he traveled with his AK-47 into the Tora Bora mountains, remained there during the Battle of Tora Bora, and was captured shortly thereafter by border guards while still carrying his AK-47.  The Government has also presented evidence raising a credible inference that Al Odah traveled to Afghanistan for the purpose of fighting with the Taliban and not for the purpose of teaching for two weeks, as well as credible evidence that Al Odah's movements throughout the country were consistent with someone who was taking orders from the Taliban and who decided to join the fight against coalition forces.  In almost every significant respect, Al Odah has failed to provide credible explanations for his travel to Afghanistan and the choices he made as to his movements and activities within Afghanistan.  Taken as a whole, the Court finds that this record makes it more likely than not that Al Odah became part of the Taliban's forces.  Accordingly, the Court shall deny his petition for habeas corpus.[17]

C.    Al Farouq

As described above, the evidence supporting the Court's decision that Al Odah more likely than not joined the forces of the Taliban is supported by, among other evidence, his

---

[17] The Court notes that the Government presented certain other evidence during the course of the Merits Hearing, which the Court does not reach for purposes of this decision.  This evidence includes eye witness identifications of Al Odah by David Hicks and███████████, which are far more attenuated, and require far more inferences, than the evidence on which the Court has relied in this case. ███████████████████████████████████████████████████████ ████████████████████████████that the Court described in *Al Mutairi v. United States*, Civ. A. No. 02-828, 2009 U.S. Dist. LEXIS 66868 at *37-*45 (D.D.C. Aug. 3, 2009).

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

admission that he attended a Taliban-run camp outside of Kandahar, where he took one day of AK-47 training. While Al Odah's admission that he attended an unidentified Taliban-run camp supports the Government's evidence (and is part of the record evidence the Court has found sufficient for the Government to meet its burden in this case), evidence that the unidentified Taliban camp was, in fact, Al Farouq, al Qaeda's primary Afghan basic training facility, would further strengthen the Government's evidence. In this respect, the Government presented four areas of evidence that lead the Court to conclude that the camp Al Odah attended was more likely than not Al Farouq.

First, Al Farouq was located outside of Kandahar, Ex. 3 at 3 (9/16/08 Decl. of ███████████), ███████████████████████████████████████████████████. Ex. 9 at 4. As discussed above, the Government submitted evidence establishing that some individuals traveled along the same route to Kandahar as Al Odah (Dubai, Karachi, Quetta, Spin Buldak, Kandahar). ███████████████████████████████████████████████████████████ ███████████ Ex. 68 at 2; Ex. 80 at 2.

Second, the undisputed evidence in the record is that individuals attending Al Farouq received training on AK-47 rifles early in the Al Farouq training program. Ex. 74 at 1 ███████ ███████████████████████ trained at Al Farouq for two weeks . . . ███████ claims that he only trained on the Kalashnikov"); Ex. 22 at 9 (Aug. 2002 Interrogation of John Walker Lindh) ("The training at the Al-Farouq camp lasted approximately six to seven weeks . . . and the training was divided into courses. Weapons training lasted three weeks, and included training on the AK-47 Kalashnikov"); Ex. 23 at 1 (2/21/03 Interrogation of David Hicks) ("[a]ll students that take the basic training class at Al Farouq get the same type of training, [which includes] . . . [t]wo

27



weeks of weapons training - students shoot approximately 40 rounds."); Ex. 67 at 3

("While at the Al-Farouq camp, was trained on the Kalishnikov").

. Ex. 9 at 4.

Third, the undisputed evidence in the record is that Al Farouq was evacuated shortly after September 11, 2001 attacks, and that many of the individuals attending the camp did not complete training but were marshaled north toward Kabul, Jalalabad, and the Tora Bora mountains. Ex. 22 at 2 (Aug. 2002 Interrogation of John Walker Lindh) ("When the attacks occurred, the Arabs conducting the training gave them three options. The first option was to go to Kabul, the second was to go to an airport outside of Kabul[,] and the third was to go to the mountains."); Ex. 69 at 1



); Ex. 80 at 2

As described above, Al Odah stated that he arrived at the camp or in the Kandahar area on September 10, 2001, and left after only one day of training at the camp, moving north in response to          instructions – matching the movements of the trainees at Al Farouq during the same time period.

Fourth, the record is replete with evidence that one of the trainers at Al Farouq was named        Ex. 67 at 3          was described as the person who headed the prayers at the camp and also one of the trainers.          was the primary trainer who instructed [the detainee]

UNCLASSIFIED//FOR PUBLIC RELEASE.

on the Kalishnikov"); Ex. 68 at 2-3 ███████████████████████████

█████"); Ex. 69 at 2 ██████████████████████████████████

█████████████████████████████████████████████████████

███████████████████"); Ex. 70 at 2 ██████████████████████

███████████; Ex. 73 at 4 ████████ unit's trainer was a man whose 'code name' was ████████).

