UNCLASSIFIED//FOR PUBLIC RELEASE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:

|  |  |
|---|---|
| FOUAD MAHMOUD AL RABIAH, *et al.* | ) ) ) ) |
| Petitioners, | ) ) |
| v. | ) ) |
| UNITED STATES, *et al.*, | ) ) |
| Respondents. | ) ) ) ) |

Civil. Action No. 02-828 (CKK)

**CLASSIFIED MEMORANDUM OPINION**
(September 17, 2009)

Petitioner Fouad Mahmoud Al Rabiah ("Al Rabiah") has been detained by the United

States Government at the Guantanamo Bay Naval Base in Cuba since 2002. The evidentiary

record on which the Government seeks to justify his indefinite detention is surprisingly bare.

The Government has withdrawn its reliance on most of the evidence and allegations that were

once asserted against Al Rabiah, and now relies almost exclusively on Al Rabiah's "confessions"

to certain conduct. Not only did Al Rabiah's interrogators repeatedly conclude that these same

confessions were not believable – which Al Rabiah's counsel attributes to abuse and coercion,

some of which is supported by the record – but it is also undisputed that Al Rabiah confessed to

information that his interrogators obtained from either alleged eyewitnesses who are not credible

and as to whom the Government has now largely withdrawn any reliance, or from sources that

never even existed. Far from providing the Court with credible and reliable evidence as the basis

for Al Rabiah's continued detention, the Government asks the Court to simply accept the same

confessions that the Government's own interrogators did not credit, and to ignore the assessment

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████████████████

Based on this record (or more accurately, in spite of it), the Government asserts that it has the authority to detain Al Rabiah pursuant to the Authorization for the Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) ("AUMF"), which authorizes the use of force against certain terrorist nations, organizations, and persons. Al Rabiah believes he is unlawfully detained and has filed a petition for a writ of habeas corpus.

In connection with its inquiry into whether Al Rabiah is lawfully detained, the Court has considered the factual evidence in the record, the extensive legal briefings submitted by the parties, and the arguments presented during a four-day Merits Hearing held on August 26-28, 2009, and August 31, 2009, during which the parties proffered evidence based on the written record and did not present any live testimony.[1] Based on the foregoing, the Court concludes that Al Rabiah's uncorroborated confessions are not credible or reliable, and that the Government has failed to provide the Court with sufficiently credible and reliable evidence to meet its burden of persuasion. If there exists a basis for Al Rabiah's indefinite detention, it most certainly has not been presented to this Court. Al Rabiah's petition for habeas corpus is GRANTED.

## I. BACKGROUND

### A.    Procedural History

Al Rabiah filed his petition for habeas corpus on May 1, 2002, making this case the oldest of the pending Guantanamo Bay habeas cases. After several years of litigation, this case was stayed pending resolution of whether the Court had jurisdiction to hear Al Rabiah's petition. On June 12, 2008, the United States Supreme Court issued its decision in *Boumediene v. Bush*,

---

[1] Al Rabiah did listen to the unclassified opening statements of counsel.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

clarifying that this Court had jurisdiction to consider the petition and advising this and the other

judges in this District that "[t]he detainees are entitled to [] prompt habeas corpus hearing[s]."

553 U.S. ___, 128 S. Ct. 2229, 2275 (2008).

Following the *Boumediene* decision, this and most of the other judges in this District

agreed to consolidate their Guantanamo Bay habeas cases before former Chief Judge Thomas F.

Hogan for issuance of an initial case management order that would expeditiously move these

cases toward resolution. Judge Hogan issued a Case Management Order on November 6, 2008,

which he amended on December 16, 2008, and which the Court adopted in this case on

December 22, 2008. The Court has relied on the Amended Case Management Order as the

backdrop for its subsequent Scheduling Orders in this case.[2]

The Government filed an Amended Factual Return on September 5, 2008, and pursuant

to the schedule set by the Court, Al Rabiah filed a Traverse on March 30, 2009. The parties

engaged in extensive discovery and motions practice in the interim. Al Rabiah filed a Motion for

Additional Discovery on January 26, 2009, which the Court granted-in-part and denied-in-part on

February 12, 2009, after a hearing on February 11, 2009. Al Rabiah filed a Motion to Produce a

Declassified Factual Return on January 9, 2009, which the Government produced on February 6,

2009. The Court also required the Government to provide Al Rabiah with certain discovery from

the Guantanamo Bay Joint Task Force database, although the parties decided to narrow the

Government's search obligations in order to expedite the production of specific documents in

---

[2] The Court extends its gratitude to Judge Hogan for his considerable investment of time
and energy to produce the Case Management Order.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

which Al Rabiah's counsel were particularly interested.[3]  Additionally, the parties filed seven

pre-hearing motions, most of which sought rulings concerning the admissibility of particular

evidence.  By Order dated June 16, 2009, the Court granted the parties' motions to rely on

hearsay evidence at Al Rabiah's Merits Hearing, but held their other evidentiary motions in

abeyance.[4]

      To narrow the disputed issues presented at the Merits Hearing and to focus the parties on

the specific documents underpinning their respective arguments, the Court ordered the

Government to file a Statement of Facts on which it intended to rely at the Merits Hearing (which

narrowed the allegations presented in the Amended Factual Return), and instructed both parties

to submit Witness and Exhibit Lists.  The Court advised the parties that it would likely exclude

from consideration any evidence at the Merits Hearing that had not been identified in the Witness

and Exhibits Lists by August 20, 2009 (approximately one week prior to the scheduled Merits

Hearing).[5]  The parties timely submitted these materials, although the Court allowed both parties

---

[3] Although the Government was required to produce these documents on a rolling basis, Al Rabiah's counsel expressly stated that they wanted to proceed with the scheduled Merits Hearing regardless of whether the Government had completed its review of documents in the Guantanamo Bay Joint Task Force database. *See* Joint Status Report at 2 ("Although Petitioners would prefer to have all relevant and exculpatory evidence prior to the merits hearings in these cases, Petitioners' counsel indicated that he did not wish to delay the merits hearings by a single day to wait for Respondents to search the TF Network database for additional documents. Accordingly, Petitioners will forego additional production of documents from Respondents except to the extent that Respondents locate such documents between now and the date(s) of the final merits hearing(s).").

[4] Al Rabiah also filed a Motion for Sanctions against the Government for failing to timely disclose exculpatory evidence.  The Court does not find that sanctions are warranted on the present record.

[5] The Court noted two exceptions for (1) documents offered for rebuttal purposes, and (2) exculpatory documents, as to which the Government has a continuing obligation to disclose.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

to supplement their amended Exhibit Lists on August 21, 2009, in the absence of any prejudice and subject to the intended use of the additional documents at the Merits Hearing.

### B. Evidentiary Approach

As stated above, the Court granted the parties' motions to rely on hearsay evidence in this proceeding. The plurality in *Hamdi v. Rumsfeld* specifically acknowledged that "[h]earsay . . . may need to be accepted as the most reliable available evidence from the Government." 542 U.S. 507, 534 (2004). The Court finds that allowing the use of hearsay by both parties balances the need to prevent the substantial diversion of military and intelligence resources during a time of hostilities, while at the same time providing Al Rabiah with a meaningful opportunity to contest the basis of his detention. The Court is fully capable of considering whether a piece of evidence (whether hearsay or not) is reliable, and it shall make such determinations in the context of the evidence and arguments presented during the Merits Hearing – including any arguments the parties have made concerning the unreliability of hearsay evidence. *Cf. Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008) (explaining, in the context of the Detainee Treatment Act, that the Court was "*not* suggest[ing] that hearsay evidence is never reliable – only that it must be presented in the form, or with sufficient additional information, that permits [the finder of fact] to assess its reliability") (emphasis in original).

For similar reasons, the Court shall deny the Government's motion to have its evidence admitted with a presumption of accuracy and authenticity. Relying in part on the Supreme Court's statement in *Hamdi v. Rumsfeld* that "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided," 542 U.S. at 534, the Government

5

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

argues that a presumption as to its evidence is both appropriate and necessary. The Court

disagrees. One of the central functions of the Court in this case is "to evaluate the raw evidence"

proffered by the Government and to determine whether it is "sufficiently reliable and sufficiently

probative to demonstrate the truth of the asserted proposition with the requisite degree of clarity."

*Parhat*, 532 F.3d at 847. Simply assuming the Government's evidence is accurate and authentic

does not aid that inquiry. *Cf. Ahmed v. Obama*, 613 F. Supp. 2d 51, 55 (D.D.C. 2009) (rejecting

a presumption of accuracy for the Government's evidence and holding that "the accuracy of

much of the factual material contained in [the Government's] exhibits is hotly contested for a

host of different reasons . . .").

The Court also finds that there are significant reasons why the Government's proffered

evidence may not be accurate or authentic. Some of the evidence advanced by the Government

has been "buried under the rubble of war," *Hamdi*, 542 U.S. at 532, in circumstances that have

not allowed the Government to ascertain its chain of custody, nor in many instances even to

produce information about the origins of the evidence. Other evidence is based on so-called

"unfinished" intelligence, information that has not been subject to each of the five steps in the

intelligence cycle (planning, collection, processing, analysis and production, and dissemination).

Based on the Government's own declarations, its raw intelligence may not have been fully

analyzed for its "reliability, validity, and relevance" in the context of other intelligence where

"judgments about its collective meaning" are made. Ex. 1 at 5 (9/19/08 Decl. of D3

D3          Ex. 1-A at 1-2 (5/29/09 Decl. of D3                    (explaining that the five

steps in the intelligence cycle are not "mechanical" and that the process "var[ies] by collection

specialty," but not disturbing the conclusion that "unfinished" intelligence has not undergone the

6

UNCLASSIFIED//FOR PUBLIC RELEASE

same rigorous integration and evaluation process that produces "finished" intelligence).[6] Still

other evidence is based on multiple layers of hearsay (which inherently raises questions about

reliability), or is based on reports of interrogations (often conducted through a translator) where

translation or transcription mistakes may occur.  In this case, for example, the record contains

two reports written about *the same interrogation*, with one report stating that ████████████

████████████, Ex. 31 at 1 ██████

██████, and the other report indicating that ████████████, Ex.

44 at 1 (██████████████████).  The Government did not address this discrepancy

at the Merits Hearing and did not show that any attempt had been made to reconcile the reports.

Accordingly, the Court shall not accord a presumption of accuracy or authenticity to the

Government's evidence, but shall consider the accuracy or authenticity of the evidence in the

context of the entire record and the arguments raised by the parties.

The Court shall use the same approach to consider Al Rabiah's pre-hearing evidentiary

motions that sought to exclude particular pieces of evidence prior to the Merits Hearing based on

their alleged lack of authenticity, reliability, or relevance, or sought to exclude Al Rabiah's

statements based on alleged abuse and coercion.  Rather than exclude evidence from

consideration *ex ante* by examining it in a vacuum, the Court concludes that the better approach

is to make such determinations after considering all of the evidence in the record and hearing the

parties' arguments related thereto.  The Court believes this approach is particularly useful where,

as here, a document viewed in isolation may appear to be irrelevant, but when considered in the

---

[6] All citations to exhibits (cited as "Ex.") refer to the parties' joint exhibits submitted at
the Merits Hearing.

UNCLASSIFIED//FOR PUBLIC RELEASE

context of the other evidence in the record its importance may become clear. The Court also believes this approach is appropriate for allegations involving abuse or coercion, where evaluation of the entire record will elucidate the relationship between the possible abuse or coercion and any statements relied on by the Government to justify Al Rabiah's detention. Accordingly, the Court's consideration of the evidence proffered by the parties shall encompass inquiries into authenticity, reliability, relevance, and alleged abuse or coercion. *Cf. Parhat*, 532 F.3d at 847 (describing the Court's inquiry into whether evidence is "'sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty'") (quoting *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993)).

    C.    *Standard of Detention*

As Judge Reggie B. Walton accurately observed in a thoughtful opinion considering the Government's detention authority, "the state of the law regarding the scope of the President's authority to detain petitioners remains unsettled," *Gherebi v. Obama*, 609 F. Supp. 2d 43, 45 (D.D.C. 2009), even though habeas petitions by individuals such as Al Rabiah have been pending for over seven years. Guidance in this area is limited because the Supreme Court acknowledged but did not clarify the uncertain "permissible bounds" of the Government's detention authority, *see Hamdi*, 542 U.S. at 552 n.1, and the D.C. Circuit has not had occasion to address the issue. Fortunately, several judges in this District have considered the scope of the Government's detention authority and have issued well-reasoned opinions on the subject. *See, e.g., Gherebi*, 609 F. Supp. 2d at 43; *Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009); *Mattan v. Obama*, 618 F. Supp. 2d 24 (D.D.C. 2009).