As described above, ████████████████████████████████████

███████████████████████████████████████████ Ex. 9 at 4.

During the Merits Hearing, Al Odah's counsel argued that the Taliban official who

transported Al Odah to the camp outside of Kandahar was not the same person as the trainer at

Al Farouq for two reasons. First, Al Odah's counsel explained that Al Odah identified someone

named ███████ whereas the evidence in the record reflected that other detainees identified

the Al Farouq trainer as ████████████ This argument fails. As an initial matter, ████

████████████████████████████████████████ Ex. 69 at 2

████████████████████████████████████████████████████

█████████████████████ Additionally, █████ was identified by other detainees as

█████ and others as ████████ even though Al Odah's counsel does not claim that these

detainees are identifying different people. In fact, one interrogation report even identifies

███████ as a "code name." Ex. 73 at 4. Finally, the Government submitted evidence that

individuals whose true names include neither an "al" nor an "abu" may nevertheless include such

terms when constructing an alias or other name variants. *See* Ex. 6 at 5 (9/19/08 Decl. of ████

████████████. Accordingly, the Court is not persuaded that Al Odah's Taliban guide

was not ████████ because Al Odah referred to him as ██████████

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

The second argument made by Al Odah's counsel was that the physical descriptions differ between the ████ described by Al Odah and the ████ described by other detainees. This is partially correct. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████ Ex. 9 at 4. There are two other descriptions of ████ in the record. Ex. 73 at 4

████ in his late twenties, was approximately 60 inches tall with a thin build. ████ was fluent in Arabic but ████ was unsure of his nationality"); Ex. 70 at 2 (████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ Al Odah argues that these descriptions differ with respect to ████ height (tall, short, and average), and hair color (black, brownish red). While the Court agrees that these constitute differences between the descriptions, the Court emphasizes that ████ name, national origin, beard length, and age, are consistent. The Court finds that these consistencies (particularly name and national origin) are much more significant than the differences identified by Al Odah's counsel involving height and hair color, which are relative descriptions. Based on this record, the Court finds that it is more likely than not that Al Odah and the other detainees were describing the same ████

Finally, Al Odah's counsel argued during the Merits Hearing that Al Odah could not have attended Al Farouq because the camp he described did not match the physical description of Al Farouq. As support, Al Odah relies on the statement of an analyst in one of Al Odah's interrogation reports, reflected as follows:

███████████████████████████████████████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.



Ex. 54 at 4 ███████████████████ Al Odah's counsel is correct that the assessment

by this analyst, in the context of Al Odah's statement, must be considered in the context of the

evidence in the record.

Upon consideration of the entire record, the Government has submitted evidence showing

that some individuals traveled to Afghanistan using the same route as Al Odah and that they were

traveling to Al Farouq; that AK-47 training was an early part of the Al Farouq training program;

that Al Farouq was evacuated shortly after September 11, 2001, when trainees were sent north

toward Kabul, Jalalabad, or the Tora Bora mountains; and that the individual who transported Al

Odah from the Afghanistan-Pakistan border to a camp outside of Kandahar was likely a trainer at

Al Farouq. Through Al Odah's admissions, the Government has also submitted evidence that Al

Odah was brought to a camp outside of Kandahar (where Al Farouq was located) on or around

September 10, 2001; that he received one day of training on an AK-47; that he was shortly

thereafter evacuated and directed to travel north to Logar (a province just south of Kabul); and

that he eventually traveled to Jalalabad and the Tora Bora mountains. In contrast, Al Odah has

identified evidence in the record suggesting that the description Al Odah provided to an

interrogator of the camp that he visited did not match the physical description of Al Farouq.

After weighing all of the evidence in the record, the Court finds that the camp to which Al Odah

was transported by ████ was more likely than not Al Farouq. When this evidence is considered

in the context of Al Odah's travel north at the direction of ████, and Al Odah's subsequent

31

UNCLASSIFIED//FOR PUBLIC RELEASE.

activities described above, the Court finds that it is more likely than not that Al Odah became part of the forces of the Taliban and al Qaeda.

In summary, the Court finds that the Government has met its burden based on the evidence in the record without specifically identifying that the Taliban-run camp attended by Al Odah was, in fact, Al Farouq. Nevertheless, the Court also finds that it is more likely than not that the camp was Al Farouq, which also makes it more likely than not, when combined with the other evidence in the record, that Al Odah became a part of the forces of the Taliban and al Qaeda.

## III. CONCLUSION

Because the Government has met its burden by a preponderance of the evidence in this case, the Court shall DENY Al Odah's petition for habeas corpus.

Date: August 24, 2009

/s/
**COLLEEN KOLLAR-KOTELLY**
United States District Judge

32

UNCLASSIFIED//FOR PUBLIC RELEASE.