UNCLASSIFIED//FOR PUBLIC RELEASE

Taking advantage of these prior decisions, the Court shall adopt the reasoning set forth in

Judge John D. Bates's decision in *Hamlily v. Obama*, and shall partially adopt the Government's

proposed definition of its detention authority.[7]  The Court agrees that the President has the

authority to detain individuals who are "part of" the Taliban, al Qaeda, or associated enemy

forces, but rejects the Government's definition insofar as it asserts the authority to detain

individuals who only "substantially supported" enemy forces or who have "directly supported

hostilities" in aid of enemy forces.  While evidence of such support is undoubtedly probative of

whether an individual is part of an enemy force, it may not by itself provide the grounds for

detention.  Accordingly, the Court shall consider whether Al Rabiah is lawfully detained in the

context of the following standard:

> The President has the authority to detain persons that the President determines
> planned, authorized, committed, or aided the terrorist attacks that occurred on
> September 11, 2001, and persons who harbored those responsible for those
> attacks.  The President also has the authority to detain persons who were part of
> Taliban or al-Qaida forces or associated forces that are engaged in hostilities
> against the United States or its coalition partners, including any person who has
> committed a belligerent act in aid of such enemy armed forces.[8]

---

[7] The Government's proposed definition for its detention authority is found in the
Memorandum that it submitted in this case on March 13, 2009.  According to the Government,

> [t]he President has the authority to detain persons that the President determines
> planned, authorized, committed, or aided the terrorist attacks that occurred on
> September 11, 2001, and persons who harbored those responsible for those
> attacks.  The President also has the authority to detain persons who were part of,
> or substantially supported, Taliban or al-Qaida forces or associated forces that are
> engaged in hostilities against the United States or its coalition partners, including
> any person who has committed a belligerent act, or has directly supported
> hostilities, in aid of such enemy armed forces.

[8] Al Rabiah submitted a response to the Government's proposed detention standard
seeking to have the Court limit the types of organizations that may be considered an "associated
force" or "enemy armed force."  *See* Pet'r's Resp. at 2-11.  The Court declines to engage in a
hypothetical inquiry concerning the types of organizations that may or may not fall within this

9

UNCLASSIFIED//FOR PUBLIC RELEASE

In the context of this definition, the "key inquiry" for determining whether an individual has become "part of" one or more of these organizations is "whether the individual functions or participates within or under the command structure of the organization – *i.e.*, whether he receives and executes orders or directions." *Hamlily*, 616 F. Supp. 2d at 75.

### D.    Burden of Persuasion

Pursuant to the Amended Case Management Order that the Court adopted in this case on December 22, 2008, the Government bears the burden of proving by a preponderance of the evidence that Al Rabiah is lawfully detained. *See In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6, 2008) ("[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful") (citing *Boumediene*, 128 S. Ct. at 2271) ("[T]he extent of the showing required of the government in these cases is a matter to be determined."). Accordingly, Al Rabiah need not prove his innocence nor testify on his own behalf. The Court has drawn no inference based on Al Rabiah's decision not to testify in this case. *Accord Awad v. Obama*, 2009 U.S. Dist. LEXIS 75374 at *9 (D.D.C. Aug 12, 2009). The Government must come forward with evidence demonstrating by a preponderance of the evidence that he is lawfully detained, and if the Government fails to meet this burden, the Court must grant Al Rabiah's petition for habeas corpus.

## II. DISCUSSION

### A.    Al Rabiah's Reasons for Traveling to Afghanistan in October 2001

Al Rabiah's background is not in dispute. He is a fifty year old father of four from

---

definition, but shall instead examine the facts of each case and shall further define these terms in context if appropriate and necessary.

UNCLASSIFIED//FOR PUBLIC RELEASE

Kuwait. Ex. 175 ¶ 2 (3/17/09 Decl. of Al Rabiah). He graduated from AST University in Perth, Scotland, with an aviation maintenance degree in 1981. *Id.* ¶ 3. Shortly after his graduation, Al Rabiah joined Kuwait Airways as an aviation engineer, and worked there for twenty years until his detention in 2001. *Id.* ¶ 3. From 1986-1988, Al Rabiah took leave from Kuwait Airways to obtain a bachelor's degree in professional aeronautics and a master's degree in aviation management from Embry-Riddle Aeronautical University in Daytona Beach, Florida. *Id.*

In addition to his career at Kuwait Airways, Al Rabiah helped create and became part owner of Summits Health Club in Kuwait, and he was hired to assist with the management of a second health club located on the premises of a charitable organization called the Isla Society. *Id.* ¶ 4. He has no military training except for two weeks of compulsory basic training with the Kuwait Army, after which he was medically discharged due to a knee injury. *Id.* ¶ 5. At the time of his detention, Al Rabiah was overweight (240 pounds) and suffered from various medical ailments such as high blood pressure and chronic pain in his neck and lower back. *Id.* ¶ 6.

Al Rabiah has a history of traveling to impoverished and/or war-torn countries for charitable purposes. In 1994-95, Al Rabiah traveled to Bosnia as a volunteer for the Revival of Islamic Heritage Society. *Id.*, Ex. C at 1 (9/7/94 Letter from al Anzi to al Zaban). In 1998, Al Rabiah traveled to Kosovo to work as a volunteer for the Kuwait Red Crescent. *Id.*, Ex. C at 11 (2/25/02 Certificate). He also traveled on a mission to Bangladesh on behalf of the Patients Helping Fund in April 2000 to deliver kidney dialysis fluid to a facility in Dakka. *Id.*, Ex. C at 13 (3/6/02 Certificate). There is also no dispute that Al Rabiah traveled to Afghanistan for

11

UNCLASSIFIED//FOR PUBLIC RELEASE

approximately 10 days in July 2001.  *Id.* ¶ 10 (3/17/09 Decl. of Al Rabiah).[9]

As a routine practice, Al Rabiah formally requested leave from Kuwait Airlines when he undertook his charitable activities.  According to Adel Al-Rashed, Al Rabiah's supervisor at Kuwait Airlines, Al Rabiah had a "spotless attendance record" and "was never absent without leave."  Ex. 179 ¶ 3 (2/23/09 Decl. of Adel Al-Rashed).  Included in the record are letters associated with Al Rabiah's mission to Bosnia, for which Al Rabiah sought and received leave. *Id.*, Ex. B at 1 (9/7/94 Letter from Al Anzi to Al Zaban).  One of the letters even sought an additional week of leave for Al Rabiah when he was unable to timely depart Bosnia "due to the siege imposed on it."  *Id.*

Against this background, the parties dispute the reasons for Al Rabiah's decision to travel to Afghanistan in October 2001 (Al Rabiah was on this trip when he was detained and subsequently transferred to Guantanamo Bay).  According to Al Rabiah, he traveled to Afghanistan to complete a fact-finding mission related to Afghanistan's refugee problems and the country's non-existent medical infrastructure.  Ex. 175 ¶¶ 10,11.  According to the Government, Al Rabiah was "not an aspiring aide worker caught up in the front lines of the United States war against al-Qaeda" but instead was someone who traveled to Afghanistan in October 2001 as a "devotee of Osama bin Laden who ran to bin Laden's side after September 11th."  8/26/09 Merits Hrg. Tr. at 28.

The evidence in the record strongly supports Al Rabiah's explanation.  On September 29,

---

[9] Although Al Rabiah asserts that he traveled to Afghanistan in July 2001 for charitable purposes, Ex. 175 ¶ 10 (3/17/09 Decl. of Al Rabiah), the Government asserts that he traveled to Afghanistan to meet with Usama bin Laden.  The Court shall address the Government's argument in Section II.B, *infra*.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

2001 (prior to his departure to Afghanistan), Al Rabiah completed a leave form requesting leave from Kuwait Airlines between October 6, 2001, to October 17, 2001. Ex. 179, Ex. at 1 (9/29/01 Leave Form). This request was approved by Mr. Al Rashed's supervisor, Bader M. Al Khulaifi. *Id.* ███████████████████████████████████████████████████

███████████████████████████████████████ Although Al Rabiah traveled to Afghanistan knowing that it was likely to become a dangerous place, he had traveled previously to other dangerous places – including Bosnia – for his charitable work. Ex. 179 & Ex. B (2/23/09 Decl. of Adel Al-Rashed).

Al Rabiah was unable to leave Afghanistan as he had planned. On October 18, 2001, he wrote a letter to his family, explaining that for ten days he assisted with the delivery of supplies to refugees and that he was able to take video "reflecting the tragedy of the refugees," but that he was unable to leave Afghanistan through Iran (the route he took to enter the country) because the borders had been closed. Ex. 177, Ex. C at 1 (10/18/01 Letter from Al Rabiah). After submitting his passport to Iranian officials at the border and waiting two days to exit the country, he was told that Iran would not receive him. *Id.* Accordingly, Al Rabiah wrote in his letter that he and an unspecified number of other persons decided "to drive four trucks to Pakistan making our way to Peshawar." *Id.* Having apparently recognized that he had reached the end of his requested leave with Kuwait Airlines, Al Rabiah also requested that his letter be given to his brother Yahya, who also worked at Kuwait Airlines, "in order to inform [his] Personnel Affairs Manager accordingly."[10] *Id.*

---

[10] Although Al Rabiah's letter is dated October 18, 2001, information printed at the top of the letter indicates that it was faxed on November 15, 2001, from a phone number associated with Peshawar, Pakistan. Ex. 177, Ex. C at 1 (10/18/01 Letter from Al Rabiah); Ex. 61 at 1

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

The evidence in the record establishes that Al Rabiah did, in fact, travel across Afghanistan toward Peshawar, ultimately getting captured (unarmed) by villagers outside of Jalalabad, Afghanistan (across the border from Peshawar, Pakistan) on approximately December 25, 2001. Ex. 75 at 1 (Feb. 2002 Intake Form for Maher Al Quwari); Ex. 175 ¶ 32 (3/17/09 Decl. of Al Rabiah) (stating that he and Al Quwari were captured together). After Al Rabiah was transferred to American custody in Afghanistan, he wrote a second letter to his family. Ex. 177, Ex. D at 1 (Undated Letter from Al Rabiah). He explained that he was in "good health and condition" and that "[t]he situation in the country turned upside down between one day and night and every Arab citizen has become a suspect." *Id.* He further explained that he was "detained by the American troops and thanks to God they are good example [sic] of humanitarian behavior." *Id.* Finally, he explained that he was "detained [] pending verification of [his] identity and personality" but that the "investigation and verification procedures may last for a long period due to the great number of the detained Arabs and other persons." *Id.*

At the Merits Hearing, the Government did not dispute that Al Rabiah sought two weeks of leave from Kuwait Airlines prior to leaving for Afghanistan or that he wrote these two letters, and did not argue that his request for leave and these letters were part of an elaborate plan to mask his true intentions in Afghanistan. Rather, the Government sought to demonstrate that Al

---

(Undated City and Country Codes for Pakistan). While this information initially gave the Court pause, it is unclear what if anything that information demonstrates. The Government has never maintained that Al Rabiah made it to Peshawar and then re-entered Afghanistan, and it is unclear what probative value it would have if Al Rabiah gave his letter to someone who faxed it from Peshawar. Moreover, Al Rabiah's counsel emphasized that the Government's exhibit listing city and country codes contains an advertisement for phone numbers that can be forwarded through Pakistan. *Id.* (advertising "800 Toll Free Numbers that forward your calls to Pakistan Phone Numbers"). Ultimately, the Court is able to find little relevance associated with this evidence and gives no weight to the parties' speculation based on the same.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Rabiah made previous trips to impoverished and war-torn countries for terrorism-related purposes and not charity. As support, the Government proffered evidence that the Kuwaiti Joint Relief Committee and the Revival of Islamic Heritage Society (two organizations for which Al Rabiah volunteered), have been designated by the United States as organizations that provide financial or other support to terrorist organizations. Ex. 1 at 25-26 (9/19/08 Decl. ▮D3▮ ▮D3▮ The Government argues that this evidence supports the inference that Al Rabiah had a history of supporting terrorism, and that he "acted in conformity" with this history when he traveled to Afghanistan in October 2001. 8/26/09 Merits Hrg. Tr. at 30-32.

The Court finds no basis for the Government's suggested inference because, as the Government conceded at the Merits Hearing, neither of these organizations was designated as a supporter of terrorism at the time Al Rabiah volunteered with them. *Id.* at 31 ("THE COURT: But you've indicated that [the organizations] were not considered [supporters of terrorism] at the time that he was associated or doing any work with them? THE GOVERNMENT: That is correct, Your Honor."). Beyond this deficiency, there is also no evidence in the record that these organizations supported terrorism at the time Al Rabiah volunteered for them (regardless of their designations by the United States), or evidence that Al Rabiah had any role involving terrorism or knowledge that these organizations had links to terrorism. In short, there is no evidence in the record supporting the inference that Al Rabiah was involved with terrorist activities when he previously traveled to impoverished and war-torn locations.

The other evidence proffered by the Government in support of its argument that Al Rabiah has a history of supporting terrorism is based on one sentence, from one interrogation report, of someone named ▮C6▮

15

UNCLASSIFIED//FOR PUBLIC RELEASE

██ C6                                    Ex. 77 at 1-3   ██ C2, C6 ████████████

██ C2, C6  ██ C1 C6 ████████████████████████████████████████

██ C1 C6 ████████████████████████████████████████████████

██ C1 C6 ████████████        *Id.* at 2.   ██ C1 C6 ████████████████

██ C1 C6 ████████████████        the Court does not credit this allegation because the

Government provides no information about ██ C6 ████ beyond this one interrogation report,

which itself states that ██ C1, C5 ████████████████████ *Id.* at 1.  As a direct

consequence of this lack of supporting information, there is no evidence identifying the source of

██ C6 ████ knowledge, or evidence that the Government ever determined that he was a reliable

witness.  This is particularly significant because ██ C6 ████ made other allegations during this

interrogation in ██ 2 concerning the conduct of other individuals in 2000 and 2001 (such as

identifying where individuals attended training camps or organizations with whom others were

affiliated) even though ██ C6 ████████████████████████████.  The

Government also fails to indicate whether ██ C6 ████ other allegations included in the

interrogation report are credible.  Based on the wholesale lack of evidence demonstrating that ██ C6

██ C6 ████ is a reliable witness and that his allegations are credible, the Court finds that this

evidence is entitled to no weight and shall not be considered probative of whether Al Rabiah's

detention is lawful.  *See Parhat*, 532 F.3d at 848 (explaining that the Court must "have an

opportunity to assess the reliability of the record evidence" which is "not simply a theoretical

exercise").[11]

---

[11] The only other evidence proffered by the Government with respect to Al Rabiah's reasons for traveling to Afghanistan in October 2001 consists of ██ b(1), b(6) ████ ██ b(1), b(6) ████ and the confessions of Al Rabiah.  Although the Court shall address both ██ b(1), b(6) ████ and

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Based on the foregoing, the Court finds that Al Rabiah has proffered the following credible evidence:  that he has a history of traveling to impoverished and war-torn locations for charitable purposes; that he has a history of requesting leave from Kuwait Airlines, his employer, prior to undertaking these trips; that he requested and received two weeks of leave in October 2001 to travel to Afghanistan; that he wrote a letter to his family at the end of his planned two week trip explaining that he was unable to exit the country as he had planned, but that he would attempt to leave Afghanistan through the Pakistani border to get to Peshawar; and that he requested that his brother notify personnel at Kuwait Airlines because his leave had expired.  The Court finds that this evidence gives rise to a strong inference that Al Rabiah traveled to Afghanistan in October 2001 for charitable purposes.  In contrast, the Government has argued that Al Rabiah traveled to Afghanistan in October 2001 in conformity with his previous connections with terrorist activity, but has failed to proffer reliable and credible evidence in support of that argument.  Accordingly, the Court concludes by a preponderance of the evidence that Al Rabiah more likely than not traveled to Afghanistan in October 2001 for charitable purposes.

B.     *Al Rabiah's Activities in Afghanistan*

The Government's case rests primarily on three allegations concerning Al Rabiah's activities in Afghanistan.  First, the Government asserts that Al Rabiah traveled to Afghanistan for approximately two weeks in July 2001 where he met Usama Bin Laden on four occasions and then returned to Kuwait until his trip in October 2001.  Second, the Government asserts that Al

---

Al Rabiah's statements at length below, for present purposes, the Court shall simply note that this evidence provides no support for the Government's argument that Al Rabiah traveled to Afghanistan to aid bin Laden in October 2001.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Rabiah fought at Tora Bora and took a leadership position by distributing supplies and managing resource disputes. Third, the Government asserts that Al Rabiah is part of al Qaeda because he traveled through Afghanistan with members of al Qaeda, stayed at al Qaeda guesthouses, and surrendered his passport to al Qaeda members pursuant to its standard operating procedures. The Government relies on the first allegation – that Al Rabiah met with Usama bin Laden – only to the extent that it supports the Government's other allegations in this case, and not as itself a basis for Al Rabiah's detention. 8/27/09 Merits Hrg. Tr. at 157-58 (clarifying that the Government's evidence related to Al Rabiah's association with bin Laden and his history of volunteering for organizations that have now been designated as supporters of terrorism were offered only to show Al Rabiah's "propensities" and that he acted in conformity with those propensities when he traveled to Afghanistan in October 2001).

The Court's discussion of the Government's allegations shall proceed in three steps. First, the Court shall address the alleged eyewitnesses, as to whom the Government has withdrawn substantially all reliance in this case, and explain why none of these witnesses have provided reliable or credible allegations against Al Rabiah. Second, the Court shall address Al Rabiah's alleged confessions, on which the Government relies almost exclusively to support his detention, and explain why they too are neither reliable nor credible. Third, the Court shall briefly address the Government's few remaining arguments based on the evidence in the record and explain why these arguments do not provide a basis for Al Rabiah's indefinite detention. Ultimately, the Court concludes that the Government has not proffered sufficiently credible and reliable evidence to support its allegations concerning Al Rabiah's activities in Afghanistan, and although Al Rabiah has not provided a full explanation for his activities either, the Government

18

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

and not Al Rabiah bears the burden in this case.

        1.    <u>Alleged Eyewitnesses</u>

           i.    ███ b(1), b(6) ███

The first detainee at Guantanamo who made allegations against Al Rabiah was ███ b(1), b(6) ███ ███ b(1), b(6) ███ Although his allegations are filled with inconsistencies and implausibilities, the Government continues to rely on him as an eyewitness to Al Rabiah's activities at Tora Bora. There is no justification for the Government's reliance on ███ b(1), b(6) ███ in this case.

    ███ b(1), b(6) ███ made his first set of allegations against Al Rabiah on ███ b(2) ███ when he described a meeting that occurred in the Tora Bora mountains during the last week of October 2001. Ex. 41 at 3 ███ b(1), b(2), b(6) ███ [12] ███ b(1), b(6) ███ ███ b(1), b(6) ███ and was told that Al Rabiah was in charge of supplies at Tora Bora. *Id.* ███ b(1), b(6) ███ also stated that ███ b(1) ███ ███ b(1) ███ Ex. 195 at 2 ███ b(1), b(6) ███ ███ b(1), b(6) ███ As these allegations reflect ███ b(1), b(6) ███ was not speaking based on firsthand knowledge, and the reliability of the unnamed ███ b(1) ███ is entirely unknown. Additionally, ███ b(1), b(6) ███ interrogator immediately questioned his second allegation because ███ b(1) ███ ███ b(1) ███ *Id.* at 1. In fact, it is

_____

[12] ███ b(1), b(6) ███ identified Al Rabiah using his kunya or nickname, ███ b(1), b(6) ███ The Government has conceded that another individual named ███ 1, 6 ███ was present in Tora Bora, 8/31/09 Merits Hrg. Tr. at 49, and the evidence in the record suggests that this other individual was from Kuwait and was an al Qaeda operative. Ex. 164 at 1 (3/20/02 Summary of Document) (translation of a letter threatening attacks on Americans from an individual named ███ 1 ███ ); Ex. 165 at 8 (Undated Translation of loose pages of persons who died in Tora Bora) ███ 1 ███ . Based on the Court's assessment of ███ b(1), b(6) ███ allegations, the Court need not reach the issue of whether ███ b(1), b(6) ███ allegations against Al Rabiah involved a mistaken identification.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

undisputed that Al Rabiah's oldest son would have been 11 years old in 2001, Ex. 175 ¶ 2

(3/17/09 Decl. of Al Rabiah), and the Government has never argued that Al Rabiah brought his

son with him to Afghanistan.

█ provided a second set of allegations on █ Ex. 42 █

█ This time purporting to provide first-hand information about

Al Rabiah's activities in Afghanistan, █ alleged that:



*Id.* at 1. The Government has not even attempted to defend most of the allegations quoted above.

It is undisputed, for example, that Al Rabiah never studied to be a pilot, Ex. 175 ¶ 3 (3/17/09

Decl. of Al Rabiah), and the Government has never alleged that someone who was so slow that

█ could nonetheless █ There

is similarly no evidence in the record that Al Rabiah had the training or background that would

have allowed him to become a trusted leader of a fighting group, and the Government has never

suggested otherwise.

█ provided a third and final set of allegations on █ when he

alleged that he met Al Rabiah in █ and provided new insights into Al Rabiah's activities:



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



Ex. 17 at 1-2 [b(1), b(2), b(6)] [b(1), b(6)] allegation that Al Rabiah [b(1)] is inconsistent with his allegation that Al Rabiah [b(1)] [b(1)] Further, [b(1), b(6)] 's allegation that he carried Al Rabiah's [b(1)] is completely incredible because Al Rabiah's counsel cited evidence at the Merits Hearing that 120 rounds of ammunition for a Kalashnikov would have weighed approximately five pounds, Ex. 117 at 4 (1998 Jane's Infantry Weapons Excerpt) (explaining that a 30-round magazine weighs approximately .6 kilograms, the equivalent of 1.3 pounds), and the Government did not argue otherwise.

Based on these inconsistencies and impossibilities, the Court has little difficulty concluding that [b(1), b(6)] 's allegations are not credible. In addition, Al Rabiah's counsel submitted into the record numerous exhibits that undermine [b(6)] 's reliability based on, among other things, undisputed inconsistencies associated with his allegations against other detainees, instances where [b(1), b(5)] , and medical records suggesting that he [b(6)] . 8/31/09 Merits Hrg. Tr. at 33-34 (listing exhibits). At a minimum, the Government would have had to corroborate [b(1), b(6)] 's allegations with credible and reliable evidence, which it has not done. Accordingly,

21

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

the Court shall find that ██████'s allegations are entitled to no weight and they shall not be considered probative of whether Al Rabiah's detention is lawful.

      ii. ██████████

The second detainee to make allegations against Al Rabiah was ██████ Over a series of interrogations, ██████ alleged that Al Rabiah attended a feast hosted by Usama bin Laden where Al Rabiah presented bin Laden with a suitcase filled with money, that Al Rabiah served in various fighting capacities in the Tora Bora mountains, and that Al Rabiah funneled money to mujahadeen in Bosnia in 1995. The Government has now withdrawn its reliance on almost all of ██████ allegations except for his claim against Al Rabiah in Bosnia. The Government's reliance on ██████ in this case even for this one allegation is unjustifiable.

First, the only consistency with respect to ██████ allegations is that they repeatedly change over time. With respect to ██████ allegation that Al Rabiah attended a feast with Usama Bin Laden, in one version ██████████ Ex. 30 at 3 ██████████ in another version ██████ ██████ Ex. 33 at 2 ██████████ ██████████, in another interrogation he explained that ██████ ██████ Ex. 154 at 1 ██████████ and in yet another version he stated that, rather than presenting bin Laden with money, Al Rabiah solicited *others* to give donations to bin Laden during the feast. Ex. 96 (2/22/06 Interrogation of ██ ██). Morever, in one version of ██████ allegations ██████ ██████ Ex. 24 at 2-3 ██████████ in another version ██████ ██████ Ex. 36 at 2 ██████████

UNCLASSIFIED//FOR PUBLIC RELEASE

and in another version Al Rabiah arrived with "a Palestinian male by the name of ████████
also called ████ '" Ex. 96 at 1 (2/22/06 Interrogation of ██████). The guest list for this
feast also consistently changes over time, with the differences too numerous to identify. *See,
e.g.*, 8/27/09 Merits Hrg. Tr. at 72.  In fact, ████████ claimed in one interrogation that this
alleged feast occurred in August 2001, when it is undisputed that Al Rabiah was not even in
Afghanistan.  ██████████████████████████  The Government did not attempt to
defend these allegations at the Merits Hearing or explain these inconsistencies.

    Second, several of ██████████'s allegations are demonstrably false.  For example, ██████████
alleged that ██████████████████████████████████████████████████
██████████████████████████████████████  It is undisputed, however,
that Al Rabiah is "not a pilot, nor ha[s] [he] ever trained as a pilot [and] [has] never taught in a
flight school," Ex. 175 ¶ 3 (3/17/09 Decl. of Al Rabiah), and the Government has never alleged
that Al Rabiah trained the 9-11 hijackers. ██████████ also alleged that ██████████████
██████████████████████  Ex. 146 at 2 ████████████████████████
██████████  As described above, it is undisputed that Al Rabiah's oldest son would have been 11
years old at the time and the Government has never alleged that Al Rabiah's son accompanied
him to Afghanistan. Ex. 175 ¶ 2 (3/17/09 Decl. of Al Rabiah).

    Third, there are multiple exhibits in the record demonstrating ██████████ unreliability as a
witness.  For example, in a ██████ interrogation, ████████████████████████████
██████████████████████████████████████.  Ex. 146 at 2 ██████████████
██████████████  Al Rabiah's counsel at the Merits Hearing demonstrated that ██████████
██████████ misidentified all ██████ individuals about whom he provided information.  8/31/09 Merits



Hrg. Tr. at 39 (explaining that ▮▮▮ provided the wrong nation of origin for all ▮▮▮ individuals he identified ▮▮▮. As another example, ▮▮▮ was asked during an ▮▮▮ interrogation ▮▮▮ Ex. 158 at 2 ▮▮▮ He first stated that ▮▮▮ ▮▮▮ and even when ▮▮▮ ▮▮▮ Id. Yet, in a subsequent interrogation, ▮▮▮ ▮▮▮ stated that ▮▮▮ and he then provided additional information about ▮▮▮ activities. Ex. 163 at 2 ▮▮▮ ▮▮▮ The Court also notes that, as of ▮▮▮ ▮▮▮ ▮▮▮ Ex. 136 at 2 ▮▮▮, and that he explained to interrogators that ▮▮▮ ▮▮▮ Id. These facts raise, at a minimum, a serious question about ▮▮▮ mental capacity to accurately make allegations against Al Rabiah, but the Government did not address them at the Merits Hearing.

Based on the inconsistencies and impossibilities associated with ▮▮▮ allegations – which the Government did not attempt to defend at the Merits Hearing – and ▮▮▮ demonstrable lack of reliability as a witness, the Court finds no basis to credit his allegation about Al Rabiah in Bosnia. Given the foregoing, the Government would have had to provide the Court with, at a minimum, evidence establishing ▮▮▮ basis of knowledge for this allegation or present credible corroborating evidence, which it has not done. Accordingly, ▮▮▮ ▮▮▮ allegation shall not be considered probative of whether Al Rabiah's detention is lawful.

       iii. ▮▮▮



The third detainee who made allegations against Al Rabiah is ███ ██████ █████ alleged that ██████ ████ ██████ Ex. 151 at 1 ████████████ . Several months later, however, ████ explained that ████████████ was *not* Al Rabiah, ████████ Ex. 152 at 1 ████████████ [13]

Accordingly, ████████ allegations shall not be considered probative of whether Al Rabiah's detention is lawful.

iv.    ████

The final detainee who provided an allegation against Al Rabiah is ████████ ████ Unlike the other detainees, it is undisputed that Al Rabiah had contact with ████████ while he was in Afghanistan. Nevertheless, the Court finds that ████████ allegation against Al Rabiah is unreliable and not credible.

As described above, Al Rabiah was unable to exit Afghanistan and attempted to travel across the country to exit through the Pakistani border toward Peshawar. Ultimately, Al Rabiah attempted to reach Peshawar through the Tora Bora mountains, but was unable to do so given his health conditions and various ailments. According to Al Rabiah's declaration, "Al Quwari assisted [him] in getting down from the Tora Bora mountains," Ex. 175 ¶ 32 (3/17/09 Decl. of Al

---

[13] Al Rabiah's counsel also submitted affirmative evidence demonstrating that Al Rabiah could not have been the person to whom ████████ was referring (*e.g.*, by establishing that Al Rabiah was not in Afghanistan in 1991). Al Rabiah's counsel also submitted evidence that ████ was subject to unlawful interrogation techniques. Ex. 192 at 24-25 (4/6/09 Transcript, *Aziz v. Obama*, No. 05-492). Because ████████ admitted that his allegations did not relate to Al Rabiah and the Government did not argue otherwise at the Merits Hearing, the Court makes no findings with respect to whether ████████ statements were the product of abuse or coercion.

25

UNCLASSIFIED//FOR PUBLIC RELEASE

Rabiah), prior to getting detained with Al Quwari outside of Jalalabad. █████ provided a similar explanation during one of his interrogations when he stated that █████ █████ Ex. 95 at 2 █████ █████ made one allegation against Al Rabiah during a █████ interrogation, when he stated that █████ █████ █████ Ex. 95 at 2 █████ The Court does not credit this allegation for two reasons. First, the allegation is not that █████ saw Al Rabiah with a weapon, but rather, that Al Rabiah █████ , suggesting that █████ was speculating or repeating hearsay and was not reporting information that he saw firsthand. The interrogation report provides no identification of the person who would have provided this information to █████ █████ such that the Court could evaluate the person's reliability. Second, and equally problematic, is that █████ made this allegation while he was undergoing a cell relocation program at Guantanamo called the "frequent flier program," which prevented a detainee such as █████ from resting due to frequent cell movements. Ex. 147 at 1 █████ █████ According to a report published by the Senate Armed Services Committee concerning the treatment of detainees in United States custody, sleep deprivation was *not* a technique that was authorized by the Army Field Manual. Ex. 191 at 132 (11/20/08 Senate Armed Services Committee Report). Although sleep deprivation became authorized at Guantanamo by the Secretary of Defense on April 16, 2003, the guidance issued by the Commander of USSOUTHCOM on June 2, 2003, prohibited the use of sleep deprivation for more than "four days in succession." Ex. 189 at 10 (4/1/05 Army Regulation 15-6 Final Report). According to



UNCLASSIFIED//FOR PUBLIC RELEASE

the evidence in the record, ███████ was subject to the frequent flier program between ████

████████████████████ ███████████ allegation against Al Rabiah was

made after one week of sleep deprivation in this program, and he did not repeat this allegation

either before or after the program.  Under such circumstances, the Court cannot credit ██████████

███████ uncorroborated and unreliable allegation against Al Rabiah, and the Court shall not

consider it probative of whether Al Rabiah's detention is lawful.

* * *

For the reasons described above, the Court finds that none of the alleged eyewitnesses

have provided credible allegations against Al Rabiah.  Although the Government withdrew most

of its reliance on these witnesses for purposes of the Merits Hearing, it is very significant that Al

Rabiah's interrogators apparently believed these allegations at the time they were made, and

therefore sought to have Al Rabiah confess to them.  As the evidence in the record reflects, Al

Rabiah subsequently confided in interrogators ██████████████████████████ that

he was being pressured to falsely confess to the allegations discussed above.  Nevertheless, Al

Rabiah's interrogators ultimately extracted confessions from him, but they never believed his

confessions based on the comments they included in their interrogation reports.  These are the

confessions that the Government now asks the Court to accept as evidence in this case, and that

the Court shall now discuss in the section that follows.

    2.    <u>Al Rabiah's Confessions</u>

The Government rests its case on Al Rabiah's confessions made after Al Rabiah's

interrogators ████████████████ on ██████████ Ex. 29 at 1 ████████████████

████████ To understand why the Court does not view these confessions as credible or reliable,

the Court shall describe Al Rabiah's interrogations and his corresponding statements in three

phases: (1) from ███ through ███, during which there were no allegations

directed toward Al Rabiah and Al Rabiah provided no confessions; (2) from ███ until

███ during which ███ and ███ made their now-discredited allegations and

Al Rabiah was told of the allegations against him, but Al Rabiah nevertheless made no

confessions; and (3) from ███ until the present, during which Al Rabiah confessed to

the now-discredited allegations against him, as well as to other "evidence" that interrogators told

him they possessed when, in fact, such evidence did not exist.

        i.     ███ until ███

Al Rabiah arrived at Guantanamo Bay in ███. 8/28/09 Merits Hrg. Tr. at 36. From

that date until ███, there is no evidence in the record that anyone directed any

allegations toward Al Rabiah nor any indication that interrogators believed Al Rabiah had

engaged in any conduct that made him lawfully detainable. To the contrary, the evidence in the

record during this period consists mainly of an assessment made by an intelligence analyst that

Al Rabiah should not have been detained.



*Id.* This is the

only analyst-level evaluation of Al Rabiah in the record of which the Court is aware.[14] Although

---

[14] During the Merits Hearing, the Government's counsel argued that the analyst's
conclusion ███████ was actually Al Rabiah's
own description of his detention. 8/27/09 Merits Hrg. Tr. at 106 ("there's no reason to believe

UNCLASSIFIED//FOR PUBLIC RELEASE

the Government sought to downplay the importance of this assessment at the Merits Hearing by

arguing that it represented the opinion of only one analyst, 8/27/09 Merits Hrg. Tr. at 106,

according to the Government's own evidence, "[i]ntelligence analysts undergo rigorous tradecraft

training [and] use various methods and employ specific analytical tools to assist them in sorting

and organizing [] various pieces of information." Ex. 1 at 7-8 (9/19/08 Decl. of ████

████ Analysts are also "trained to recognize and mitigate biases, not only in the

information presented to them, but their own cognitive biases as well." *Id.* at 8.  The

Government offers no reason why, given the significant training and substantial abilities of its

intelligence analysts, the Court should discount the conclusions of the intelligence analyst who

reviewed the circumstances of Al Rabiah's detention.  Accordingly, the Court finds that the

opinion of this intelligence analyst is relevant and it shall be considered probative of whether Al

Rabiah's detention is lawful.

      ii.   ████ through ████

    The circumstances of Al Rabiah's detention changed in ████ after ████ made

his first allegation against Al Rabiah, ████

████ Ex. 23 ████

████ ; Ex. 24 ████ A new lead interrogator was assigned to

Al Rabiah on ████ named ████, whose express objective was to

████

---

that that's the [analyst's] viewpoint" because [Government counsel] reads his conclusion as "a
description of Mr. Al Rabiah's views of his situation").  That argument has no merit because the

████

29



b(1) ███████████████ Ex. 25 at 1 b(2) ███████████████████

For approximately the next b(2) ██████, despite repeated interrogations by b(3) ████ and

other interrogators, Al Rabiah denied b(1) █████████████████████████████

b(1) █████ *See, e.g.,* Ex. 27 at 3 b(2) ██████████████. Ex. 11 at 1-3 (5/6/03

Interrogation of Al Rabiah) (expressing frustration to FBI agents that he was repeatedly asked,

among other questions, whether he had ever seen Usama bin Laden, and remarking that his

answer was "no" and would continue to remain "no").  At one point, Al Rabiah b(1) ████████

b(1) ████████████████████████████ Ex. 137 at 3 b(2) █████████

b(2) ████████ b(1) █████████████████████████████████

b(1) █████████

After approximately b(1) ████████ interrogations, Al Rabiah's interrogators switched to a

new three-pronged approach.  First, Al Rabiah was introduced to a second set of interrogators

who b(1), b(2) █████████████████████. Ex. 137 at 1 b(2) █████████

b(2) ███████████ These interrogators explained to Al Rabiah that b(1) ██████████

b(1) ████████████████████████████████████████████

b(1) ████████████████████████████████████████████

b(1) ██████████████████████████ *Id.* at 2.  They also told Al Rabiah that

b(1) ████████████████████████████████████████████

b(1) ████████████████████████████████████████████

b(1) ██████████████████████████ *Id.*  Second, b(3) ████ and Al

Rabiah's b(2) ███████████████████ b(1), b(2) █████████████████████

b(1), b(2) ██████████████████████████████████████ They told

30

UNCLASSIFIED//FOR PUBLIC RELEASE

Al Rabiah that ▨ ████████████████████████████

████████████████████████████ Ex. 138 at 1-3 ▨

▨ ████████████████

████████████████████████████

▨ *Id.* The third aspect of this approach was that the interrogators explained to

Al Rabiah ▨ ████████████████████████████

▨ Ex. 137 at 2 ▨ ████████████████ ▨ ██████████████

▨ ████████████████████████████ *Id.*

    This new approach did not result in any confessions.  Al Rabiah repeatedly denied the

allegations against him and ▨ ████████████████ Ex. 138 at 3

▨ ████████████ On ▨ ████ after Al Rabiah's ▨ interrogation at

Guantanamo, and after again denying the allegations against him, the ▨ b(1), b(2), b(5)

b(1), b(2), b(5) ████████████████████████████

b(1), b(2), b(5) ████████████████████████ Ex. 139 at 1

▨ ████████ (explaining that Al Rabiah was **b(1), b(5)**

**b(1), b(5)** ████████████████████████

**b(1), b(5)** ████████████████████████

b(1), b(5) b(1), b(5) ████████████████████

b(1), b(5) ████ *Id.* at 3.

    Although it is unclear what this ▨ entailed, Al Rabiah met with the ▨ b(1), b(2)

b(1), b(2) ████████████████████████

b(1), b(2) ████████████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



**b(1), b(2)** _____ Ex. 140 at 1 **b(2)** _____ He further

explained that **b(1)** _____

**b(1)** _____ *Id.* In

response, **b(1), b(2)** _____

**b(1), b(2)** _____ *Id.* at 2.  Al Rabiah responded that he was grateful to **b(1), b(2)** _____

**b(1), b(2)** for trying to help him, but **b(1)** _____

**b(1)** _____ *Id.* at 2.  Following this exchange, **b(1), b(2)** _____

**b(1), b(2)** _____

**b(1), b(2)** _____ *Id.*

at 3.

Apparently following this recommendation, **b(3)** began using more aggressive

interrogation tactics, including **b(1)** and **b(1), b(2)** _____ .  As defined in the

Army Field Manual, Ex. 101 (9/28/92 FM 34-52), the **b(1), b(2)** _____ is designed to exploit

**b(1)** _____ . . **b(1)** _____

**b(1)** _____ *Id.* at

3-15 - 3-16.  The **b(1), b(2)** _____ is used **b(1)** _____

**b(1)** _____ *id.* at 3-16, specifically by **b(1)** _____

**b(1)** _____

**b(1)** _____ *id.* 3-17.  Although allowed

by the Army Field Manual, the report issued by the Senate Armed Services Committee explains

that the **b(1), b(2)** _____ did not become authorized by the Secretary of Defense

for use at Guantanamo until April 16, 2003.  Ex. 191 at 132 (11/20/08 Senate Report).  Once it

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

became authorized, it could not be used on a detainee until "the SOUTHCOM Commander

ma[de] a determination of 'military necessity' and notif[ied] the Secretary in advance" of its use.

*Id.* In this case, the Government was unable to produce any evidence that ██████ obtained

authorization to use the ████████ technique with Al Rabiah despite requests by the

Court at the Merits Hearing for such evidence.



During ████ initial interrogation applying these new techniques, he informed Al

Rabiah ████████████████████████████████

████████ Ex. 141 at 3 ████████ Interrogators

elevated Al Rabiah's ████████████ (which is not explained in

greater detail) and told him that they ████████████

████ *Id.* They then told Al Rabiah that ████████

████████████████████████████████

████████████████ *Id.* at 3-4. ████

████████████████████████ *Id.* at 3.

The following day marked a turning point in Al Rabiah's interrogations.  Ex. 29 ████

████ After using a ████████ (with no further details)

featuring ████ and ████ for approximately ████

████████████████ *Id.* at 1. ████

████████████████████████████

████████████ *Id.* at 2. ████

████████████

*Id.* at 1.  From that point forward, Al Rabiah confessed to the allegations that interrogators

33

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

described to him.

  iii.   ██b(2)██ to the present

Al Rabiah's confessions all follow the same pattern: Interrogators first explain to Al

Rabiah the "evidence" they have in their possession (and that, at the time, they likely believed to

be true). Al Rabiah then requests time to pray (or to think more about the evidence) before

making a "full" confession. Finally, after a period of time, Al Rabiah provides a full confession

to the evidence through elaborate and incredible explanations that the interrogators themselves

do not believe. This pattern began with his confession that he met with Usama bin Laden,

continued with his confession that he undertook a leadership role in Tora Bora, and repeated

itself multiple other times with respect to "evidence" that the Government has not even attempted

to rely on as reliable or credible. The Court shall describe these confessions in turn.

During the ██b(2)██ interrogation where Al Rabiah ██b(1)██ he admitted

██b(1)██ Ex. 29

at 1, 3 ██b(2)██ ██b(1)██

██b(1)██

██b(1)██ *Id.* at 2-3. ██b(1)██

██b(1)██ *Id.* at 3. The result was the following

confession, ██b(1)██

██b(1)██



UNCLASSIFIED//FOR PUBLIC RELEASE



Ex. 29 at 3.

*Id.* at 4.

On [b(2)] Al Rabiah's interrogations resumed, and Al Rabiah made a full confession that is entirely different than his initial confession.[15]  Ex. 31 at 1-9

Most significantly, he confessed to

*Id.* at 3-4.

*Id.* at 6.  According to Al Rabiah,

*Id.* at 7.

*Id.* at 8.

---

[15] One possibility for the differences between confessions is that, in addition to confessing to meeting with bin Laden, Al Rabiah's full confession sought to weave together all of the "evidence" interrogators told Al Rabiah that they possessed, even though the "evidence" is absent from the record in this case (if it ever existed) or was based on the alleged eyewitnesses whom the Court has found to lack credibility or reliability.  For example, Al Rabiah was told

Ex. 137 at 2

Ex. 31 at 1

35

UNCLASSIFIED//FOR PUBLIC RELEASE



Notably, Al Rabiah's full confession did not incorporate a description concerning a suitcase full of money that he allegedly gave Bin Laden.  There is no evidence in the record that Al Rabiah's interrogators informed Al Rabiah about this allegation until ██████, approximately ████ after this full confession.  Ex. 143 at 3 ████ ████ At that point, interrogators "confronted" Al Rabiah with ████████ ████████ *Id.*  Al Rabiah did not know what to admit:

████████████████████████████████████

Ex. 143 at 3 ████ ).  ████████

████████████

████ Ex. 150 at 1 ████ .

Significantly, Al Rabiah's interrogators began to question the truthfulness of his confessions almost immediately.  On ████, Al Rabiah's interrogators noted that, even though ████████ ████████ Ex. 142 at 1, 5 ████ ).  Less than ████ later, interrogators noted that the story Al

36

Rabiah provided to them had  ▮b(1)▮ Ex. 145 at 3 (▮b(2)▮

▮b(2)▮ ).

Nevertheless, having obtained Al Rabiah's confession about bin Laden, his interrogators

turned their attention to the allegations originating from ▮b(6)▮ and ▮b(6)▮ concerning Tora

Bora. Ex. 32 at 1-6 ▮b(2)▮ . ▮b(2)▮

interrogators began "grilling" Al Rabiah concerning ▮b(1)▮ *Id.* at 5. Al

Rabiah initially denied ▮b(1)▮ [6] *Id.* Based on the information in this

interrogation report, it is unclear whether Al Rabiah's denial of ▮b(1)▮

▮b(1)▮

▮b(1)▮ In any event,

interrogators told Al Rabiah that ▮b(1)▮

▮b(1)▮ *Id.* Similar to Al Rabiah's

confession concerning bin Laden, Al Rabiah ▮b(1)▮

▮b(1)▮ *Id.* ▮b(1)▮

▮b(1)▮ *Id.* ▮b(1)▮

▮b(1)▮

▮b(1)▮ *Id.* The interrogators agreed to end their interrogation after Al Rabiah's brief confession.

*Id.* at 6.

---

[16] "Tora Bora" is the name used to describe bin Laden's six square mile cave complex in
the 100 square mile Spin Ghar Mountain range sitting on the border between Afghanistan and
Pakistan. Ex. 98 at 97 (3/31/08 U.S. Special Operation Command History). Al Rabiah has
admitted that he attempted to cross through Tora Bora in an attempt to reach Peshawar, Pakistan.
Ex. 175 ¶ 12 ("I tried to make my way through the Tora Bora mountains to Pakistan, but my
health and physical fitness were too poor").

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



[b(2)]              , Al Rabiah was interrogated [b(2)]              during which he made a full confession regarding his activities at Tora Bora.  Ex. 142 [b(2)]

[b(2)]   ).  According to Al Rabiah's confession, [b(1), b(6)]

[b(1), b(6)]

[b(1), b(6)]

[b(1), b(6)]   *Id.* at 3. [b(1), b(6)]

[b(1), b(6)]   *Id.* [b(1), b(6)]

[b(1), b(6)]

[b(1), b(6)]   *Id.* [b(1)]

[b(1)]   *Id.* [b(1)]

[b(1)]   *Id.* He also [b(1)]

[b(1)]   *Id.*

Interrogators pressed for additional details concerning Tora Bora [b(2)]          .

Ex. 143 at 3 [b(2)]                    ).  In this confession, Al Rabiah [b(1), b(6)]

[b(1), b(6)]

[b(1), b(6)]          :

*Id.* at 3.

At this point, Al Rabiah's interrogators became increasingly convinced that his

38

UNCLASSIFIED//FOR PUBLIC RELEASE



confessions ▓▓▓▓▓▓. They concluded in one interrogation report ▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 34 at 1-6

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). The interrogators observed that ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* One week later, Al Rabiah's interrogator

concluded that Al Rabiah ▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓ Ex. 37 at 3 ▓▓▓▓▓▓▓▓▓▓▓). After several additional

interrogation sessions, Al Rabiah's interrogators concluded simply ▓▓▓▓▓▓

▓▓▓▓▓▓ Ex. 38 at 3 ▓▓▓▓▓▓▓). Incredibly,

these are the confessions that the Government has asked the Court to accept as truthful in this

case.

The Court briefly describes two other confessions made by Al Rabiah (even though the

Government does not even attempt to rely on them as credible and reliable) because they follow

the same pattern reflected in Al Rabiah's confessions described above.[17]  First, during a ▓▓▓▓

▓▓ interrogation where interrogators ▓▓▓▓▓▓▓▓▓▓▓ and told

him ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[17] During the Merits Hearing, the Government took the position that it was coincidental
that Al Rabiah only provided his confessions after his interrogators received the allegations from
the now-discredited eyewitnesses and after telling Al Rabiah about the allegations. 8/27/09
Merits Hrg. Tr. at 104 ("THE COURT: So, your view of it is that . . . it's coincidence that he
would not make any statements about seeing UBL or didn't bring up anything about it, they go
talk to [the alleged eyewitnesses] who indicates this, they come back, and the reports indicate
that they are clearly telling him what other detainees are saying?  THE GOVERNMENT: Yes,
Your Honor").

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



**b(1)** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 145 at 3 **b(2)** ▮▮▮▮▮▮▮▮▮ ) ( **b(1)** ▮▮▮▮▮▮▮▮

**b(1)** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**b(1)** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Al Rabiah

**b(1)** ▮▮▮▮▮▮ and **b(2)** ▮▮▮▮▮, he provided interrogators with a full confession

**b(1)** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**b(1)** ▮▮▮▮▮▮▮▮▮▮▮ Ex. 34 at 3-4 **b(2)** ▮▮

**b(2)** ▮▮▮▮▮▮ In their interrogation report, interrogators noted that Al Rabiah's

story was **b(1)** ▮▮▮▮▮▮▮▮▮▮▮▮

**b(1)** ▮▮▮▮▮▮▮ *Id.* at 6 **b(1)** ▮▮

**b(1)** ▮▮▮▮▮▮▮▮▮▮▮▮▮

Another example of this confession pattern occurred on **b(2)** ▮▮▮▮, when interrogators

questioned Al Rabiah about **b(1)** ▮▮▮▮▮▮▮

**b(1)** ▮▮▮▮▮▮▮▮ Ex. 38 at 2 **b(2)** ▮▮▮▮▮▮▮ [18]

Initially, Al Rabiah denied **b(1)** ▮▮▮▮▮▮ *Id.* **b(2)** ▮▮▮▮,

however, Al Rabiah not only confessed **b(1), b(6)** ▮▮▮▮

**b(1), b(6)** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**b(1), b(6)** ▮▮▮▮▮▮▮▮ Ex. 39 at 2 ( **b(2)** ▮▮

**b(2)** ▮▮▮▮▮▮ ).  The Government has not even attempted to explain how someone

---

[18] **D1** ▮

**D1** ▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 6 at 1 (8/29/08 Decl. of **D3** ▮ ;
Stipulations of Fact ¶ 3 **D1** ▮▮▮▮▮▮

40

UNCLASSIFIED//FOR PUBLIC RELEASE

with no known connections to al Wafa and who had never even been to Afghanistan longer than a few weeks could ascend to such an honored position, and no credible explanation is contained in the record.

In anticipation of his Merits Hearing in this case, Al Rabiah submitted two declarations explaining why he provided the confessions described above. He explains that, several months after arriving at Guantanamo, he was told by an interrogator that he had to confess to something or that he would not be sent back to Kuwait:

> a senior ▮b(3)▮ interrogator came to me and said: 'There is nothing against you. But there is no innocent person here. So, you should confess to something so you can be charged and sentenced and serve your sentence and then go back to your family and country, because you will not leave this place innocent.

Ex. 176 ¶ 15 (3/17/09 Decl. of Al Rabiah). After his interrogators were changed (presumably referring to ▮b(3)▮ ), Al Rabiah explains that his confessions arose out of "scenarios offered . . . by [his] interrogators . . . which [he] believed to be the story they wanted [him] to tell and which [he] felt pressured to adopt." Ex. 175 ¶ 13 (3/17/09 Decl. of Al Rabiah). According to Al Rabiah, his interrogators told him these admissions were a way for the United States to "save face" and would allow him to be sent back to Kuwait:

> my interrogators told me they knew I had met with Usama bin Laden, that other detainees had said I met with Usama bin Laden, that there was nothing wrong with simply meeting Usama bin Laden, and that I should admit meeting with him so I could be sent home . . . In about August 2004, shortly before my CSRT hearing [an administrative review of Al Rabiah's detention], my interrogators told me the CSRT was just a show that would allow the United States to 'save face.' My interrogators told me no one leaves Guantanamo innocent, and told me I would be sent home to Kuwait if I 'admitted' some of the false things I had said in my interrogations. The interrogators also told me that I would never go home if I denied these things, because the United States government would never admit I had been wrongly held.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

*Id.* ¶¶ 13-14. Al Rabiah also explains that he made his confessions to reduce the abuse meted out by his interrogators "to obtain confessions that suited what [they] thought they knew or what they wanted [him] to say." Ex. 176 ¶ 17. He maintained his confessions over time because "the interrogators would continue to abuse me anytime I attempted to repudiate any of these false allegations." Ex. 175 ¶ 13.

There is substantial evidence in the record supporting Al Rabiah's claims. The record is replete with examples of Al Rabiah's interrogators emphasizing a stark dichotomy – if he confessed to the allegations against him, his case would be turned back over to ▮b(1), b(2) ▮b(1), b(2)▮ so that he could return to Kuwait; if he did not confess, he would not return to Kuwait, and his life would become increasingly miserable. His interrogation on ▮b(2)▮ ▮b(2)▮ is a representative example of what his interrogators told him:

▮b(1), b(2) ▮

Ex. 144 at 3 ▮b(2)▮ ). Similarly, during a ▮b(2)▮ interrogation, Al Rabiah ▮b(1)▮ Ex. 142 1-4 ▮b(2)▮ ▮b(2)▮ ). His interrogators told him that ▮b(1)▮ ▮b(1)▮ ▮b(1)▮ *Id.* at 4. Interrogators decided to increase his ▮b(1)▮ after this confession but wrote that, if he refused to admit to his activities in Tora Bora again, ▮b(1)▮

42

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



*Id.*

The record also supports Al Rabiah's claims that he was punished for recanting.

Ex. 149 at 2

*Id.*

*Id.* at 2.

The record contains evidence that Al Rabiah's interrogators became increasingly frustrated because his confessions contained numerous inconsistencies or implausibilities. As a result, Al Rabiah's interrogators began using abusive techniques that violated the Army Field Manual and the 1949 Geneva Convention Relative to the Treatment of Prisoners of War. The first of these techniques included threats of rendition to places where Al Rabiah would either be tortured and/or would never be found. Ex. 101 at 1-8 (34-52 Army Field Manual) (prohibiting "[t]hreatening or implying physical or mental torture to the subject" and "[t]hreatening or implying that other rights guaranteed by the [the Geneva Conventions] will not be provided unless cooperation is forthcoming").

The first threat reflected in the record occurred on ▇▇▇▇ when Al Rabiah's interrogators told him that,

43

UNCLASSIFIED//FOR PUBLIC RELEASE



Ex. 149 at 2 ▮). On ▮ his interrogators

amplified this threat:

Ex. 71 at 2 ▮). His interrogators reinforced this threat on

▮ by explaining that he would ▮ Ex. 72 at

2 ▮). On ▮, interrogators again threatened Al

Rabiah ▮:

Ex. 73 at 2 ▮).

These threats were also reinforced by placing Al Rabiah into the frequent flier program,

an interrogation "technique" that, as already noted, violated the Army Field Manual and the 1949

Geneva Convention Relative to the Treatment of Prisoners of War. Ex. 101 at 1-8 (34-52 Army

44

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Field Manual) (prohibiting "abnormal sleep deprivation"); Ex. 191 at 132 (Senate Armed

Services Report) (explaining that "sleep adjustment" is not an authorized technique "listed in the

Army Field Manual"). Based on the documents submitted into the record, Al Rabiah was moved

between cells ███ b(1), b(2) ████████████ Ex.

119, Ex. A (8/19/09 Decl. of ██B6██ ██b(2)██████ While on this

program, Al Rabiah's interrogators continued to threaten him ██b(1)██:



Ex. 74 at 2 ██b(2)██████). As explained in the Army Field Manual, these

"prohibited techniques [are] not necessary to gain the cooperation of interrogation sources." Ex.

101 at 1-8 (FM 34-52 Army Field Mauaul). In fact, the use of these methods is likely to "yield[]

unreliable results, may damage subsequent collection efforts, and can *induce the source to say

what he thinks the interrogator wants to hear*." *Id.* (emphasis added).

Underscoring the impropriety of these techniques is the fact that ██b(3)██, Al Rabiah's lead

interrogator, was disciplined for making similar threats during the same period toward a

Guantanamo detainee who was also one of the alleged eyewitnesses against Al Rabiah. Ex. 188

at 26-27 (Army Regulation 15-6 Final Report). ██b(3)██'s threat to the other Guantanamo detainee

for which he was disciplined consisted of the following:

UNCLASSIFIED//FOR PUBLIC RELEASE

**b(1)** ███████████████████████████████████████████

*Id.* at 26.

These abusive techniques did not result in any additional confessions from Al Rabiah,
although he continued to parrot his previous confessions with varying degrees of consistency.  In
**b(2)** ████████, **b(3)** ████ was replaced by a new interrogator who questioned Al Rabiah using
rapport-building techniques rather than the **b(1)** ████ or **b(1)** ████████ approaches that
led to his confessions.  Ex. 13 at 1 **b(2)** ████████████████.  Significantly, by at least
**b(2)** ████████ Al Rabiah's new interrogator reached the same conclusions as the previous
interrogators – that Al Rabiah's statements **b(1), b(5)** ████████.  For example, in an **b(2)** ████
**b(2)** ████ interrogation, Al Rabiah's interrogator concluded that **b(1), b(5)** ████████████████
**b(1), b(5)** ████████████ Ex. 155 at 2 **b(2)** ████████████).  During a
**b(2)** ████████ interrogation, his interrogator **b(1), b(5)** ████████████
**b(1), b(5)** ████ Ex. 156 **b(2)** ████████████).  On **b(2)** ████ his
interrogator concluded that **b(1), b(5)** ████████████████████████
**b(1), b(5)** ████████████████████████████ Ex. 114
at 3 **b(2)** ████████████).

The Court agrees with the assessment of Al Rabiah's interrogators, as well as Al Rabiah's
counsel in this case, that Al Rabiah's confessions are not credible.  Even beyond the countless
inconsistencies associated with his confessions that interrogators identified throughout his years
of detention, the confessions are also entirely incredible.  The evidence in the record reflects that,
in 2001, Al Rabiah was a 43 year old who was overweight, suffered from health problems, and

46

UNCLASSIFIED//FOR PUBLIC RELEASE

had no known history of terrorist activities or links to terrorist activities. He had no military experience except for two weeks of compulsory basic training in Kuwait, after which he received a medical exemption. He had never traveled to Afghanistan prior to 2001. Given these facts, it defies logic that in October 2001, after completing a two-week leave form at Kuwait Airlines where he had worked for twenty years, Al Rabiah traveled to Tora Bora and began telling senior al Qaeda leaders how they should organize their supplies in a six square mile mountain complex that he had never previously seen and that was occupied by people whom he had never previously met, while at the same time acting as a supply logistician and mediator of supply disputes that arose among various fighting factions.

Recognizing the improbability of such a sequence of events, the Government sought to minimize Al Rabiah's confessions during the Merits Hearing, particularly with respect to his alleged role at Tora Bora. For example, the Government argued that Al Rabiah "didn't need to know anymore than what [b(1), b(6)] told him to do . . . [The Government] is not saying that he was a chief supply officer." 8/31/09 Merits Hrg. Tr. at 124. This argument encapsulates one of the most significant problems associated with the Government's decision to proffer Al Rabiah's confessions as evidence in this case. Al Rabiah did *not* confess to merely doing the things that [b(1), b(6)] told him to do," as the Government suggests. Rather, Al Rabiah confessed to instructing [b(1), b(6)] on the organization of supplies, to riding a mule to a second location at Tora Bora – away from [b(1), b(6)] – where he then coordinated the use of mules to transport goods to various locations, to settling supply disputes among mule owners, and to organizing and leading a meeting of different fighting groups where he settled disputes concerning the distribution of water resources and other supplies. The fact that the Government has been forced by its theory

47

UNCLASSIFIED//FOR PUBLIC RELEASE

of detention to search for the least detailed and least inculpatory version of Al Rabiah's

confessions *in order for the evidence in this case to even make sense*, while simultaneously

ignoring all of the details associated with the other versions of the same confessions, underscores

the lack of reliability and credibility associated with the confessions themselves.  The Court is

unwilling to credit confessions that the Government cannot even defend as believable.[19]

Despite the foregoing, the Government advanced the position at the Merits Hearing that

the Court should nevertheless accept Al Rabiah's confessions as reliable and credible evidence,

raising what the Court perceives as five separate arguments in support of this position.  The

Court shall identify each of these arguments and explain why none is persuasive.

First, the Government argued that Al Rabiah's confessions provided such specific details

that they could not possibly have been imagined.  8/27/09 Merits Hrg. Tr. at 104 ("th[e] reports

that [the Government] rel[ies] on, are of a character of such great detail as to suggest . . . that it

could not have come from [Al Rabiah's] imagination").  The logic of this argument is directly

undermined by the evidence in the record.  In particular, the alleged eyewitnesses who provided

interrogators with allegations against Al Rabiah also used very specific details, but ultimately

their allegations have been discredited.  For example, ██b(1), b(6)██ described how he observed Al

Rabiah b(1)███████████████████████████████████████████████

b(1)██████████████████████████████████████████████████████

---

[19] The Court notes that Al Rabiah's confessions pertaining to other allegations also
contain implausibilities.  For example, despite his never having been to Afghanistan or having
any known links to bin Laden, Al Rabiah confessed to traveling in July 2001 to Afghanistan
where he entered bin Laden's Kandahar home unsearched by bodyguards, where bin Laden
greeted him by name, and where he then challenged bin Laden's ethos during a long conversation
where bin Laden sought to justify his beliefs to Al Rabiah.

48

UNCLASSIFIED//FOR PUBLIC RELEASE



█b(1)█ Ex. 33 at 2 █b(2)█ ██. These specific details were discredited because █b(1), b(6)█ later admitted that he █b(1)█ █b(1)█ Ex. 154 at 1 █b(2)█ Similarly, █b(6)█ provided specific details concerning █b(1)█ █b(1)█ Ex. 17 at 1-2 (█b(2)█ █b(2)█ Those specific details were discredited because, among other reasons, 120 rounds of ammunition would have weighed approximately five pounds. Ex. 117 at 4 (1998 Jane's Infantry Weapons Excerpt). Thus, the specific details included in these allegations served to undermine their credibility, not to raise the inference that they were too specific to be imagined.

Similarly, the specific details provided in Al Rabiah's confessions are often inconsistent. For example, in one confession Al Rabiah explained █b(1)█ █b(1)█ Ex. 31 at 7 █b(2)█ In another version of the confession, bin Laden not only answered, but his answer then led to further discussion. Ex. 50 at 5 (CSRT Testimony). Similarly, Al Rabiah asserted that he arrived at bin Laden's home where "[t]here were no guards." Ex. 50 at 4 (CSRT testimony). In the *same confession* he also explained how another person arrived at the home and was searched because guards "checked everything before [a person] get[s] close to Bin Laden." *Id.* Accordingly, far from raising the inference that the details in Al Rabiah's confessions were too specific to be imagined, the specific details are often inconsistent and lead to the opposite inference which is that the confessions lack credibility.

Second, the Government emphasized that, even if Al Rabiah's confessions in 2003 were

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

the product of abuse or coercion, Al Rabiah repeated his confessions during his Combatant

Status Review Tribunal ("CSRT") proceeding in 2004.  The Government argued that the taint of

any abuse or coercion in 2003 would have dissipated by the time he provided these later

confessions.  8/31/09 Merits Hrg. Tr. at 66 ("any kind of abuse or coercion certainly . . . was

attenuated one year later by the time of the CSRT statement and beyond").  The Court rejects this

argument for both factual and legal reasons.

    As a factual matter, Al Rabiah's confessions in connection with his CSRT proceeding are

essentially the same as the confessions that his interrogators found to lack credibility when he

originally made them, with some variations and inconsistencies.  The evidence in the record

suggests that Al Rabiah repeated these confessions in the false belief that it would allow him to

return to Kuwait, Ex. 144 at 3 [b(2)] ████████████ ) [b(1)] ████████████

[b(1)] ████████████████████████

[b(1)] ████████████████████ Ex. 149 at 2

[b(2)] ████████████ ) [b(1)] ████████████

[b(1)] ████████████████████████.

Ex. 71 at 2 [b(2)] ████████████ ) [b(1)] ████████████ ; Ex. 72 at

2 [b(2)] ████████████ ) [b(1)] ████████████

[b(1)] ████████████ .

    The evidence in the record also establishes that [b(3)] the interrogator who extracted Al

Rabiah's confessions and punished his recantations, continued to make "appearances" at Al

Rabiah's interrogations at least as late as [b(2)] ████████████ – after Al Rabiah's testimony in his

CSRT proceedings.  Ex. 14 at 1 [b(2)] ████████████ ).  Such "appearances"

50

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

appear to have been terrifying events for Al Rabiah given the description included in a

b(2) ███████ interrogation report. *Id.* (explaining that b(3) ████ entered the interrogation

booth and Al Rabiah's b(1) ████████████████████████████

b(1) ████████████████████████████████████

b(1) ████████████████████████ Under these circumstances, the fact

that Al Rabiah would have repeated his confessions (that interrogators never believed) in 2004 is

not surprising and certainly provides no basis for the Court to find that his later confessions were

reliable and credible.

As a legal matter, it is certainly true in the criminal context that coerced confessions do

not necessarily render subsequent confessions inadmissible because the coercion can be found to

have dissipated. *United States v. Bayer*, 331 U.S. 532, 541 (1941) (holding that a "confession

[obtained] under circumstances that preclude its use," does not "perpetually disable[] the

confessor from making a usable one after those conditions have been removed"). Nevertheless,

the Court must consider the "totality of the circumstances" in order to determine whether there

exists evidence from which to find that there was a "clean break" between the coercion and the

later confessions. *United States v. Karake*, 443 F. Supp. 2d 8, 87-88 (D.D.C. 2006). The legal

defect associated with the Government's argument is that it has failed to submit evidence from

which the Court could find that the coercion that existed in 2003 had dissipated by 2004. In

particular, the Government did not submit into evidence any interrogation reports from

November 2003 to July 2004, and provided no information about whether Al Rabiah was

interrogated during this period or whether he continued to have contact with b(3) ████ If anything,

the evidence suggests that there was not a "clean break" between the coercion and his later

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

statements because there is evidence that ██ continued to appear at Al Rabiah's interrogation

sessions through at least September 2004. Ex. 14 at 1 ██████████████████ ).

Accordingly, the Court has no basis to find, by a preponderance of the evidence, that the

confessions that Al Rabiah repeated in 2004 are reliable and credible.

    The Court also notes that Al Rabiah provided a written statement in connection with an

Administrative Review Board ("ARB") proceeding in May 2005, although the Government does

not rely on it to justify his detention. Ex. 223 (5/9/05 Statement for the ARB). In this document,

which was not submitted into the record until the Merits Hearing, Al Rabiah recanted all of his

previous confessions with the sole exception of one admission that he *saw* Usama bin Laden

during his July 2001 trip to Afghanistan.[20] *Id.* at 2-6. Even if the Court were to accept the

Government's argument that the taint from abuse occurring in 2003 had been removed by May

2005, Al Rabiah's ARB statement would not provide a basis on which the Government could

rely to justify Al Rabiah's detention because merely seeing Usama bin Laden would not make a

person "part of" al Qaeda or its associated forces. *Hamlily*, 616 F. Supp. 2d at 75. *Cf. Al-Adahi*

*v. Obama*, No. 05-280, 2009 U.S. Dist. LEXIS 75103 at *52-*53 (D.D.C. Aug. 21, 2009)

(holding that merely meeting Usama bin Laden, although "sensational and compelling," is not

"evidence that would justify the Government's detention" of an individual). The Government

did not argue otherwise at Al Rabiah's Merits Hearing. 8/27/09 Merits Hrg. Tr. at 157-58

(clarifying that the Government's evidence related to Al Rabiah's association with bin Laden and

other evidence prior to October 2001 was offered only to show Al Rabiah's "propensities" and

---

    [20] The Court notes that there is no evidence in the record that Al Rabiah had any contact with ██ between September 2004 and May 2005, even though the Government submitted into the record seven different interrogation reports for Al Rabiah during this period.

52

UNCLASSIFIED//FOR PUBLIC RELEASE

that he acted in conformity with those propensities when he traveled to Afghanistan in October 2001).

Third, Al Rabiah met with a "Personal Representative" in connection with his CSRT proceeding. Pursuant to CSRT procedures, a Personal Representative was a military officer who was permitted to "review information that may be relevant to a determination of a detainee's status . . . [and] discuss that information with the detainee, except for classified information." Ex. 91 at Enc. 4 (7/29/04 CSRT Procedures). The Personal Representative was "neither a lawyer nor [an] advocate," and "[n]one of the information [a detainee] provide[d] . . . [was] held in confidence." *Id.* at Enc. 3.

Prior to his CSRT proceeding, Al Rabiah lodged various complaints with his Personal Representative concerning his treatment at Guantanamo. Ex. 157 at 1 (9/1/04 Memorandum from ██████ (describing the allegations made by Al Rabiah about mistreatment that he conveyed to his CSRT Personal Representative). The complaints lodged by Al Rabiah do not match the allegations of abuse described in Al Rabiah's declaration submitted into evidence in this case and did not include the claim that he was falsely confessing to the evidence against him. The Government surmises that this evidence undermines Al Rabiah's claims of abuse and his claim that he falsely confessed to the allegations against him. 8/27/09 Merits Hrg. Tr. at 117 (asking rhetorically, "[i]f Mr. Al Rabiah had truly suffered what he has now alleged . . . why wouldn't he have made those allegations [to his Personal Representative] as well?").

With respect to his claims of abuse, Al Rabiah did not inform his Personal Representative that he had been threatened with rendition or torture, or that he had been placed in a cell relocation program, although the evidence in the record clearly reflects that both occurred. Ex.

53

UNCLASSIFIED//FOR PUBLIC RELEASE



71 at 2 ████████████████████████ ████████ Ex. 72 at 2 (████████

████████████████ ) (threatening that Al Rabiah would ████████████

████████ ); Ex. 119, Ex. A (████████ Decl. of████ ████████

Thus, the fact that Al Rabiah omitted some allegations of abuse does not support the blanket

inference that such abuse did not occur. Moreover, the abuse detailed by the Court above is

drawn from the Government's own documents, primarily contemporaneous interrogation reports,

and is therefore not dependent on specific findings related to the allegations of abuse included in

Al Rabiah's declarations. Accordingly, the Court does not reach the issue of whether the specific

abuses alleged in Al Rabiah's declarations did or did not occur.[21]

With respect to his false confessions, Al Rabiah previously confided "at length" to

Government interrogators ████████████████████ that ████████ and his other

interrogators were ████████████████████████████████████ and that

they had made his life ████████ Ex. 140 at 1 ████████████████████ ). These ████████

████████████████ responded by telling Al Rabiah that they were ████████

████████ id., and ████████ and Al Rabiah's other interrogators then switched to more aggressive tactics

with Al Rabiah. Ex. 141 at 1 ████████████████████ ). In combination with this

experience, there is substantial evidence in the record that Al Rabiah was led to believe that he

needed to confess something in order to be eligible to be returned to Kuwait. Ex. 144 at 3

████████████████████ ) (explaining ████████

---

[21] For the same reasons, the Court does not draw any conclusions concerning the
declarations submitted by the Government in support of its position that the specific abuses
alleged by Al Rabiah in his declarations did not occur. *See* Ex. 100 at 1 (8/19/09 Decl. of████
████ ; Ex. 133 ¶¶ 1-19 (Undated Decl. of████████ .

UNCLASSIFIED//FOR PUBLIC RELEASE

[b(1) ████████████████████████████████████████]). Given

this evidence, it is entirely understandable that Al Rabiah would not have told his Personal

Representative – a member of the United States military – that he was planning to falsely confess

to the allegations against him. In short, the Court is not persuaded that the evidence related to Al

Rabiah's complaints to his Personal Representative enhances the reliability or the credibility of

Al Rabiah's confessions.

     Fourth, Al Rabiah has admitted that he made up a false story about his relationship with

Al Quwari, the individual with whom he was captured:

> Al Quwari assisted me greatly in getting down from the Tora Bora mountains.
> Because he had helped me so much, I wanted to protect him. Consequently, after
> we were captured and handed over to the Afghan warlord, I told Al Quwari to tell
> our captors he was an assistant I had hired in Iran. I believed, because of my
> confidence in my own innocence, that Al Quwari would be able to secure his own
> release by claiming he worked for me.

Ex. 175 ¶ 32 (3/17/09 Decl. of Al Rabiah). The Government argued that if Al Rabiah was

pressured into making false confessions, he would not have simultaneously maintained a false

story about his relationship with [b(1), b(6)]. 8/27/09 Merits Hrg. Tr. at 108-09. This argument

fails as a factual matter because not only did Al Rabiah admit that the story was untrue almost

immediately after he was [b(1)] by his interrogators, but he also began making

confessions related to [b(1), b(6)] along with his other string of confessions. Ex. 144 at 2

[b(2) ████████████]) [b(1), b(6) ████████████]

[b(1), b(6) ████████████████████████]

[b(1), b(6) ████████████████████████]

[b(1), b(6) █████████████████████████████];

UNCLASSIFIED//FOR PUBLIC RELEASE

Ex. 142 at 4 (confessing that ███ b(1), b(6) ████████████████

███ b(1), b(6) ██████████████). The Court also notes that it is difficult to understand

how Al Rabiah's decision to make up a false story to protect ███ b(1), b(6) █ could be viewed as

inculpatory when the story necessarily depended on Al Rabiah's innocence (otherwise, making

up a story that Al Rabiah hired ███ b(1), b(6) █ as an assistant would be a detriment and not a benefit

to ███ b(1), b(6) █ Accordingly, the Court does not find that Al Rabiah's initial false story about ███ b(1), b(6) █

███ b(1), b(6) █ enhances the credibility or reliability of his confessions.

Fifth, the Government argued that Al Rabiah would not have sought to minimize his

culpability and would have confessed to everything if his confessions were coerced. 8/27/09

Merits Hrg. Tr. at 104 ("If this is an imaginary story, why not [admit to] 10 [meetings with bin

Laden]? And if this is what his interrogators wanted him to do, why not a million dollars, why

not $2 million?"). This argument assumes, however, that Al Rabiah was being coerced to admit

"everything," rather than the particular allegations on which his interrogators were most focused.

This assumption is baseless. The evidence that has been presented to the Court raises the

inference that Al Rabiah's interrogators apparently believed the allegations they obtained from

now-discredited eyewitnesses, and after increasing the pressure on Al Rabiah to confess to the

allegations, and after Al Rabiah reported that he was being pressured to falsely confess to the

allegations, interrogators nevertheless extracted confessions from him that largely tracked the

allegations against him.

Ultimately, the most significant fact that Al Rabiah denied (and something that the

Government has even withdrawn as an allegation against Al Rabiah) is that Al Rabiah was

alleged to have given Usama bin Laden a suitcase filled with money. As described above,

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

however, Al Rabiah was not told what he was supposed to have given bin Laden until after he

had already confessed  Ex. 143 at 3 (

; Ex. 150 at 1

) (Al Rabiah confesses

Ex. 149 at 2                    )                and

Ex. 71 at 2                    ; Ex. 72 at 2

) (threatening that Al Rabiah would

. Under these circumstances, Al Rabiah's unwillingness to subsequently confess

that he gave bin Laden a suitcase filled with money does not lead the Court to conclude that his

confessions are reliable and credible.

\* \* \*

In summary, the evidence in the record reflects the following. From              through

              , the most relevant evidence in the record is an assessment by

              This is the only analyst-level evaluation of Al Rabiah in the record of which

the Court is aware. Notwithstanding this evaluation,          and several other detainees

provided interrogators with allegations against Al Rabiah that have now been discredited but that

were apparently believed at the time. New interrogators were assigned to Al Rabiah with the

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

express objective of obtaining his confessions to these allegations.

After approximately ▮▮▮ interrogations, ▮▮▮▮▮▮ were introduced to Al Rabiah who told him that he had to confess to something in order to be sent back to Kuwait, and they described to Al Rabiah the particular allegations that had been made against him. At the same time, Al Rabiah's other interrogations increased Al Rabiah's ▮▮▮ ▮▮▮ and decreased his ▮▮▮ and told him that his refusal to confess would lead to his detention at Guantanamo forever. After Al Rabiah's ▮▮▮ interrogation, he confided in the ▮▮▮ ▮▮▮▮▮▮ that his other interrogators were pressuring him to confess to things he did not do. Interrogators responded by using more aggressive and apparently unauthorized techniques on Al Rabiah that ultimately caused him to ▮▮▮

From that point forward, Al Rabiah provided his interrogators with countless confessions that followed the same pattern: Interrogators told Al Rabiah the "evidence" they had in their possession (whether it really existed or not), Al Rabiah would request time to pray or otherwise ask for a break, and then he would provide a full confession through an elaborate or incredible story. Significantly, the interrogators never believed these confessions, observing that they contained "inconsistencies" and "vast holes," and expressly concluding that Al Rabiah was creating a "tale" to "please interrogators." Ultimately, his interrogators grew increasingly frustrated with the inconsistences and implausibilities associated with his confessions and began threatening him with rendition and torture, and decided to place him in the frequent flier program. These tactics violated both the Army Field Manual and the 1949 Geneva Convention Relative to the Treatment of Prisoners of War, but they did not produce any additional confessions. In ▮▮▮, Al Rabiah received a new interrogator who listened to Al

58

UNCLASSIFIED//FOR PUBLIC RELEASE

Rabiah's confessions and similarly concluded that they b(1), b(5)          , explaining that Al

Rabiah appeared to be repeating a b(1), b(5)

b(1), b(5)        "

Al Rabiah's "story" to which his interrogators alluded is also entirely incredible. Al

Rabiah was a 43 year old who was overweight, suffered from health problems, and had no known

history of terrorist activities or links to terrorist activities. He had no military experience except

for two weeks of compulsory basic training in Kuwait, after which he received a medical

exemption. He had never traveled to Afghanistan prior to 2001. Before leaving for Afghanistan

in October 2001, he requested two-weeks leave from Kuwait Airlines, his employer, where he

had worked for twenty years. Given these facts, the Government did not even attempt to defend

many of his confessions, and particularly those where he confessed to traveling to Tora Bora and

advising senior al Qaeda leaders as to how they should be organizing their supplies within the six

square Tora Bora mountain complex that Al Rabiah had never previously seen and that was

occupied by people whom he had never previously met, while at the same time acting as a supply

logistician and mediator of supply disputes that arose among various fighting factions. These

confessions defy belief.

Based on the foregoing evidence in the record and the arguments made by counsel during

the Merits Hearing, the Court concludes that Al Rabiah's confessions are not reliable and

credible, and the Court shall not consider them probative of whether Al Rabiah's detention is

lawful.

### 3.   Remaining Evidence

Without the allegations from alleged eyewitnesses or Al Rabiah's confessions on which

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

to rely, the evidence proffered by the Government in support of its theory of detention is sparse. Although Al Rabiah is not required to produce any evidence proving his innocence, the Court notes that the evidence he submitted into the record concerning his activities in Afghanistan is equally sparse, consisting mainly of the contemporaneous letters he wrote to his family from Afghanistan, and his declarations in the record wherein he admits that he attempted to leave Pakistan through the Tora Bora mountains but was unable to do so because of his health and medical ailments, and that he descended the mountains with the assistance of Al Quwari. Ultimately, the Government and not Al Rabiah has the burden to introduce credible and reliable evidence concerning Al Rabiah's activities in Afghanistan.  Because the Court concludes that the remaining evidence proffered by the Government and described below does not support the Government's theory of detention by a preponderance of the evidence in the context of the record as a whole, the Court concludes that the Government has not met its burden in this case.

First, it is undisputed that Al Rabiah lost or otherwise gave away his passport while he was in Afghanistan.  It is also undisputed that ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ The Government introduced undisputed evidence that al Qaeda followed a standard operating procedure whereby individuals who entered al Qaida and Taliban-associated guesthouses would commonly surrender their passports. Ex. 2 at 3 (9/19/08 Decl. of ███ ████). This procedure served two purposes: (1) "the camp and guesthouse administrators [could] sanitize the passports by erasing any entry or exit stamps," and (2) for those individuals who stopped at the guesthouses on their way to training camps, "camp and guesthouse administrators [would have] greater control over [] trainees [and] . . . it prevented

60

UNCLASSIFIED//FOR PUBLIC RELEASE

trainees from easily leaving without administrator knowledge or approval." *Id.* Passports were

often placed into "safe-boxes" that were kept at the guesthouses. Ex. 4 at 3 (9/19/08 Decl. of ██████

██████ ).

The Government argued that this evidence raises the inference that Al Rabiah surrendered

his passport to members of al Qaeda pursuant to the standard operating procedures for al Qaeda

and Taliban guesthouses. 8/28/09 Merits Hrg. Tr. at 65. That argument is only partially

supported by the evidence in the record because the circumstances of Al Rabiah's travel to and

within Afghanistan do not match the standard operating procedure described by the Government.

There is no allegation that Al Rabiah was a fighter who intended to enter a training camp, and a

████████████████████████████████████████████████████

████████████████████████████████████████ Other information

submitted into the record by the Government raises the inference that individuals who were not

trainees and who did not require passport sanitation were *not* required to surrender their passports

to guesthouse administrators. *See* Ex. 123 at 1 (7/23/02 Interrogation of Sulaiman al Nahdi)

(explaining that he stayed at the guesthouse of Riyadh the Facilitator and "did not have to give up

his passport when he arrived at the guesthouse"). Finally, Al Rabiah's counsel correctly

emphasized at the Merits Hearing that there is no evidence that Al Rabiah's passport was placed

in a "safe box," as it ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ Accordingly, the Court finds that Al Rabiah's non-

possession of his passport at the time of his capture and ██████████████████████ are

only minimally probative on this record.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Second, the Government introduced evidence that Al Rabiah's travel to Jalalabad and then to the Tora Bora mountains matched the movements of Taliban and al Qaeda fighters prior to the Battle of Tora Bora. Specifically, Usama bin Laden began to marshal his forces in the vicinity of Jalalabad in mid-November 2001. Ex. 98 at 97 (United States Special Operation Command History of Operation Enduring Freedom in Afghanistan). Shortly thereafter, bin Laden decided to move his forces into the Tora Bora mountains, approximately 25 miles south of Jalalabad, "to make a stand prior to the onset of winter and to defeat American attempts both to capture senior leaders and destroy the organization." *Id.* After as many as 2,000 fighters entered Tora Bora in December 2001, coalition forces infiltrated the area and the Battle of Tora Bora ensued, taking place between December 6-18, 2001. It is undisputed that Al Rabiah was captured by Afghan villagers (while unarmed) outside of Jalalabad on December 25, 2001. Ex. 75 at 1 (Feb. 2002 Intake Form for Maher Al Quwari); Ex. 175 ¶ 32 (3/17/09 Decl. of Al Rabiah) (stating that he and Al Quwari were captured together).

The Government argued that the route and timing of Al Rabiah's travel through Afghanistan raise the inference that he decided to become part of the forces of al Qaeda. 8/28/09 Merits Hrg. Tr. at 54. The Court does not credit this argument given the evidence in this case. The Court has already found that it is more likely than not that Al Rabiah traveled to Afghanistan in October 2001 for charitable purposes. Al Rabiah then sent a letter to his family dated October 18, 2001, explaining that he attempted to leave Afghanistan through Iran, but could not do so. He then stated his intention to leave through the Pakistan border and attempt to reach Peshawar, Pakistan. His route and timing of travel are consistent with his stated intentions. On this record, the Court does not find by a preponderance of the evidence that it is more likely than not that Al

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Rabiah was traveling toward the Tora Bora mountains as part of al Qaeda rather than as a person attempting to cross the border into Peshawar.

Third, the Government argued that Al Rabiah stayed at an al Qaeda guesthouse in Kabul en route to the Tora Bora mountains. 8/28/09 Merits Hrg. Tr. at 64. The Government relied on an allegation made by ██████ who stated in an interrogation report that he saw Al Rabiah ████████████████████████████████ ████████████████ Ex. 16 at 2 ████████. ████ The Court has previously found ████ 's statements to lack credibility in connection with another Petitioner in this case, *see Al Mutairi v. United States*, No. 02-828, Classified Mem. Op. at 21 & n.12 (Aug. 3, 2008), although the Court noted that ████ 's other statements could possibly be found reliable if they were sufficiently corroborated. Here, the Government only seeks to corroborate ████ 's statements with a confession from Al Rabiah, given during an interrogation on ████ Ex. 15 at 2 ████ ). There are three problems with the Government's "corroboration." First, Al Rabiah's confession was made two days *after* ████ suddenly reappeared at Al Rabiah's interrogations, Ex. 14 at 1 (████ ████ ), and the Court has at length described the lack of reliability and credibility associated with Al Rabiah's confessions. Second, according to Al Rabiah's confession, he stated that ████ ████████████████████████ ████ Ex. 15 at 2 ████ ████ . Third, the interrogator who obtained this allegation from ████ explained that ████ ████████████████████

63

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

b(1), b(5), b(6)                     Ex. 16 at 3 b(1), b(2), b(6)

Accordingly, it is not even clear whether b(1), b(6) was attempting to relay a "bit of information"

he heard about Al Rabiah from some other source.  Given the foregoing, the Court cannot find

that b(1), b(6) allegation is sufficiently reliable and credible to be probative of whether Al

Rabiah's detention is lawful.

Finally, the Government presented the Court with evidence that Al Rabiah's name and

contact information  Al Rabiah has admitted, for example, that he gave his name and

contact information to government officials (who would have been members of the Taliban

during his July 2001 visit to Afghanistan), Ex. 175 ¶ 36, and the letter he wrote to his family in

October 2001 was sent by fax, Ex. 177, Attach. C (10/18/01 Letter from Al Rabiah).  On this

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

record, the Court is unable to determine which possibility is more likely by a preponderance of the evidence.

* * *

During the Merits Hearing, the Government expressly relied on "Occam's Razor," a scientific and philosophic rule suggesting that the simplest of competing explanations is preferred to the more complex. *See* Meriam Webster's Collegiate Dictionary at 803 (10th ed.1997). The Government's simple explanation for the evidence in this case is that Al Rabiah made confessions that the Court should accept as true. The simple response is that the Court does not accept confessions that even the Government's own interrogators did not believe. The writ of habeas corpus shall issue.

### III. CONCLUSION

Because the Government has not met its burden by a preponderance of the evidence, the Court shall GRANT Al Rabiah's petition for habeas corpus. The Court shall issue an Order requiring the Government to take all necessary and appropriate steps to facilitate Al Rabiah's release forthwith.

Date: September 17, 2009

/s/
**COLLEEN KOLLAR-KOTELLY**
United States District Judge

UNCLASSIFIED//FOR PUBLIC RELEASE