## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FAYIZ MOHAMMED AHMED ) 
AL KANDARI, *et al.*, ) 
                                ) 
    Petitioners, ) 
                                 ) 
    v. )     Civil Action No. 02-828 (CKK) 
                                 ) 
UNITED STATES, *et al.*, ) 
                                 ) 
    Respondents. ) 
_____ )

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: _9/15/10_

## CLASSIFIED MEMORANDUM OPINION
(September 15, 2010)

Petitioner Fayiz Mohammed Ahmed Al Kandari ("Al Kandari") has been detained by the

United States Government at the Guantanamo Bay Naval Base in Cuba since 2002. According to

his own statements and admissions against interest, Al Kandari was in the mountains near Tora

Bora, during the height of the Battle of Tora Bora, armed with a Kalishnikov rifle, and in the

company of several members and high-level leaders of al Qaeda, the Taliban, or associated

enemy forces, who were actively engaged in fighting the United States and its Coalition allies.

Based on these admissions and other evidence in the record, the Government asserts that it has

the authority to detain Al Kandari pursuant to the Authorization for the Use of Military Force,

Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) ("AUMF"), which authorizes the use of

force against certain terrorist nations, organizations, and persons. Al Kandari believes he is

unlawfully detained and has filed a petition for a writ of habeas corpus.

This civil proceeding requires the Court to determine whether or not Al Kandari's

detention is lawful. In connection with this inquiry, the Court has considered the factual

evidence in the record, the extensive legal briefing submitted by the parties, and the arguments

SECRET//NOFORN

presented during a five-day Merits Hearing held on October 19-23, 2009. The parties did not

present any live testimony at the Merits Hearing, but Al Kandari did listen telephonically to the

unclassified opening statements by his counsel and Government's counsel. Based on the

foregoing, the Court finds that the Government has met its burden to show by a preponderance of

the evidence that Al Kandari became part of al Qaeda, the Taliban, or associated enemy forces.

Accordingly, the Court shall DENY Al Kandari's petition for habeas corpus.

## I. BACKGROUND

### A.   *Procedural History*

Al Kandari filed his petition for habeas corpus on May 1, 2002, making this case the

oldest of the pending Guantanamo Bay habeas cases.[1] After several years of litigation, this case

was stayed pending resolution of whether the Court had jurisdiction to hear Al Kandari's

petition. On June 12, 2008, the United States Supreme Court issued its decision in *Boumediene*

*v. Bush*, clarifying that this Court had jurisdiction to consider the petition and advising this and

the other judges in this District that "[t]he detainees are entitled to [] prompt habeas corpus

hearing[s]." 553 U.S. 723, 128 S. Ct. 2229, 2275 (2008).

Following the *Boumediene* decision, this and most of the other judges in this District

agreed to consolidate their Guantanamo Bay habeas cases before former Chief Judge Thomas F.

Hogan for issuance of an initial case management order that would expeditiously move these

cases toward resolution. Judge Hogan issued a Case Management Order on November 6, 2008,

which he amended on December 16, 2008, and which the Court adopted in this case on

---

[1] The Court has previously resolved the habeas petitions of the other remaining detainees
in this civil action. *See Al Mutairi v. United States*, 644 F. Supp. 2d 78 (D.D.C. 2009); *Al Odah*
*v. United States*, 648 F. Supp. 2d 1 (D.D.C. 2009); *Al Rabiah v. United States*, 658 F. Supp. 2d
11 (D.D.C. 2009). Al Kandari is therefore the last of the petitioners in this case with a pending
petition for habeas corpus before this Court.

SECRET//NOFORN

December 22, 2008. The Court has relied on the Amended Case Management Order ("CMO") as the backdrop for its subsequent Scheduling Orders.[2]

The Government filed an Amended Factual Return on September 15, 2008, and pursuant to the schedule set by the Court, Al Kandari filed a Traverse on March 30, 2009. The parties engaged in extensive discovery and motions practice in the interim. Al Kandari filed a Motion for Additional Discovery on January 26, 2009, which the Court granted-in-part and denied-in-part on February 12, 2009, after a hearing on February 11, 2009. Al Kandari filed a Motion to Produce a Declassified Factual Return on January 9, 2009, which the Government produced on February 6, 2009. The Court also required the Government to provide Al Kandari with certain discovery from the Guantanamo Bay Joint Task Force database. In addition, to narrow the disputed issues presented at the Merits Hearing and to focus the parties on the specific documents underpinning their respective arguments, the Court ordered the Government to file a Statement of Facts on which they intended to rely at the Merits Hearing (which narrowed the allegations presented in the Amended Factual Return), and instructed both parties to submit Witness and Exhibit Lists. Finally, the parties filed seven pre-hearing motions, most of which sought rulings concerning the admissibility of particular evidence. By order dated June 16, 2009, the Court granted the parties' motions to rely on hearsay evidence at Al Kandari's Merits Hearing and granted the Government's motion to amend its Statement of Facts and Exhibit List as to Al Kandari, but held their other evidentiary motions in abeyance to be resolved in the context of Al Kandari's Merits Hearing.

On September 9, 2009, the Court issued a Merits Hearing Procedures Order, which scheduled Al Kandari's Merits Hearing to begin on October 19, 2009, and to continue through

---

[2] The Court extends its gratitude to Judge Hogan for his considerable investment of time and energy to produce the Case Management Order.

SECRET//NOFORN

October 23, 2009, as needed. In addition, as the Court has done with respect to each of the prior

Merits Hearings in this case, the Court permitted the parties to file motions for leave to amend

the parties' respective Witness and Exhibit Lists, Respondents' Statements of Facts, and/or the

underlying Factual Return and Traverse. Pursuant to the schedule proposed by the parties and

adopted by the Court, the parties exchanged their initial proposed amended exhibits by October

5, 2009; exchanged any additional amended exhibits by October 9, 2009; and conferred regarding

their final Exhibit Lists and any objections to the same prior to their submission to the Court on

October 13, 2009.[3] This schedule, as suggested by the parties, was intended to ensure that both

sides had an opportunity to review the opposing side's proposed amended exhibits, to adjust their

own proposed amended exhibits in response, and to narrow any disputes as to the proposed

motions to amend. The Court advised the parties that it would likely exclude from consideration

any evidence at the Merits Hearing that had not been identified in the Witness and Exhibits Lists

by the October 13, 2009 deadline.[4]

The parties timely submitted these materials, and the Court held an on-the-record

unclassified telephone conference call with counsel for all parties on October 15, 2009, and a

classified status hearing on October 16, 2009, to discuss the parties' motions for leave to amend

and their respective objections to the other side's amended exhibits. Discussion principally

focused on Al Kandari's objections to Respondents' newly amended exhibits ("Amended

Exhibits"), and in particular, on his objection to the admission of certain of the Government's

Amended Exhibits on the basis that Petitioner's counsel would not have an opportunity to show

---

[3] In addition, on October 6, 2009, Al Kandari filed under seal an Emergency Motion for Production of Documents and Rule 30(b)(6) Deposition, which the Court denied by Minute Order dated October 8, 2009.

[4] The Court noted two exceptions for (1) documents offered for rebuttal purposes, and (2) exculpatory documents, as to which the Government has a continuing obligation to disclose.

or discuss those exhibits with his client, Al Kandari, prior to the Merits Hearing. In an effort to

address this specific objection, Respondents — with the Court's firm encouragement — assisted

Petitioner's counsel in obtaining expedited declassification review of certain exhibits and in

arranging a secure telephone conversation between Petitioner's counsel and Al Kandari in

Guantanamo on Sunday, October 18, 2009, to discuss the Amended Exhibits.[5]

At the close of the October 16, 2009 hearing, the Court granted Al Kandari's motion for

leave to amend his Exhibit List and granted-in-part and held in abeyance-in-part Respondents'

motion for leave to amend the Statement of Material Facts and the Government's Exhibit List.

The Court made clear that it would not exclude Respondents' Amended Exhibits from

consideration *ex ante* because of the importance of ensuring that its ruling on Al Kandari's

habeas petition was made on the basis of all available evidence. The Court indicated instead that

it would permit the presentation of all evidence, including Respondents' Amended Exhibits,

during the course of the Merits Hearing and would reserve its final decision regarding the parties'

objections to particular pieces of evidence until after all evidence and the parties' positions

thereto had been considered. The Court notes that while the volume of Respondents' Amended

Exhibits was not insignificant, Respondents' request for leave to amend was timely filed in

compliance with the parties' own proposed schedule and both parties were aware that the number

of amended exhibits submitted with respect to Al Kandari — the last of the four habeas petitions

in this case — was likely to be substantial, given the parties' ongoing efforts to respond to the

Court's prior rulings in these habeas cases. Nonetheless, Al Kandari's concerns regarding the

timing of the Government's Amended Exhibits and its effect on his ability to respond to the

---

[5] Petitioner's counsel subsequently confirmed at the start of the Merits Hearing that he
had been able to speak with his client through the secure telephone connection on October 18,
2009.

Amended Exhibits would be considered by the Court in determining the weight to be afforded to any particular piece of evidence during the course of the Merits Hearing.[6]  Al Kandari gave no indication that he required additional time in light of this evidentiary approach to further investigate the Amended Exhibits or to augment the record in order to present an adequate defense as to those exhibits, nor did he request a postponement of the Merits Hearing.

Accordingly, the Merits Hearing began as scheduled on Monday, October 19, 2009.  As the hearing progressed, Al Kandari's objections to the Amended Exhibits became increasingly focused on the allegation that his defense was hampered by his counsel's inability to conduct a further investigation into certain of those exhibits because of the timing of their submission by the Government.  On the morning of the fourth day of the Merits Hearing, Thursday, October 22, 2009, the Court halted the parties' presentation of evidence to address the issue.  Observing that most of the evidence relied upon by Respondents from the Amended Exhibits neither raised new allegations against nor contained new information concerning Al Kandari, the Court cautioned that Al Kandari must specify precisely how he would be prejudiced if the Court were to rely on the Amended Exhibits in ruling on his habeas petition.  The Court advised the parties that it would provide Petitioner's counsel a final opportunity before the close of the Merits Hearing to identify — with specificity — the particular actions counsel would have taken in order to complete Al Kandari's defense with respect to the Amended Exhibits, if counsel had additional time.  To the extent Petitioner's counsel was able to identify such actions with particularity, the Court would order the record held open for the limited purpose of permitting counsel additional

---

[6] *Cf. Al Harbi v. Obama*, Civ. Act. No. 05-2479, 2010 WL 2398883, at *10 (D.D.C. May 13, 2010) (permitting the late addition of evidence submitted by the Government "because of the importance of ruling on the habeas petitions of Guantanamo Bay detainees based on all of the available evidence," but indicating that the Court would consider "the timing of the disclosure [] and its effect on [petitioner's] ability to respond to respondents' accusations in determining what value to place on the document's contents").

time to conduct the requested investigation with respect to the Amended Exhibits and any exhibits submitted at the Court's request during the Merits Hearing. In the absence of any particularized assertions of prejudice, however, the Court would conclude that Al Kandari had completed his defense as to these exhibits; the Court would close the factual record at the end of the Merits Hearing, as anticipated, and make its final decisions on both the exclusion of evidence and the merits of Al Kandari's habeas petition on the present record.

Accordingly, immediately prior to closing arguments, Petitioner's counsel was presented with an opportunity "to identify what [Petitioner] need[ed] to do to complete [his] defense as it relates to . . . these new exhibits." 10/22/09 (AM) Mrts. Hr'g Tr. at 14:3-5. This opportunity was specifically limited to the Amended Exhibits as well as to any evidence newly presented at the Court's request during the course of the Merits Hearing. *See id.* at 57:19-25, 58:12-19. The Court made clear that it was not permitting Al Kandari the opportunity to advance new objections to previously disclosed evidence or to reopen discovery as to all issues. *See* 10/22/09 (PM) Mrts. Hr'g Tr. at 60:1-11. At that time, Petitioner's counsel made seven specific requests for further action with respect to the Respondents' Amended Exhibits only. Based on these particularized representations, the Court agreed to leave the record open for Al Kandari to pursue these specific actions. Although this course of action would inevitably delay final resolution of Al Kandari's petition for habeas corpus, Petitioner's counsel confirmed that his client preferred to obtain a continuance of the Merits Hearing rather than rest his defense and leave the Court to make its final decisions on both the exclusion of evidence and the merits of Al Kandari's habeas petition on the present record. *See id.* at 66:5-19.

The record was therefore left open for the limited purpose of permitting Petitioner's counsel to pursue the specific actions identified on the record at the close of the Merits Hearing.

~~SECRET//NOFORN~~

The Court ordered Respondents to search and disclose certain information requested by Petitioner regarding the Amended Exhibits by no later than November 24, 2009. To the extent Respondents' searches uncovered responsive information that was inculpatory in nature, the Court indicated that the Government would be permitted to seek leave to augment the record with this additional material as well. Pursuant to the schedule suggested by the parties and adopted by the Court, on February 26, 2010, the Government — but not Al Kandari — filed a Motion to Augment the Record. Al Kandari opposes that Motion, which is now fully briefed and pending before the Court. By contrast, Al Kandari did not seek to admit any additional evidence into the record in response to the seven areas of concern related to the Respondents' Amended Exhibits, despite having been permitted an additional four months to conduct further investigations in order to complete his defense as to those exhibits. With the Court's leave, however, Al Kandari filed a Petition for Writs of Habeas Corpus Ad Testificandum directed at securing certain testimony relating to the Amended Exhibits as well as a supplemental brief in support of his objections to certain of the Amended Exhibits. *See* Feb. 3, 2010 Order.[7] The Government opposes Al Kandari's Petition for Writs of Habeas Corpus Ad Testificandum, which is now fully briefed and pending before the Court. Both Respondents' Motion to Augment the

---

[7] Al Kandari's remaining requests for additional discovery were denied in the Court's February 3, 2010 Order. The Court found that the Government had complied with its discovery obligations concerning statements made by two individuals, Abdulrahman Al Bathali (ISN 157245) and Mohammed Monsour Jabarah. In addition, the Court denied Al Kandari's request to obtain testimony through writs of habeas corpus ad testificandum relating to two exhibits, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ because these exhibits had been disclosed to Al Kandari's counsel in the Amended Factual Return, his request to obtain further discovery with respect to such evidence was outside the bounds of the Court's order leaving the record open only as to the Amended Exhibits. Ultimately, as the Court has not relied on either of the two exhibits at issue, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or on any statements made by the two individuals at issue, Jabarah or Al Bathali, in reaching its decision herein, Al Kandari is not prejudiced by the Court's decision denying his requests for additional discovery in its February 3, 2010 Order.

Record and Al Kandari's Petition for Writs of Habeas Corpus Ad Testificandum are discussed in further detail below. *See* discussion *infra* pp. 12-13.

      B.    *Evidentiary Issues*

          1.    <u>Hearsay</u>

As stated above, the Court granted the parties' motions to rely on hearsay evidence in this proceeding. The plurality in *Hamdi v. Rumsfeld* specifically acknowledged that "[h]earsay . . . may need to be accepted as the most reliable available evidence from the Government." 542 U.S. 507, 534 (2004). The Court finds that allowing the use of hearsay by both parties balances the need to prevent the substantial diversion of military and intelligence resources during a time of hostilities, while at the same time providing Al Kandari with a meaningful opportunity to contest the basis of his detention. The Court is fully capable of considering whether a piece of evidence (whether hearsay or not) is reliable, and it has made such determinations in the context of the evidence and arguments presented during the Merits Hearing — including any arguments the parties made concerning the unreliability of hearsay evidence. *Cf. Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008) (explaining, in the context of the Detainee Treatment Act, that the Court was "*not* suggest[ing] that hearsay evidence is never reliable — only that it must be presented in the form, or with sufficient additional information, that permits [the finder of fact] to assess its reliability") (emphasis in original). The D.C. Circuit recently approved this approach to the admission of hearsay evidence, explaining that "the question a habeas court must ask when presented with hearsay is not whether it is admissible — it is always admissible — but what probative weight to ascribe to whatever indicia of reliability it exhibits." *Al-Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010); *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010) (affirming that "hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable");

*Al Odah v. Obama*, 611 F.3d 8, 14 (D.C. Cir. 2010) (same).[8]

## 2. Presumption of Accuracy and Authenticity

For similar reasons, the Court shall deny the Government's motion to have its evidence admitted with a presumption of accuracy and authenticity. Relying in part on the Supreme Court's statement in *Hamdi v. Rumsfeld* that "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided," 542 U.S. at 534, the Government argues that a presumption as to its evidence is both appropriate and necessary. The Court disagrees. One of the central functions of the Court in this case is "to evaluate the raw evidence" proffered by the Government and to determine whether it is "sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of clarity." *Parhat*, 532 F.3d at 847. Simply assuming the Government's evidence is accurate and authentic does not aid that inquiry. *Cf. Ahmed v. Obama*, 613 F. Supp. 2d 51, 55 (D.D.C. 2009) (rejecting a presumption of accuracy for the Government's evidence and holding that "the accuracy of much of the factual material contained in [the Government's] exhibits is hotly contested for a host of different reasons . . .").

The Court also finds that there are significant reasons why the Government's proffered evidence may not be accurate or authentic. Some of the evidence advanced by the Government has been "buried under the rubble of war," *Hamdi*, 542 U.S. at 532, in circumstances that have

---

[8] To the extent Al Kandari contends that the Court's approach to the admission of hearsay deviates from the standard set forth in the CMO, the Court disagrees. Nonetheless, even assuming Al Kandari is correct, "the CMO governing the Guantanamo habeas cases expressly authorizes judges assigned to adjudicate habeas petitions to 'alter the framework [set out in the CMO] based on the particular facts and circumstances of their individual cases.'" *Barhoumi v. Obama*, 609 F.3d 416, 422 (D.C. Cir. 2010) (quoting CMO, 2008 WL 4858241, at *1 n.1) (approving of district court's decision to depart, in its discretion, from the CMO's procedural framework regarding the admissibility of hearsay).

~~SECRET//NOFORN~~

not allowed the Government to ascertain its chain of custody, nor in many instances even to produce information about the origins of the evidence. Other evidence is based on so-called "unfinished" intelligence, information that has not been subject to each of the five steps in the intelligence cycle (planning, collection, processing, analysis and production, and dissemination). Based on the Government's own declarations, its raw intelligence may not have been fully analyzed for its "reliability, validity, and relevance" in the context of other intelligence where "judgments about its collective meaning" are made.[9] Ex. 58 at 3-5 (09/19/08 Decl. of █ █ Ex. 59 at 1-2 (05/29/09 Decl. of █ explaining that the five steps in the intelligence cycle are not "mechanical" and that the process "var[ies] by collection specialty," but not disturbing the conclusion that "unfinished" intelligence has not undergone the same rigorous integration and evaluation process that produces "finished" intelligence).[10] Still other evidence is based on multiple layers of hearsay (which inherently raises questions about reliability), or is based on reports of interrogations (often conducted through a translator) where translation or transcription mistakes may occur. Accordingly, the Court shall not accord a presumption of accuracy or authenticity to the Government's evidence, but shall consider the accuracy or authenticity of the evidence in the context of the entire record and the arguments raised by the parties.

---

[9] The intelligence reports utilized by the Department of Defense ("DOD"), which include Intelligence Information Reports ("IIRs") and "Summary Intelligence Reports" ("SIRs"), █ █ are distinguishable from the law enforcement forms utilized by the Federal Bureau of Investigation ("FBI"), which are referred to as Field Documents ("FD-302s") and Form 40s ("FM-40s"). *See* discussion *infra* p. 41.

[10] All citations to exhibits (cited as "Ex.") refer to the parties' joint exhibits submitted at the Merits Hearing.

~~SECRET//NOFORN~~

### 3. Al Kandari's Pre-Hearing Motions to Exclude Evidence

The Court shall also use the same approach to consider Al Kandari's pre-hearing evidentiary motions, as supplemented by his post-hearing briefing, that sought to exclude particular pieces of evidence based on their alleged lack of authenticity, reliability, or relevance. Rather than exclude evidence from consideration *ex ante* by examining it in a vacuum, the Court concludes that the better approach is to make such determinations after considering all of the evidence in the record and hearing the parties' arguments related thereto. *Cf. Al-Bihani*, 590 F.3d at 880 ("Where the touchstone of a proceeding is 'meaningfulness,' empowering a district court to review and assess all evidence from both sides is a logical process."). The Court believes this approach is particularly useful where, as here, a document viewed in isolation may appear to be irrelevant, but when considered in the context of the other evidence in the record its importance may become clear. Accordingly, the Court's consideration of the evidence proffered by the parties shall encompass inquiries into authenticity, reliability, and relevance. *Cf. Parhat*, 532 F.3d at 847 (describing the Court's inquiry into whether evidence is "'sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty'") (quoting *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993)).

### 4. Al Kandari's and the Government's Post-Hearing Motions

As explained above, the following post-hearing motions were filed by the parties and remain pending before the Court: (1) Al Kandari's Petition for Writs of Habeas Corpus Ad Testificandum; and (2) Respondents' Motion to Augment the Record. Upon consideration of the parties' motions and responsive briefing, and their respective arguments as contained therein, the Court shall deny both motions as moot because they relate to evidence that the Court has not relied on in reaching its decision to deny Al Kandari's petition for habeas corpus. First, as set

SECRET//NOFORN

forth in Petitioner's motion, he requests the Court issue writs of habeas corpus ad testificandum

for the production of two individuals currently detained in United States' custody, Mohammed

Monsour Jabarah and ██████████████████████████ Al Kandari

seeks to secure testimony from the first individual, Jabarah, with respect to statements made by

him in Exhibit 76 (FD-302 ███████████ and ████████████████████

████████████████████████████████████████████████████

███████████████ As Al Kandari himself recognizes, however, his " petition need not be

granted if the Court excludes Exhibits 76 ████ from consideration." Pet'r's Pet. for Writs of

Habeas Corpus Ad Testificandum at 1. Accordingly, because the Court has not relied on either

Exhibit 76 or ████████ in reaching its decision in this case, Al Kandari's Petition for Writs of

Habeas Corpus Ad Testificandum is denied as moot. Second, the Government seeks in its

motion to augment the record to include two additional pieces of evidence that relate to ██████

████████████████████████████████████████████████████

█████████████ Again, however, the Court does not reach herein either ████████ or the

Government's allegation ████████████████████████████ Accordingly,

Respondents' Motion to Augment the Record is also denied as moot. The record before the

Court is therefore limited solely to evidence submitted by the parties prior to or during the Merits

Hearing in this case.

   C.    *Standard of Detention*

   The Government derives its authority to detain Al Kandari from the Authorization for

Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001).[11] The D.C.Circuit has

---

[11] The Government's proposed definition for its detention authority is found in the
Memorandum that it submitted in this case on March 13, 2009. According to the Government,

[t]he President has the authority to detain persons that the President determines

SECRET//NOFORN

held that the President's authority to detain individuals under the AUMF includes, but is not necessarily limited to, "those who are part of forces associated with al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners." *Al-Bihani*, 590 F.3d at 872. Both prongs of this test, which are informally referred to as the "part of" and the "support" prongs, are "valid criteria that are independently sufficient to satisfy the standard" for lawful detention under the AUMF. *Id.* at 874.

In this case, the Government contends that it is lawfully authorized to detain Al Kandari because he was part of al Qaeda, the Taliban, or associated enemy forces. *See* Jt. List of Contested Issues, Docket No. [663]. Although the D.C. Circuit "has yet to delineate the precise contours of the 'part of' inquiry," *Barhoumi*, 609 F.3d at 424, this Court is not without guidance. The Court of Appeals has emphasized that the focus of this inquiry is whether an individual is "*functionally* part of" al Qaeda, the Taliban or affiliated forces. *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010) (emphasis added). For example, while proof that "a detainee was part of the 'command structure' of al Qaeda [] satisfies the requirement to show that he was 'part of' al Qaeda," such a showing is not necessary. *Awad*, 608 F.3d at 11 (rejecting claim that "there must be a specific factual finding that [the detainee] was part of the 'command structure' of al Qaeda"); *Bensayah*, 610 F.3d at 725 ("That an individual operates within al Qaeda's formal command structure is surely sufficient but is not necessary to show he is 'part of' the organization."). Similarly, proof that an individual actually fought for or on behalf of al Qaeda or

---

planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

SECRET//NOFORN

the Taliban, while sufficient, is also not required to demonstrate that an individual is a "part of" such enemy forces. *See Al-Bihani*, 590 F.3d at 872-73. Ultimately, the determination whether an individual is a "part of" al Qaeda, the Taliban, or associated forces, "must be made on a case-by-case basis by using a functional rather a formal approach and by focusing upon the actions of the individual in relation to the organization." *Bensayah*, 610 F.3d at 725.

### D. Burden of Persuasion

Pursuant to the CMO that the Court adopted in this case on December 22, 2008, the Government bears the burden of proving by a preponderance of the evidence that Al Kandari is lawfully detained. *See In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6, 2008) ("[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful") (citing *Boumediene*, 128 S. Ct. at 2271) ("[T]he extent of the showing required of the government in these cases is a matter to be determined."). The D.C. Circuit has affirmed that "a preponderance of evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay, Cuba." *Awad*, 608 F.3d at 10; *see also Al Odah*, 611 F.3d at 14 ("It is now well-settled law that a preponderance of the evidence standard is constitutional in considering a habeas petition from an individual detained pursuant to authority granted by the AUMF."). Accordingly, Al Kandari need not prove his innocence nor testify on his own behalf. The burden of proof has remained on the Government at all times. The Court has drawn no inference based on Al Kandari's decision not to testify in this case. *Accord Awad v. Obama*, 646 F. Supp. 2d 20, 24 (D.D.C. 2009), *aff'd*, *Awad*, 608 F.3d 1. The Government must come forward with evidence demonstrating by a preponderance of the evidence that Al Kandari is lawfully detained, and if the Government fails

to meet this burden, the Court must grant Al Kandari's petition for habeas corpus.[12]

## II. DISCUSSION

The following facts are uncontroverted and/or uncontested. Al Kandari is a citizen of

Kuwait and was 26 years old at the time of his arrival in Guantanamo in 2002. Stip. of Fact ¶ 13.

In or around August 2001, Al Kandari traveled to Kabul, Afghanistan. *Id.* ¶ 15. He was

subsequently captured while fleeing the mountains near Tora Bora shortly after the feast of

Ramadan, which the Court takes judicial notice occurred on or around December 16, 2001. Ex.

139 at ¶ 7 (03/06/09 Decl. of Al Kandari); Ex. 27 (11/20/03 Al Kandari IIR); Ex. 99 (Timeline of

Operation Enduring Freedom); 10/19/09 Mrts. Hr'g. Tr. at 47:24-48:1.

Al Kandari's activities within Afghanistan during this time, however, are in dispute. Al

Kandari asserts that he engaged in charitable work while in Afghanistan and that he was

attempting to escape the fighting in that country when he was captured fleeing Tora Bora. The

Government contends that Al Kandari joined with and fought along side members of al Qaeda,

the Taliban, or associated forces, while in Afghanistan. For this reason, among others, the

Government argues that it is more likely than not that Al Kandari was part of al Qaeda, the

Taliban, or associated forces, and is therefore lawfully detained pursuant to the President's

authority under the AUMF.

The record in this case is voluminous. The Merits Hearing took place over five days, and

the parties have introduced approximately 230 exhibits into the record, consisting of Al

Kandari's own statements as well as the statements of numerous third-party sources and other

---

[12] Cognizant that some of the individuals discussed in this Memorandum Opinion are currently detained at Guantanamo Bay and may themselves have habeas petitions pending in the United States District Court for the District of Columbia, the Court notes that its findings in this case are necessarily made solely on the basis of the evidence now before it and the parties' respective arguments thereto.

SECRET//NOFORN

documents. Ultimately, the Court finds that Al Kandari's own statements and admissions against

interest regarding his travel and activities in Afghanistan between August and mid-December of

2001 are sufficient to demonstrate that it is more likely than not that Al Kandari was part of

forces associated with al-Qaeda and/or the Taliban. The Court's discussion of the evidence in

the record shall proceed in two steps. First, relying solely on Al Kandari's own statements, both

in his declaration and in his statements to Government interrogators, the Court shall describe Al

Kandari's version of events leading up to his detention; identify several of the reasons why Al

Kandari's exculpatory version of events is not credible; and explain why Al Kandari's own

statements and admissions against interest demonstrate that Al Kandari was more likely than not

part of al-Qaeda, the Taliban, or associated forces. Having found that Al Kandari's own

statements and admissions against interest discussed at the first step are by themselves sufficient

for the Government to meet its burden in this case, the Court need not reach the other evidence

offered by the Government but shall nonetheless briefly discuss the remaining evidence in the

record at the second and final step.

     *A.*    *Al Kandari's Own Statements*

     The record now before the Court consists of Al Kandari's statements made to

Government interrogators during the course of his detention as well as a declaration, sworn to

under penalty of perjury, submitted by Al Kandari in 2009 in support of his habeas petition. Al

Kandari urges the Court to exclude, or at minimum decline to consider, all of his statements

made to interrogators and rely solely on statements made in his declaration. He advances four

principal arguments in support of this assertion. Given the importance of the Government's

evidence regarding Al Kandari's statements to Government interrogators and the centrality of

such statements to the Government's case, the Court addresses each of these arguments at the

outset.

SECRET//NOFORN

First, Al Kandari asserts that the interrogation reports recording his statements should be excluded as hearsay because he does not speak English and his interrogations were necessarily conducted through interpreters.[13] While the use of an interpreter to relay Al Kandari's otherwise admissible answers "does introduce a level of technical hearsay," this does not require the exclusion of his interrogation answers from these habeas proceedings. *Al-Bihani*, 590 F.3d at 879 ("But that such evidence [is] hearsay does not automatically invalidate its admission.").[14] The question for this Court is not whether Al Kandari's statements to interrogators are admissible, but what probative weight should be given to such statements. *Id.*

Second, Al Kandari argues that the use of an interpreter to facilitate his interrogations renders the Government's reports of his interrogation answers inherently unreliable as a category of evidence. In support of this contention, Al Kandari has introduced the Declaration of Karin C. Ryding, Ph.D., Concerning Arabic Interpretation Issues, *see* Ex. 195, and a newspaper article from April 7, 2004, containing an interview with ▮▮▮▮▮▮ who was identified as one of the interpreters who facilitated ▮▮▮▮▮ interrogation of Al Kandari (as reported in Exhibit

---

[13] Statements made by Al Kandari at his Administrative Review Board ("ARB") Proceeding demonstrate that, at least at the time of those proceedings, he had a basic level of proficiency in English. *See generally* Ex. 121 (Al Kandari ARB Statement). Although the specific date of Petitioner's ARB Proceeding is unknown, as Exhibit 121 is itself undated and the Government did not introduce any further evidence on this point, Petitioner's counsel indicated during the Merits Hearing that Al Kandari's ARB Proceeding would likely have taken place no earlier than 2005, a point the Government did not dispute. 10/23/09 Mrts. Hr'g Tr. at 44:8-16. There is no other evidence in the record as to Al Kandari's ability to speak and understand English prior to the date of his ARB Proceedings. Accordingly, although the Court finds that Al Kandari had some proficiency in English by the time of his ARB Proceeding, which likely occurred sometime after 2005, the Court cannot draw any specific conclusions as to Al Kandari's ability to speak and understand English during the initial years of his detention when he made the majority of the statements at issue.

[14] It is of course settled that Al Kandari's "interrogation answers themselves [are] not hearsay; they [are] instead party-opponent admissions that would [be] admi[ssible] in any U.S. Court. That they were translated does not affect their status." *Al-Bihani*, 590 F.3d at 879 (internal citations omitted).

SECRET//NOFORN

28), *see* Ex. 194. Neither Exhibit 194 nor Exhibit 195 discuss Al Kandari's statements or

identify any specific errors in the interrogation reports now in the record. Dr. Ryding opines that

"it cannot be presumed that Arabic interpretation in the interrogation of detainees, whether

performed by a native speaker of Arabic or an American with some command of [Modern

Standard Arabic], was fully accurate or reliable." Ex. 195 at ¶ 32. ▮▮▮▮▮▮▮ reported

comments, at most, merely support the same conclusion reached by Dr. Ryding — namely, that

interrogation reports facilitated by an interpreter should not be presumed to be automatically

reliable or accurate. *See* Ex. 194. But the Court has not presumed that any evidence in these

proceedings, including the interrogation reports of Al Kandari's own statements, are either

accurate or reliable. Rather, it has reserved that determination to be made after considering all of

the evidence in the record and hearing the parties' arguments related thereto. To the extent Al

Kandari advances specific arguments that particular interpreter-related errors occurred, the Court

shall consider such evidence and arguments in evaluating the probative weight of those

statements.[15]

Third, Al Kandari's counsel argued during the Merits Hearing that the reports of Al

Kandari's statements are not reliable because they "[are] not and do[] not even purport to be a

verbatim transcript of what the interpreter said that [Al Kandari] said," but rather are written in a

"summary fashion." 10/20/09 (AM) Mrts. Hr'g Tr. at 15:6-12. That intelligence reports include

summaries, rather than a verbatim transcript, of Al Kandari's statements does not render the

reports inherently unreliable. *Cf. Abdah v. Obama*, __ F. Supp. 2d __, 2010 WL 1798989, at

---

[15] *Cf. Al Harbi*, 2010 WL 2398883, at *5 (considering specific interpreter error identified
by detainee, where detainee explained that the use of the word "join" by the interpreter poorly
conveyed his meaning in speaking with interrogators, as he would have used a Russian word with
a connotation suggesting that he physically went to a particular location, not that he had become
a part of a particular group).

~~SECRET//NOFORN~~

*11 n.16 (D.D.C. Apr. 18, 2010) ("that an SIR lacks certain details does not make the information it does include inaccurate"). While it may be a reason not to *presume* the reports are reliable or accurate, the Court has not granted the Government's evidence any such presumption of accuracy or reliability in this case. Rather, consistent with the Court's evidentiary approach in this matter, the Court shall consider the summary nature of the reports, and whether Al Kandari has identified any specific statements that he claims are inaccurate as the result of their presentation in summary form, in reaching its decision about how much probative weight, if any, to afford a particular piece of evidence.

Fourth and finally, Al Kandari broadly asserts in his declaration that the interrogation reports containing his answers to Government interrogators are plagued with inaccuracies, the implication of which is that they cannot and should not be relied on. Al Kandari states in his declaration that he has reviewed his interrogation answers and "see[s] many places where my statements have been so badly distorted or taken out of context that they are not true." Ex. 139 at ¶ 9 (03/06/09 Decl. of Al Kandari). The Court emphasizes that Al Kandari has not argued in these habeas proceedings that any of his statements were the product of abuse or coercion. While Al Kandari makes a general claim in his declaration that he was subjected to abusive and coercive interrogation tactics by the United States, he does *not* claim that he ever made any statements that were the product of such alleged abuse and coercion. *See* Ex. 139 at ¶ 8 (03/06/09 Decl. of Al Kandari). Similarly, while Al Kandari makes a general claim in his declaration that his interrogators "tried to make me confess to things I did not do, and to say things about other people I did not know," he does *not* claim that such alleged efforts were successful — i.e., that he in fact made false statements as a result of these alleged interrogation tactics. *See id.* Indeed, neither Al Kandari in his declaration nor his counsel at the Merits Hearing claimed that Al Kandari has ever made false or inaccurate statements because of the

SECRET//NOFORN

Government's alleged abuse and/or use of coercive interrogation tactics. Moreover, when specifically asked by this Court during the Merits Hearing if Al Kandari was advancing a claim of abuse in this case, Al Kandari's counsel explicitly acknowledged that Al Kandari's generalized claims of abuse are "not relevant to what the Court has to decide." 10/21/09 (PM) Mrts. Hr'g Tr. at 13:10-12; *see also* 10/22/09 (AM) Mrts. Hr'g Tr. at 87:2-3 ("Your Honor, we're not claiming that Mr. Al Kandari made false statements as a result of coercive tactics."); *id.* at 93:22-94:8 ("The Court: . . . But as I understand it, you're not claiming that he was coerced to make false statements. Mr. MacLean: Your Honor, we don't have a basis to make that - . . . We're not making that claim, Your Honor."). Accordingly, there is no claim in this case that, as a result of coercion, Al Kandari made statements to interrogators that he knew to be false, such that his statements, although accurately reported, are unreliable.[16]

Al Kandari instead argues that he never made certain inculpatory statements attributed to him — i.e., that such statements are not accurately reported and are therefore unreliable. While Petitioner's counsel speculated at the Merits Hearing that these alleged distortions and errors referred to by Al Kandari may be the result of interpreter error, among other potential possibilities, he conceded that Al Kandari himself has not proffered an explanation for these

---

[16] Given the stipulation by Petitioner's counsel that Al Kandari's broad claims of abuse are not relevant to this case, the Court need not determine whether Al Kandari's claims of abuse are reliable, accurate, and credible. Nonetheless, the Court notes that the only indication in the record that such abuse in fact occurred is Al Kandari's own statement in his declaration, which was submitted in support of his habeas petition, that he was subjected to abuse and coercive interrogation tactics by the United States Government. *See* Ex. 139 at ¶ 8 (03/06/09 Decl. of Al Kandari). Counsel for Petitioner has not directed the Court to any other evidence in the record, nor is the Court itself aware of any, that supports this claim by Al Kandari that he was abused by the United States. Moreover, the Court notes that Al Kandari's allegations of abuse, which are limited to a lone paragraph in his declaration, are entirely vague and conclusory in nature, lacking any detail as to when and where such abuse allegedly occurred, the nature of the alleged abuse, and/or who was responsible for the alleged abuse. *See id.* Nor does Al Kandari link the alleged abuse to any of his statements as a product of coercion.

-21-

~~SECRET//NOFORN~~

alleged errors. *See* 10/22/09 (AM) Mrts. Hr'g Tr. at 91:19-92:1. Save for a few limited exceptions, *see* Ex. 139 at ¶¶ 17, 28 (03/06/09 Decl. of Al Kandari), Al Kandari has not disputed the specific wording of any particular statement he is reported to have made nor has he identified any particular phrases that he alleges are the result of interpreter error, *see generally id.* Rather, Al Kandari has in most instances simply offered a blanket denial that he made certain inculpatory statements. *See* Ex. 139 at ¶ 9 (03/06/09 Decl. of Al Kandari) ("As to these statements, I can only say that they are not my words.").

After considering the evidence in the record and the parties' respective arguments thereto, the Court finds that such blanket denials, where they have been made without further explanation or support, are not credible. As compared to his inculpatory admissions against interest made to Government interrogators, Al Kandari's statements in his declaration denying that he made certain prior inculpatory statements lack sufficient indicia of reliability. The Court emphasizes that with respect to those statements that Al Kandari now denies having made to Government interrogators, there is no evidence in the record that Al Kandari ever recanted or denied making such assertions to the Government interrogators during his interrogations. Rather, it is only in his declaration, submitted several years after-the-fact, that Al Kandari denies having made these statements. Al Kandari has a motive to deny prior statements that are inculpatory in nature. *Cf. Awad v. Obama*, 608 F.3d 1, 8 (D.C. Cir. 2010) ("[I]t accords with common sense that he may have had a motivation to lie about his own involvement in nefarious activity . . . ."). Moreover, the Court notes that Al Kandari himself does not dispute the accuracy of many of his statements as reported in the Government's interrogation reports — at least as to many of those statements that are exculpatory in nature. As is discussed below, Al Kandari states in his declaration that he traveled to Afghanistan for charitable purposes; engaged solely in charitable activities while there; and was captured while attempting to flee to Pakistan to avoid the ongoing fighting in

~~SECRET//NOFORN~~

Afghanistan. These are the same basic assertions that he is consistently reported to have made to

Government interrogators (although, as is discussed below, many of the specific details of Al

Kandari's explanation vary between his different statements). As a practical matter, Al Kandari

asks this Court to accept the accuracy of these *exculpatory* statements to interrogators, at least to

the extent they are consistent with his declaration, while simultaneously asking the Court to

reject as inaccurate any and all *inculpatory* statements he made to interrogators during his

detention. The Court declines to do so. Nonetheless, insofar as Al Kandari offers specific

indications that particular statements he is reported to have made are inaccurate or unreliable, the

Court shall consider his evidence and arguments in evaluating the probative weight of those

specific statements.[17]

As the above discussion reveals, a key inquiry in this case is the extent to which the Court

assesses Al Kandari's statements — in his declaration as well as in his statements to Government

interrogators — as credible, accurate, and reliable. In evaluating Al Kandari's statements, the

Court shall proceed as follows. First, the Court shall set forth Al Kandari's version of events.

As indicated above, Al Kandari has maintained both in his declaration and in his statements to

Government interrogators that he engaged in charitable work only while in Afghanistan and was

attempting to escape the fighting in that country when he was captured fleeing Tora Bora.

Second, the Court shall identify several reasons why Al Kandari's exculpatory statements

explaining his reasons for traveling to and his activities within Afghanistan are not credible.

Third, the Court shall consider Al Kandari's inculpatory statements admitting that he was given a

---

[17] Al Kandari has made one additional argument in favor of his assertion that the Court should not rely on the Government reports of his interrogation answers. Specifically, his counsel argued in pre-hearing motions that because Al Kandari has submitted his own declaration in this matter, there is no need to rely on Government interrogation reports. Such an argument is clearly without merit and warrants little attention.

SECRET//NOFORN

Kalishnikov rifle and taught how to use it, and that he associated with members of al Qaeda, the Taliban, or associated forces, while in Tora Bora, and shall explain why these statements are credible and reliable. Ultimately, the Court finds that Al Kandari's own statements and admissions against interest demonstrate that it is more likely than not that he was part of al Qaeda, the Taliban, or associated enemy forces, and is therefore lawfully detained under the President's authority pursuant to the AUMF.

### 1. Al Kandari's Version of Events

Al Kandari states that he traveled to Pakistan in June of 2001 to visit Sheikh Mohammed Wali Allah Arrahmani, whom he describes as a respected Pakistani scholar. Ex. 139 at ¶ 3 (03/06/09 Decl. of Al Kandari.); Ex. 7 (10/27/04 Al Kandari SIR). While in Pakistan, he studied at Sheik Arrahmani's school. Ex. 139 at ¶ 3 (03/06/09 Decl. of Al Kandari). After staying with Sheik Arrahamani in Pakistan for approximately two months, Al Kandari decided to travel to Afghanistan for the purposes of doing charitable work. Ex. 139 at ¶ 3 (03/06/09 Decl. of Al Kandari). According to Al Kandari, this decision was consistent with his prior history of doing charitable work, which includes traveling to other countries such as Pakistan and Bosnia to assist with charitable projects. Ex. 139 at ¶¶ 2, 11 (03/06/09 Decl. of Al Kandari); Ex. 28 (05/06/02 Al Kandari FD-302 ); Ex. 6 (03/18/03 Al Kandari MFR); Ex. 74 (05/23/02 Al Kandari FD-302). *See also* Ex. 140 (02/22/09 Decl. of M. Al Kandari).

Al Kandari left Pakistan in or around August of 2001 to head to Afghanistan. Ex. 139 at ¶ 3 (03/06/09 Decl. of Al Kandari); Ex. 27 (11/20/03 Al Kandari IIR). He traveled first to Kandahar before then proceeding on to Kabul. Ex. 139 at ¶ 3 (03/06/09 Decl. of Al Kandari); Ex. 27 (11/20/03 Al Kandari IIR). Upon his arrival in Kabul, Al Kandari went to the local office of al-Wafa al-Igatha al-Islamia ("al-Wafa"). Ex. 139 at ¶ 4 (03/06/09 Decl. of Al Kandari); Stip. of Fact ¶ 16; Ex. 27 (11/20/03 Al Kandari IIR); Ex. 7 (10/27/04 Al Kandari SIR). Although the

-24-

~~SECRET//NOFORN~~

parties introduced evidence ███████████████████████████████████

████████████████████ Ex. 25 (9/19/08 Decl. of ████████ Stip. of Fact ¶ 3 █

██████████████████████████████, Al Kandari states in his declaration that

he went to al-Wafa because it was "[o]ne of the principal charitable organizations in Afghanistan

at that time," and he "never had any reason to suspect" that al-Wafa was involved with al Qaeda,

Ex. 139 at ¶ 4 (03/06/09 Decl. of Al Kandari).

At al-Wafa, Al Kandari inquired about opportunities for charitable work and was directed

by a member of the organization to a village located approximately 45 minutes to one hour

outside of Kabul. Ex. 139 at ¶¶ 4-5 (03/06/09 Decl. of Al Kandari); Ex. 7 (10/27/04 Al Kandari

SIR); Ex. 27 (11/20/03 Al Kandari IIR). He traveled to this unnamed village, arriving sometime

in early September 2001. Ex. 139 at ¶ 5 (03/06/09 Decl. of Al Kandari); Ex. 28 (05/06/02 Al

Kandari FD-302). While there, Al Kandari worked on a charity project digging a well for the

community. Ex. 139 at ¶ 5 (03/06/09 Decl. of Al Kandari). He stayed in this village for

approximately one and a half months until Coalition forces began bombing Afghanistan, which

the Court takes judicial notice occurred on October 7, 2001. Ex. 139 at ¶ 5 (03/06/09 Decl. of Al

Kandari); Ex. 7 (10/27/04 Al Kandari SIR); Ex. 28 (05/06/02 Al Kandari FD-302); Ex. 99

(Timeline of Operation Enduring Freedom).

At that time, Al Kandari realized that he should leave Afghanistan. Ex. 139 at ¶ 6

(03/06/09 Decl. of Al Kandari). He left the village where he had been staying and returned to

Kabul. Ex. 139 at ¶ 6 (03/06/09 Decl. of Al Kandari); Ex. 28 (05/06/02 Al Kandari FD-302). He

went back to the al-Wafa office there, but found that it was closed. Ex. 139 at ¶ 6 (03/06/09

Decl. of Al Kandari); Ex. 28 (05/06/02 Al Kandari FD-302). A taxi cab driver suggested that he

go to Jalalabad and offered to take him there for a large sum of money. Ex. 139 at ¶ 6 (03/06/09

Decl. of Al Kandari); Ex. 28 (05/06/02 Al Kandari FD-302). Upon arriving in Jalalabad, Al

SECRET//NOFORN

Kandari met a Saudi named Abdul Rahman al Kasimi, who permitted Al Kandari to stay at his house for approximately two days. Ex. 139 at ¶ 6 (03/06/09 Decl. of Al Kandari); Ex. 28 (05/06/02 Al Kandari FD-302). Al Kandari explains that fighting was breaking out everywhere, and Arabs were being rounded up by police and militias to be handed over in exchange for money. Ex. 139 at ¶ 7 (03/06/09 Decl. of Al Kandari). He joined with a small group of Arabs who were trying to flee the fighting through the Tora Bora mountains. Ex. 139 at ¶ 7 (03/06/09 Decl. of Al Kandari). The group walked for a few days in the mountains, but they were eventually captured by Afghani villagers while staying the night at a village home owned by an unidentified Afghani. Ex. 139 at ¶ 7 (03/06/09 Decl. of Al Kandari); Ex. 27 (11/20/03 Al Kandari IIR). Al Kandari was later transferred into American custody. Ex. 139 at ¶ 7 (03/06/09 Decl. of Al Kandari); Ex. 27 (11/20/03 Al Kandari IIR).

2.    Al Kandari's Version of Events is Not Plausible

Having reviewed all of the evidence in the record and listened to counsel's arguments during the Merits Hearing, the Court concludes that Al Kandari's explanation for his time in Afghanistan, as asserted in both his declaration and in his statements to Government interrogators, is not plausible for three principal reasons. First, Al Kandari's version of events suffers from several inconsistencies. Second, Al Kandari's explanation does not fully explain or account for his time in Afghanistan. Third, Al Kandari's exculpatory statements are not credible in several key aspects.

a.    Al Kandari's version of events suffers from several inconsistencies.

First, Al Kandari's version of events suffers from several inconsistencies that have not been explained. Although Al Kandari has maintained the same general explanation for his time in Afghanistan throughout his detention — that he traveled to Afghanistan for charitable

SECRET//NOFORN

purposes; engaged solely in charitable activities while there; and was captured while attempting

to flee to Pakistan to avoid the ongoing fighting in Afghanistan — the specific details provided

by Al Kandari regarding his activities have varied and have even conflicted at times. For

example, Al Kandari has offered conflicting statements as to the identify of the individual he

spoke with at the al-Wafa office in Kabul when he initially inquired about possible charitable

opportunities and was referred to the unnamed needy village. Al Kandari has variously asserted

that he spoke with: (a) an unidentified worker at the al-Wafa office, but was unable to speak with

the Director, whom Al Kandari explained was not present at the office at that time of his visit,

Ex. 7 (10/27/04 Al Kandari SIR); (b) a man whom he believed at the time to be the Director of

the Kabul al-Wafa office and whom he later learned upon his arrival at Guantanamo Bay was

Abdallah Al Matrafi (ISN 005), Ex. 27 (11/20/03 Al Kandari IIR); *see also* Ex. 32 (11/20/03 Al

Kandari IIR) (met with ████ at the al-Wafa office), a Saudi whom the Government

identifies as ██████████████████████████████ Ex. 25 ████

Decl.); Ex. 32 (11/20/03 Al Kandari IIR);[18] and (c) an unidentified man with a long beard who

was neither a Saudi nor a Kuwaiti and whose name he did not know, Ex. 28 (05/06/02 Al

Kandari FD-302). Al Kandari's declaration does not clarify these inconsistencies, indicating

only that he briefly met with an unidentified official at the Kabul al-Wafa office. Ex. 139 at ¶ 5

(03/06/09 Decl. of Al Kandari).

    In addition, Al Kandari has offered conflicting reasons for his initial decision to travel to

Pakistan and then to Afghanistan. During an interrogation in May of 2002, Al Kandari explained

---

[18] In contrast to these statements admitting that he met with Al Matrafi at the al-Wafa office in Kabul, the Court notes that Al Kandari has at other times denied that he met Al Matrafi or otherwise knew of him prior to Al Kandari's detention at Guantanamo Bay. *See* Ex. 74 (05/23/02 Al Kandari FD-302) (stating that he was unfamiliar with Al Matrafi); Ex. 7 (10/27/04 Al Kandari SIR) (stating that he met Al Matrafi for first time at Guantanamo Bay).

SECRET//NOFORN

that he went to Pakistan to look up a Sheik, whose name he could not recall, with whom Al Kandari had been in communication; he stated that he stayed at the Sheik's apartment, which was located near an unidentified Islamic school, for approximately two months before then traveling to Afghanistan after learning that there had been a famine in that country. Ex. 28 (5/6/2002 Al Kandari FD-302). In both an October 2004 interrogation and in his present declaration, however, Al Kandari stated that he had actually been invited to Pakistan by Sheik Arrahmani, whom he was able to identify by name, to study at the Sheik's madrassa. Ex. 7 (10/27/04 Al Kandari SIR); Ex. 139 at ¶ 3 (03/06/09 Decl. of Al Kandari). Al Kandari also initially advised interrogators that he had first heard about al-Wafa from Sheik Arrahmani, but when later asked who had first told him about al-Wafa, stated only that he "used to hear about it." Ex. 7 (10/27/04 Al Kandari SIR). Al Kandari's declaration does not provide clarification, indicating simply that he went to Afghanistan because he had decided that it was the best place for charitable work. Ex. 139 at ¶ 3 (03/06/09 Decl. of Al Kandari). Similarly, Al Kandari has variously stated that he went to al-Wafa to inquire where he could make a charitable donation of six to seven thousand dinars, Ex. 28 (05/06/02 Al Kandari FD-302), and that he went to al-Wafa to inquire where he could go to build a well, Ex. 7 (10/24/04 Al Kandari SIR); *see also* Ex. 139 at ¶ 5 (03/06/09 Decl. of Al Kandari) (assisted villagers with digging a well).

Al Kandari has also offered inconsistent statements regarding his travel path immediately after the bombing campaign began in October of 2001. He stated on one occasion that, upon returning to Kabul and discovering the al-Wafa office closed, he initially decided to travel south away from Kabul and then decided to reverse his travel path and head to Jalalabad only after traveling south for an unspecified period of time. Ex. 27 (11/20/03 Al Kandari IIR). Al Kandari has otherwise indicated, however, that he left Kabul directly for Jalalabad, which the Court takes judicial notice is east of Kabul. Ex. 74 (05/23/02 Al Kandari FD-302) (stating he located a taxi

SECRET//NOFORN

driver to drive him directly from Kabul to Jalalabad); *see also* Ex. 28 (05/06/02 Al Kandari FD-302); Ex. 139 at ¶ 6 (03/06/09 Decl. of Al Kandari).

Finally, Al Kandari has provided conflicting statements as to whether he met with Anas Al Kandari ("Anas"), while in Afghanistan. Al Kandari repeatedly admitted to Government interrogators on multiple occasions that he met Anas during his visit to the Kabul office of al-Wafa, Ex. 7 (10/27/04 Al Kandari SIR); Ex. 28 (05/06/02 Al Kandari FD-302); Ex. 32 (11/20/03 Al Kandari IIR); Ex. 43 (10/06/05 Al Kandari IIR); Ex. 122 (6/15/05 Al Kandari SIR), and that Anas told Al Kandari during this meeting that he and an associate, Jassem Al Hajeri, had recently received military training at the Libyan camp in Afghanistan, Ex. 28 (05/06/02 Al Kandari FD-302); Ex 43 (10/06/05 Al Kandari IIR); Ex. 122 (6/15/05 Al Kandari SIR). However, in his declaration submitted nearly eight years later as part of this litigation, Al Kandari denies these admissions for the first time, stating that he "did not meet Anas Al Kandari in Afghanistan" and that he has "no knowledge about anything [Anas] did." Ex. 139 at ¶ 17 (03/06/09 Decl. of Al Kandari). The Court finds that Al Kandari's contradictory denial in his declaration, made without further explanation, is not credible, and therefore serves to undermine the credibility of his declaration. Al Kandari's prior admissions with respect to Anas are consistent across several interrogations, and there is no indication in any of the interrogation reports that his admissions on this point were viewed by the interrogators themselves as incredible or unreliable. It is also significant that Al Kandari never recanted his admission that he met and spoke with Anas at al-Wafa during any of the multiple interrogations in which he consistently admitted to having met Anas in Afghanistan.[19] Moreover, given Anas' admission to Al Kandari that he received military

---

[19] At least one Government interrogator, however, anticipated that Al Kandari might attempt to deny certain statements he made regarding Anas at some later point. *See* Ex. 122 (6/15/05 Al Kandari SIR) (noting that Al Kandari identified Al Hajeri as Anas' associate, although he had previously denied knowing any of Anas' associates) ("Interrogator speculates

SECRET//NOFORN

training, and the Government's uncontroverted evidence that Anas was responsible for leading an

attack on United States Marines on Faylaka Island in Kuwait on October 8, 2002, during which

attack both he and ███████████████ were killed, ████████████████ Al

Kandari clearly has a motivation to deny any association with or knowledge of Anas or Anas'

associate Al Hajeri.

        b.    Al Kandari's version of events does not fully account for his time
             in Afghanistan.

Second, Al Kandari's explanation of events does not fully account for his time in

Afghanistan. Al Kandari maintains that he remained in the unnamed village outside of Kabul

until Coalition forces began their bombing campaign on Sunday, October 7, 2001, at which time

he states that he returned to Kabul. As the unnamed village in which Al Kandari stayed was

allegedly located only 45 minutes to one hour by car outside of Kabul, it is reasonable to infer

that his return trip from the unnamed village to Kabul would have taken no more than one day.[20]

Upon arriving in Kabul and finding the al-Wafa office closed, Al Kandari states that he paid a

---

that detainee will realize the mistake detainee made in reference to Anas and Jassem Al Hajeri.
Detainee will most likely claim interpreter error in an effort to correct any possible perception of
deceptive behavior.").

  [20] While Al Kandari has generally indicated — both in his statements to Government
interrogators and in his declaration submitted in support of his habeas petition — that he returned
to Kabul shortly after the air strikes on Afghanistan began on October 7, 2001, the Court located
one instance in the record in which Al Kandari asserted that he did not return to Kabul until
approximately two days before its fall, which the Court takes judicial notice occurred on
November 14, 2001. Ex. 27 (11/20/03 Al Kandari IIR); Ex. 99 (Timeline of Operation Enduring
Freedom). Neither the Government nor Al Kandari relied on this statement at the Merits
Hearing. Regardless, the statement, even if credited, does not alter the Court's finding above that
Al Kandari's version of events fails to fully account for his time in Afghanistan. Al Kandari
provides no explanation for his activities during the month between his departure from the
unnamed village shortly after the October 7, 2001 air strikes began and his alleged arrival in
Kabul on November 9, 2001, and an unexplained delay of one month in traveling to Kabul
contradicts Al Kandari's claim that he realized soon after the bombing campaign began on
October 7, 2001, that he should leave Afghanistan as soon as possible.

SECRET//NOFORN

cab driver a large sum of money to drive him from Kabul to Jalalabad. The Court takes judicial

notice that Jalalabad is located approximately 90-100 miles east of Kabul. *See* Ex. 94 (map of

Afghanistan with scale). Al Kandari has never suggested that the drive from Kabul to Jalalabad

took an unusual or extended period of time; absent any indication to the contrary, it is reasonable

to infer that this trip would have taken no more than one or two days. Accordingly, Al Kandari's

own statements place him in Jalalabad by no later than October 14, 2001, approximately one

week after his departure from the unnamed village on or around October 7, 2001.[21]

Upon his arrival in Jalalabad, Al Kandari states that he stayed with al Kassimi in

Jalalabad for two days. He then joined a group of Arabs who were trying to flee through the

mountains of Tora Bora and traveled with them for a few days in the mountains before he was

ultimately captured by Aghan forces. Therefore, according to Al Kandari's own version of

events, he was captured no more than five days after his arrival in Jalalabad, which would place

his capture on or around October 19, 2001. It is uncontroverted, however, that Al Kandari was

not actually captured by Afghani villagers and turned over to American forces until

approximately two months later, shortly after December 16, 2001. Ex. 139 at ¶ 7 (03/06/09 Decl.

of Al Kandari Decl.); Ex. 27 (11/20/03 Interrogation of Al Kandari); Ex. 99 (Timeline of

Operation Enduring Freedom). Al Kandari's own explanation for his activities in Afghanistan

therefore creates a "missing" two months of time for which Al Kandari cannot account.

Moreover, the fact that Al Kandari was unwilling repeatedly to provide a full explanation

for his time and activities in Afghanistan is itself evidence that undermines the veracity of his

---

[21] As noted previously, the Court located one instance in the record in which Al Kandari stated that he initially traveled south away from Kabul for an unspecified time before ultimately deciding to reverse his travel path and head to Jalalabad. Ex. 27 (11/20/03 Al Kandari IIR). Even if this statement were credited, it does not address or resolve the deficiencies in Al Kandari's explanation, as outlined above.

SECRET//NOFORN

version of events. Al Kandari is by no means an unsophisticated individual, having studied

Shari'a law at college in Ra's al Khayman, United Arab Emirates. Stip. of Fact ¶ 14. His

interrogators repeatedly noted as much, observing him to be "very polite and well-educated" and

"smart with the attitude that the interrogation team cannot catch him." Ex. 6 (03/18/03 Al

Kandari MFR); Ex. 118 (08/05/03 Al Kandari MFR). The evidence in the record strongly

suggests that Al Kandari has affirmatively chosen not to provide any detailed information about

his time in Afghanistan. In late 2002, Al Kandari explicitly advised his interrogators that,

although he was willing to discuss certain issues, he would not talk about his activities in

Afghanistan. Ex. 48 (12/13/02 Al Kandari IIR); *cf.* Ex. 43 (10/06/05 Al Kandari IIR) (assessing

Al Kandari as "deceptive" and concluding that he "is most likely withholding information"); Ex.

122 (6/15/02 Al Kandari SIR) (assessing Al Kandari as "deceptive" and noting that he "appears

to cooperate but offers information of insignificant value"). Similarly, in his testimony during

his Administrative Review Board ("ARB") Proceeding, Al Kandari declined to explain his

activities in Afghanistan. *See generally* Ex. 121 (Al Kandari ARB Statement). In his declaration

submitted in support of his habeas petition, Al Kandari once again declined to provide any

specific details regarding his time in Afghanistan or to address any of the deficiencies identified

above. *See generally* Ex. 139 (03/06/09 Decl. of Al Kandari). While recognizing that Al

Kandari has no burden to prove his innocence in these habeas proceedings, his repeated

unwillingness to provide details as to his time in Afghanistan is nonetheless inconsistent with,

and undermines the credibility of, his claim that he was an innocent charity worker who became

inadvertently trapped in Afghanistan in the wake of September 11, 2001.

        c.      Al Kandari's version of events is not credible in certain key
                 aspects.

Third, Al Kandari's explanation is not credible in certain aspects. Although Al Kandari

~~SECRET//NOFORN~~

maintains that he remained in the unidentified needy village for approximately one and a half

months, during which time he stayed in the village leader's house, Al Kandari has been

consistently unable to recall or otherwise identify the name of that village or anyone in it or

provide any other identifying information. Ex. 7 (10/27/04 Al Kandari SIR); Ex. 27 (11/20/03 Al

Kandari IIR); Ex. 139 at ¶ 5 (03/06/09 Decl. of Al Kandari). Yet he is able to easily recall the

name of a restaurant near which he stayed for two days while in Kandahar on his way to Kabul in

August of 2001. *See* Ex. 27 (11/20/03 Al Kandari IIR) (explaining that he stayed at a hotel

located near the Ariana restaurant in Kandahar for two days); Ex. 28 (05/06/02 Al Kandari FD-

302) (same); Ex. 74 (05/23/02 Al Kandari FD-302) (same). Al Kandari explains in his

declaration that he "wrote down the name of the village and the mayor and other people" in a

notebook, which he states is now in the possession of the United States Government. Ex. 139 at

¶ 5 (03/06/09 Decl. of Al Kandari). The Government represented that it was unable to locate any

such notebook in its possession and also disputes Al Kandari's claim that he was detained with a

notebook. The evidence presented on this issue is conflicting.[22] However, even assuming that Al

---

[22] During opening statements, Al Kandari's counsel indicated that the existence of this
notebook was confirmed by a statement in an interrogation report in which Al Kandari is noted to
have been detained with a "telephone book." 10/19/09 Mrts. Hr'g. Tr. at 35:18-24. Although
counsel did not provide a specific citation at that time, it appears that counsel intended to
reference an FM40 made with respect to Al Kandari and dated March 10, 2004, a date which the
Court notes was well after his capture and subsequent transfer to United States' custody. This
document, while not introduced into evidence at the Merits Hearing, was attached as an exhibit
to the Government's Amended Factual Return and indicates, in part, that Al Kandari "was found
in possession of . . . a telephone book." The Government in response introduced Exhibit 222, an
undated document which purports to relate to Al Kandari and lists "none" under the heading
"Pocket Litter." The Government contends this disproves Al Kandari's claim that he was
detained with a notebook. The Court finds that this document is not sufficiently reliable to
establish that Al Kandari was detained without any possessions. The document is undated and
does not indicate the source of the statement that Al Kandari was detained with no pocket litter
nor is there any indication as to the source of the document itself. The Government has not
offered any supporting information explaining how and when this document was compiled, who
was responsible for its creation, and the source of the information listed therein. The Court,
however, also finds that there is no support in the record, other than the speculation of

SECRET//NOFORN

Kandari maintained a notebook, as he asserts in his declaration, this fact does not negate the implausibility of his continued inability to independently recall any information identifying: the village in which he claims to have lived for approximately six weeks; the village leader, whose house he asserts he stayed in during his one and a half months in the village; or any of the local villagers, whom he alleges to have worked beside for the duration of his stay in the village.

In addition, Al Kandari's assertion that he visited al-Wafa solely for assistance in locating a village where he could do charitable work, and that he "never had any reason to suspect" that al-Wafa was associated with al Qaeda, is not credible on the present record. Al Kandari has acknowledged that Suleiman Abu Ghaith was present at the al-Wafa office in Kabul during his visit, and that he himself was aware of Abu Ghaith's presence at the al-Wafa office, although he maintains that he did not see or speak with Abu Ghaith at that time. Ex. 32 (11/20/03 Al Kandari IIR); cf. Ex. 139 at ¶ 27 (03/06/09 Decl. of Al Kandari) (stating that he did not see or speak with Abu Ghaith in Afghanistan, but containing no denial of his statement that he was told Abu Ghaith was also present at the al-Wafa office in Kabul). Al Kandari has also admitted that Abu Ghaith is associated with al Qaeda, describing him in multiple interrogations as Usama Bin Ladin's spokesman, a fact that is uncontroverted on the present record. See Ex. 32 (11/20/03 Al Kandari IIR); Ex. 38 (12/04/03 Al Kandari IIR); Ex. 74 (05/23/02 Al Kandari FD-302); cf. Ex. 139 at ¶ 27 (03/06/09 Decl. of Al Kandari). Indeed, Al Kandari himself has characterized Abu Ghaith as a dangerous individual with extremist views. Ex. 38 (12/04/03 Al Kandari IIR). That

---

Petitioner's counsel, that the telephone book referred to in the March 20, 2004 FM40 is the same notebook discussed in Al Kandari's declaration. The Court is thus unable to find either that Al Kandari was detained with a notebook in his possession listing the name of the village in which he stayed, as Petitioner urges, or that Al Kandari was detained without any possessions, as the Government urges. The Court draws no inferences for or against Al Kandari based on this evidence, but finds only that it is implausible that Al Kandari cannot independently recall the information at issue.

~~SECRET//NOFORN~~

Abu Ghaith was present at the al-Wafa office in Kabul, and that Al Kandari was aware of his presence there, undermines the credibility of his claim that he "never had any reason to suspect" al-Wafa supported or was associated with al Qaeda.[23]

Similarly, Al Kandari's assertion that he, along with a group of other noncombatants, "were trying to flee the fighting through the Tora Bora mountains" is not credible. While Al Kandari refers generally to the "Tora Bora mountains," the Government's uncontroverted record evidence explains that "Tora Bora is the name of a cave complex, approximately 9.5 km wide and 10 km long, embedded within a 100 mile stretch of the White Mountains of Eastern Afghanistan." Ex. 34A at 1 (19/10/09 Decl. of [3] ███████ This cave complex was used in the 1990's by Usama Bin Ladin as his headquarters, and he returned there in late 2001 after the fall of the Taliban regime in Afghanistan to join the many Taliban and al Qaeda fighters who had retreated to the complex to make their last stand against the United States and its allies. *Id.* at 2. Travel from Jalalabad to Tora Bora took approximately "10 to 15 hours over donkey trails through difficult terrain." *Id.* at 3. Its remote location, combined with the fact that the "Tora Bora cave complex has historically been used by al-Qaida and its precursor organizations as a fortified defensive position," makes it unlikely that Al Kandari simply wandered from Jalalabad into the mountains near and around Tora Bora. *Id.* Similarly, in light of "Usama Bin Ladin's widely known call for fighters to join him . . . at Tora Bora" and his "robust operational security

---

[23] The Court notes that Al Kandari also acknowledged to Government interrogators that he saw, *inter alia*, Hamid Madhi al Azmi, a.k.a. Abu Jamila, and his brother Saad Madi Saad Moash al Azmi (ISN 571), a.k.a. Abu Daoud, at the al-Wafa office. Ex. 32 (11/20/03 Al Kandari IIR). The Government has introduced uncontroverted evidence that both Abu Jamila and Abu Daoud were members of, or substantially supported, al Qaeda. *See* Ex. 83 (8/31/04 ISN 157425 IIR); Ex. 133 (7/10/04 ISN 157425 IIR). Nonetheless, there is no indication on the present record that Al Kandari was aware of the al Azmi brothers' association with al Qaeda at the time he saw them at the al-Wafa office in Kabul. In the absence of such evidence, the Court declines to draw any inferences from Al Kandari's admission that Abu Jamila and his brother Abu Daoud were also present at the al-Wafa office during his visit.

SECRET//NOFORN

procedures," it is unlikely that Al Kandari, as a noncombatant, would have gone to Tora Bora or would have even been allowed into the area by al Qaeda or Taliban forces, if he had managed to make it there. *Id.* at 4.[24]

This is particularly so in this case, given the Court's findings below that, while in Tora Bora, Al Kandari was given a Kalishnikov rifle and trained on how to use it by an individual who was more likely than not associated with al Qaeda and/or the Taliban, and that he also met and associated with several members and high-level leaders of al Qaeda, the Taliban, or associated enemy forces in Tora Bora, many of whom were actively engaged in fighting the United States and its allies. Al Kandari's assertion that he, as a noncombatant with no connections to or prior associations with al Qaeda or the Taliban, would have been permitted not only to wander through Tora Bora, but to also meet and associate with members and high-level leaders of al Qaeda and/or the Taliban while he was armed with a Kalishnikov rifle, is utterly implausible. Surely al Qaeda and the Taliban would not allow an unknown and untrusted noncombatant to be located near and closely associate with key leaders and their fighting forces in Tora Bora during the height of the Battle of Tora Bora. *Cf. Al-Warafi v. Obama*, ___ F. Supp. 2d ___, 2010 WL 1404001, at *8 (D.D.C. Mar. 24, 2010) ("It is inconceivable that the Taliban would allow an outsider to stay at their front line camp just to see what the fighting was like. An outsider whose trustworthiness and loyalty are unknown poses a threat to a miliary camp."). Accordingly, these

---

[24] Although counsel did not explicitly raise the argument at the Merits Hearing, the Court notes that Al Kandari argued in his Traverse that he could only reach Pakistan by traveling through the Tora Bora mountains, an assertion which the Court finds is not credible. While it appears that Al Kandari no longer relies on this assertion, the Government nonetheless introduced evidence at the Merits Hearing that the shortest and simplest route from Jalalabad to Pakistan was through the famed Kyber pass, 45 miles from Jalalabad. 10/19/09 Mrts. Hr'g Tr. at 49:11-50:25; Ex. 34A (10/19/09 ███████ Decl.). In contrast, as indicated above, the route through the mountains of Tora Bora required a difficult climb into and then through bitterly cold mountains where al Qaeda and Taliban fighters were making their stand against coalition forces. Ex. 34A (10/19/09 ███████ Decl.).

~~SECRET//NOFORN~~

findings, which are discussed in detail below, further undermine and discredit Al Kandari's claim that he was simply a noncombatant attempting to flee the fighting through the mountains of Tora Bora.

\* \* \*

In summary, then, the Court finds that Al Kandari's explanation for his travel to and activities within Afghanistan is not plausible for the reasons set forth above. While Al Kandari does not bear the burden of proving his innocence, the Court's finding that his version of events is not worthy of belief is itself of some probative value. Recent D.C. Circuit precedent counsels that the provision by a detainee of an implausible explanation for his activities in Afghanistan is a relevant consideration in these habeas proceedings given the "well-settled principle that false exculpatory statements are evidence — often strong evidence — of guilt." *Al-Adahi v. Obama*, __ F.3d __, 2010 WL 2756551, at \*5 (D.C. Cir. July 13, 2010). The Government has also introduced evidence that the particular explanation provided by Al Kandari in this case is consistent with al Qaeda counter-interrogation tactics. *See* Ex. 50 (02/10/08 Decl. of █████

█

███████████████ *Id.* at 2; *see also Al-Adahi*, 2010 WL 2756551 at \*9 ("Put bluntly, the instructions to detainees █████████████████████

████████████████████████

████ Ex. 50 at 3 (02/10/08 Decl. of █████ Evidence that Al Kandari provided an implausible explanation for his reasons for traveling to and his activities within Afghanistan, and that the explanation provided is consistent with al Qaeda counter-interrogation tactics, therefore supports a reasonable inference that Al Kandari was not in Afghanistan solely to assist with, and did not engage solely in, charitable work, as claimed. While this inference standing alone is insufficient to find that Al Kandari became "part of" the forces of the Taliban or al Qaeda, the

-37-

~~SECRET//NOFORN~~

Court finds that this evidence is probative and shall be considered in the context of the other record evidence.

### 2. Al Kandari's Admissions Against Interest Regarding His Activities and Association with Members of al Qaeda, the Taliban, or Associated Enemy Forces, While in Tora Bora

The Court turns next to consider Al Kandari's statements and admissions against interest made to Government interrogators regarding his activities and association with members of al Qaeda, the Taliban, or associated enemy forces, while in Tora Bora. Although significant portions of Al Kandari's time in Afghanistan are not accounted for, Al Kandari was, by his own admission, in the mountains near Tora Bora for at least some portion, if not the entirety, of the Battle of Tora Bora. The Court takes judicial notice that the Battle of Tora Bora took place from December 6, 2001, through December 17, 2001, with the most intense strikes occurring in the last week of fighting between December 10 and 17, 2001. *See* Ex. 99 (Timeline for Operation Enduring Freedom); Ex. 34A at 2 (10/19/09 ████ Decl.). Al Kandari was captured fleeing Tora Bora shortly after December 16, 2001, and asserted that he had been traveling through the mountains of Tora Bora for a least a few days prior to his capture. Ex. 27 (11/20/03 Al Kandari IIR); *see also* Ex. 28 (05/06/02 Al Kandari FD-302) (stating that he was in Tora Bora during Ramadan). Accordingly, Al Kandari's own admissions place him in or near Tora Bora during the most intense portion of the Battle of Tora Bora. Ex. 99 (Timeline of Operation Enduring Freedom) (Ramadan began on November 17, 2001 and ended on December 16, 2001).

Significantly, Al Kandari has admitted that during this time he (a) was given a Kalishnikov rifle and taught how to use it, and (b) met and associated with various members and high-level leaders of al Qaeda, the Taliban, or associated enemy forces. For the reasons set forth below, the Court finds that Al Kandari's statements and admissions as to these two points are both reliable and credible, and demonstrate that it is more likely than not that Al Kandari was

SECRET//NOFORN

part of forces associated with al Qaeda or the Taliban. In reaching this conclusion, the Court

proceeds in three steps. First, the Court shall discuss Al Kandari's admission that he was armed

with a Kalishnikov rifle while in Tora Bora and explain both why this admission is reliable and

credible and why it is reasonable to infer that the individual who provided Al Kandari with the

weapon and training was more likely than not associated with al Qaeda and/or the Taliban.

Second, the Court shall discuss Al Kandari's admissions that he met and associated with several

individuals while in Tora Bora, describe the Government's evidence connecting these same

individuals with al Qaeda and/or the Taliban, and explain why both Al Kandari's admissions and

the Government's evidence on these issues are reliable and credible. Third and finally, the Court

shall explain why this evidence is sufficient by itself to satisfy the Government's burden of proof

in this case.

a.    Al Kandari was given a weapon and taught how to use it.

Al Kandari admitted to Government interrogators that he was given a Kalishnikov rifle

and taught how to use it while he was in Tora Bora. Ex. 28 (05/06/02 Al Kandari FD-302). The

statement, as reported in Exhibit 28, reads in relevant part as follows:

> He stated that he heard that arabs were being killed in Jalalabad, that the road to
> Peshawar was closed and that people were fleeing to the mountains. He went with
> Al Qasim to a mountain village which overlooked Jalalabad. At first Al Kandari was
> happy because he was told that there were five hundred arabs in the village, although
> he saw only about twenty. In the village he saw a Kuwaiti, identified as Abu
> Sulaiman, who advised him that he went to Afghanistan to get military training. Al
> Kandari stated that this was during Ramadan. *He stated that he was in fear and
> claimed that he did not know how to use a weapon, but that he was given a
> Kalishnikov and taught how to use it.* He stated that he knew some of the arabs there,
> including Mohammed Taha Mowala, Hamed Asulaiman and Abu Hafs. Bombing
> was getting closer to them, it became very scary. He said that people were creating
> routes to escape to Jalalabad.

Ex. 28 (05/06/02 Al Kandari FD-302) (emphasis added).

At the Merits Hearing, Al Kandari's counsel argued that this admission against interest is

~~SECRET//NOFORN~~

unreliable. In particular, counsel maintained that the statement is ambiguous and appears to indicate that Abu Sulaiman, not Al Kandari, was given a gun and taught how to use it: "The 'he' there is entirely ambiguous, but given the past tense, it would appear that this is Al Kandari continuing to relate what this Abu Sulaiman told him about his military training." 10/20/09 (AM) Mrts. Hr'g Tr. at 18:23-19:1. The Court is unpersuaded by this argument. As an initial matter, this assertion is advanced solely by counsel. Al Kandari himself has never denied, in his other statements to Government interrogators or in his declaration, that he was given a weapon and taught how to use it while in Tora Bora. *See* Ex. 139 (03/06/09 Decl. of Al Kandari); 10/20/09 (AM) Mrts. Hr'g Tr. at 48:5-10 ("[Al Kandari] had this document and he has never denied carrying the Kalishnikov. That is nowhere in his declaration."). Similarly, although Exhibit 28 was attached to the Amended Factual Return in this case, Al Kandari himself has never claimed that he advised interrogators that the Kalishnikov rifle was given to Abu Sulaiman, and not to him.[25]

Moreover, contrary to his counsel's assertions, the statement by Al Kandari is not ambiguous. Each sentence of the paragraph cited above reports what Al Kandari stated to the Government interrogators, and the paragraph as a whole is written entirely in the past tense. The phrase "he stated" is consistently used throughout the report to indicate that the information that follows is derived from oral declarations made by Al Kandari to the interrogators. The only fair

---

[25] The Court notes that Al Kandari was on notice that the Government read his statement in Exhibit 28 as an admission that he, not Abu Sulaiman, was given a Kalishnikov rifle and was taught how to use it. The Government introduced into evidence Exhibit 29, a summary review of all information derived from FBI investigations of Al Kandari prior to April 6, 2005. *See* Ex. 29 (4/6/05 FBI Admin. Review). As set forth therein, the FBI reported Al Kandari to have stated that he "saw a Kuwaiti man who advised that he had received military training in Afghanistan. Al Kandari told this man that he was afraid and that he did not know how to use a weapon. Al Kandari was given a Kalishnikov and taught how to use it at this time." *Id.*

SECRET//NOFORN

reading of this paragraph is as follows:

> In the village he [Al Kandari] saw a Kuwaiti, identified as Abu Sulaiman, who advised him [Al Kandari] that he [Abu Sulaiman] went to Afghanistan to get military training. Al Kandari stated that this [his meeting with Abu Sulaiman] was during Ramadan. He [Al Kandari] stated that he [Al Kandari] was in fear and claimed that he [Al Kandari] did not know how to use a weapon, but that he [Al Kandari] was given a Kalishnikov and taught how to use it.

The argument advanced to the contrary by Petitioner's counsel is without merit.

The Court notes that Exhibit 28 is a FD-302. The Government has submitted a declaration outlining the relevant standards and procedures that the FBI follows in producing FD-302s. *See* Ex. 56 (Decl. ██████████████ As explained therein, FD-302s are used to

██████████████████████████████████████████████████

Petitioner's counsel nonetheless argued at the Merits Hearing that various inconsistencies in Exhibit 28 demonstrate that the document as a whole is unreliable. For example, counsel noted that the document is dated May 6, 2002, but contains information gathered from interrogations on May 2 and 13, 2002. As explained in the ██████ Declaration, it is

██████████████████████████████████████████████████

SECRET//NOFORN

In this case, the final date of the FD-302 is listed as "May 6, 2002," which is the same date as listed in the lower left corner. *See* Ex. 28 (05/06/02 Al Kandari FD-302). The Court agrees with Petitioner's counsel that this date appears to be in error, as it would seem that a final draft of the FD-302 could not have been produced until after the information from the second interrogation on May 13, 2002, was incorporated therein. Nonetheless, the fact that the final date for the document was not changed or updated after the second interrogation does not cast the reliability of the entire document in doubt, particularly given that the FBI agent responsible for the FD-302 must certify the substantive accuracy of the statements reported therein. Nor is the date of the FD-302 relevant to Al Kandari's specific admission that he was given a gun while in Tora Bora. The Court is therefore hard-pressed to see how the date of the final report affects the reliability of Al Kandari's own uncontroverted admission against interest.

Petitioner's counsel also noted that the document reports statements by Al Kandari that (a) "he went to Afghanistan in June, 2001," and (b) "in August, 2001, . . . he went to Qandahar, Afghanistan. . . ." Counsel argued that these statements are inherently contradictory and cast doubt on the reliability of the statements in the document. The Court disagrees. A statement that an individual went to Afghanistan in June of 2001 does not necessarily conflict with a statement that the same individual also went to Afghanistan in August of 2001. Regardless, to the extent these particular statements conflict, such a conflict at most affects the reliability of the statement that Al Kandari traveled to Afghanistan in June of 2001, as the parties have stipulated that Al Kandari traveled to Afghanistan in August of 2001. Stip. of Fact ¶ 15. The Court, however, has not relied on the statement that Al Kandari traveled to Afghanistan in June of 2001 in reaching

~~SECRET//NOFORN~~

its findings in this case, and it remains unpersuaded that this alleged conflict is material to the reliability of Al Kandari's uncontroverted admission against interest that he was in Tora Bora during Ramadan and that he was given a Kalishnikov rifle and taught how to use it at that time. *Cf. Abdah*, 2010 WL 1798989 at *11 n.16 (rejecting detainee's assertion that his statements in intelligence reports are inaccurate, in part because "none of the minor discrepancies to which [the detainee] points . . . are sufficiently important to have bearing on the Court's determinations regarding the main, relevant facts"). Accordingly, upon considering the evidence in the record and the parties' arguments thereto, the Court finds that Al Kandari's uncontroverted admission that he was armed with, and trained on the use of, a Kalishnikov rifle while in Tora Bora is both credible and reliable.[26]

Finally, while the evidence does not specify from whom Al Kandari received the weapon and training, the Court finds that it is more likely than not that he was given the Kalishnikov rifle and taught how to use it by an individual who was associated with al Qaeda or the Taliban. As is explained in the next section below, Al Kandari admitted that he was with or in the vicinity of

---

[26] The Court notes that the Government submitted at the Merits Hearing a second statement by Al Kandari for the purpose of rebutting the assertion by Petitioner's counsel that the statement in Exhibit 28 should either be read to indicate that Abu Sulaiman, not Al Kandari, was given a gun or found unreliable for the reasons described above. ████████ ████████████████████████████████████████████████████████ ████████████████████████ Unlike the other evidence in the record ████████████ itself provides no information indicating either the identity of those responsible ████████████ or the circumstances in which these statements were made, and the Government has not provided further evidence on this point. *See id.* The Court, however, need not conclusively determine the reliability of this statement on the present record, as the Government submitted ██████ solely for purposes of rebutting counsel's arguments relating to Exhibit 28, arguments which the Court has already rejected for the reasons set forth above. ████████ is therefore unnecessary to the Court's finding above that Al Kandari's admission in Exhibit 28 is reliable.

-43-

~~SECRET//NOFORN~~

several members and high-level leaders of al Qaeda, the Taliban, or associated enemy forces,

while in Tora Bora, during the Battle of Tora Bora, at or around the same time he was given the

Kalishnikov rifle. It is reasonable to infer that any individual who was in this area during the

height of the Battle of Tora Bora, and who was both armed with a spare Kalishnikov rifle and

capable of training another person on its use, would have been a member of or associated with al

Qaeda or the Taliban. The converse — that a noncombatant, unknown to al Qaeda or the

Taliban, would have been permitted to wander through Tora Bora while providing arms and

training to other individuals — is simply implausible. *Cf. Sulayman v. Obama*, __ F. Supp. 2d

__, 2010 WL 3069568, at *19 n.20 (D.D.C. July 20, 2010) ("Given the Court's deep skepticism

of the notion that a complete stranger would be permitted to knowingly possess a deadly weapon

while being permitted to stay in a fighting force's camp near the front lines, the logical result of

that reasoning is that the two individuals who allowed petitioner to take possession of their

weapons were more likely than not to have been a 'part of' the Taliban fighting force.").[27]

> b. Al Kandari's association with members of al Qaeda, the Taliban, or associated enemy forces, while in Tora Bora.

The Court next discusses Al Kandari's statements and admissions against interest

regarding his associations with members of al Qaeda, the Taliban, or associated forces, while he

---

[27] The Government also contends that Al Kandari was injured during the Battle of Tora Bora. As support for this assertion, the Government relies largely on Al Kandari's own statement, in which he states that he sustained an injury to his right leg while in the mountains of Tora Bora. Ex. 28 (05/06/02 Al Kandari FD-302). Rather than indicate that this injury occurred during battle, however, Al Kandari explains that the injury occurred while he was being led down the mountain from Tora Bora shortly after his capture. *Id.* Al Kandari's medical records from May of 2002, on which the Government also relies, indicate that Al Kandari has a scar on his lateral right thigh and a history of a gun shot wound on his right lateral hip, but do not indicate whether or not these injuries were of recent origin. Ex. 137 (05/1/02 Al Kandari Medical Records). The only additional evidence in the record relied upon by the Government for this point appears to be based on information relayed from an unidentified second-hand source and does not bear sufficient indicia of reliability. Ex. 44 (3/26/04 ISN 760 IIR).

SECRET//NOFORN

was in Tora Bora. Specifically, Al Kandari has acknowledged that he met and associated with the following individuals during this time: (a) Ibn Sheik Al Libi; (b) Abdul Qadous; (c) Abu Thabit; (d) Abu Hamza al-Masri; and (e) Mohammed Taha Malu-Allah. The Government has in turn introduced evidence, both from Al Kandari himself as well as from third-party sources, that each of these individuals was more likely than not associated with al Qaeda and/or the Taliban. For the reasons set forth below, the Court finds that both Al Kandari's admissions regarding his associations with these individuals and the Government's evidence associating each of these individuals with al Qaeda and/or the Tabliban are reliable and credible.

**Ibn Sheik Al Libi.** Al Kandari admitted the following in a statement to a Government interrogator: that he knew Ibn Sheik Al Libi; that he had met with Al Libi in Tora Bora; and that Al Libi was leading a group of fighters in Tora Bora at the time Al Kandari met with him. Ex. 38 (12/04/03 Al Kandari IIR).[28] While Al Kandari subsequently denied these admissions in his

---

[28]Al Kandari objected to the reliability of Exhibit 38, and certain other intelligence reports, on the basis that the reports indicate Al Kandari was detained with a Kuwaiti passport, but none has ever been produced by the Government and the Government now takes the position that Al Kandari did not have his passport on him at the time of his detention by American forces. Al Kandari argued that if, as he contends, the statement in the reports is accurate and he was detained with his passport, he is prejudiced by the Government's failure to produce it during discovery. Alternatively, if the Government is correct that he was not detained with a passport, the statement in the reports to the contrary is inaccurate and is evidence of the inherent unreliability of these reports. The Court cannot determine which interpretation of the statement — Petitioner's or the Government's — is most likely correct. As indicated previously, the Government's evidence regarding Al Kandari's pocket litter at the time of his detention is not sufficiently reliable. *See supra* p. 33 n. 22. In addition, while Government counsel speculated at the Merits Hearing that the statements at issue, which are located in the source field of the intelligence reports, are only "summary information provided by the detainee, that [is] his own description of himself," 10/20/09 (AM) Mrts. Hr'g Tr. at 97:6-13, the evidence before the Court does not appear to either confirm or contradict this assertion, *see, e.g.,* Ex. 58 at 8 (09/19/08 Decl. of ▇▇▇▇▇▇▇▇▇▇ (noting only that "Intelligence reports include a source line that gives a description of the source and their assessed credibility by the reporting officer."). Similarly, Al Kandari has offered no independent evidence in support of his position that he was detained with his passport. Although the Court is ultimately unable to resolve this question on the present record, this dispute does not affect the Court's decision in this case. There is no indication that Respondents' failure to produce the passport was the result of bad faith,

-45-

~~SECRET//NOFORN~~

declaration, *see* Ex. 139 at ¶ 28 (03/06/09 Decl. of Al Kandari), the Court does not credit this

denial. Al Kandari states in his declaration that: "It is alleged that I have admitted knowing 'Ibn

Sheikh al-Libi [and others]. I have never known any of these people. My interrogators told me

that I must have known them, but I have always said that I did not know them, although I had

heard of them while in detention at Guantanamo." *Id.* While this statement appears to imply that

Al Kandari's admissions on this point were the result of interpreter error, based on a possible

misunderstanding of his statement that he knew of Al Libi from his time in Guantanamo, the

Court notes that Al Kandari admitted not only that he knew Al Libi, but also that he met with

him in Tora Bora while Al Libi was leading a group of fighters. Ex. 38 (12/04/03 Al Kandari

IIR). It is difficult to see how such admissions — that Al Kandari knew Al Libi and had met

with him Tora Bora, where Al Libi was leading a group of fighters — could have resulted from a

misinterpretation of Al Kandari's statement that he did not know Al Libi, but had only heard of

him. Moreover, Al Kandari clearly has a motive to deny his prior inculpatory admission to

Government interrogators that he knew Al Libi and associated with him while in Tora Bora. The

Court therefore does not credit Al Kandari's blanket denial in his declaration. By contrast, the

Court finds that Al Kandari's admissions against interest regarding his association with Al Libi,

and Al Libi's status as a leader at Tora Bora, are both reliable and credible.

     To corroborate Al Kandari's own admission that Al Libi was leading fighters on behalf of

al Qaeda, the Government has submitted additional evidence supporting a finding that Al Libi

---

Respondents have not relied on the absence of Al Kandari's passport as a fact supporting his
detention in this case, and the presence or absence of Al Kandari's passport on his person at the
time of his detention is not material to the Court's decision in this case. Moreover, even if this
particular statement in the source field of the intelligence reports is inaccurate, it does not render
the reports automatically unreliable and certainly does not cast doubt on the reliability of Al
Kandari's specific, substantive admissions that he associated with members of al Qaeda, the
Taliban, or their associated forces, in Tora Bora.

SECRET//NOFORN

was a member of al Qaeda (or its associated forces) and that he was charged with leading fighters during the Battle of Tora Bora. *See, e.g.,* Ex. 1 at 436 (National Commission on Terrorist Attacks Upon the United States, The 9/11 Commission Report (2004)) (listing Al Libi as "head of jihadist training camp in Afghanistan"); Ex. 72 (11/21/02 Muhammed Noor Othman Muhammed (ISN 707) FD-302) (identifying Al Libi as the individual in charge of the Khaldan training camp, at which detainee worked from 1996 to 2000); Ex. 88 (9/6/03 Hamud Dakhil Al-Jidani, a.k.a. Talut (ISN 230) MFR) (identifying Al Libi as former commander of Khaldan training camp and a leader at Tora Bora). The Court finds this evidence is sufficiently reliable to corroborate Al Kandari's own admission against interest concerning Al Libi's association with al Qaeda, evidence which is uncontroverted on the present record. In particular, with respect to the detainee statements, the Government has identified the sources of both statements, and the documents each indicate therein that the detainees' statements regarding Al Libi are based on personal knowledge.

**Abdul Qadous.** Al Kandari also admitted to Government interrogators that he met with Abdul Qadous during his time in Tora Bora. Ex. 38 (12/04/03 Al Kandari IIR). By Al Kandari's own admission, Qadous, like Al Libi, was leading a group of fighters at the time Al Kandari met him in Tora Bora. *Id.* Al Kandari further advised that he had heard Qadous had previously been in charge of the Al Farouq training camp, al Qaeda's primary Afghan basic training facility. *Id.* Although Al Kandari later denied in his declaration that he made these admissions or that he knew Qadous, the Court does not credit such denials. *See* Ex. 139 at ¶ 28 (03/6/09 Decl. of Al Kandari) ("It is alleged that I have admitted knowing . . . Abdul Qadous [and others]. I have never known any of these people. My interrogators told me that I must have known them, but I have always said that I did not know them, although I had heard of them while in detention at Guantanamo."). Significantly, as with Al Libi, Al Kandari admitted not only to knowing

-47-

SECRET//NOFORN

Qadous, but to also having met with him in Tora Bora, where Qadous was leading a group of

fighters at the time of their meeting. Ex. 38 (12/04/03 Al Kandari IIR). For the same reasons

discussed above, the Court finds that it is similarly unlikely that this admission resulted from

interpreter error, as Al Kandari implies in his declaration, and therefore discredits Al Kandari's

later denial of this statement, particularly in light of Al Kandari's motive to deny any association

with Qadous. Rather, the Court finds that Al Kandari's admission against interest that he met

with Qadous in Tora Bora, and that Qadous was leading a group of fighters at the time of their

meeting, is both reliable and credible.

To corroborate Al Kandari's own statements identifying Qadous as an individual

associated with al Qaeda (or its associated forces), the Government has submitted certain

statements by Abdul Latif Nasir, a.k.a. Taha (ISN 244). In these statements, ISN 244, a self-

admitted participant in the Battle of Tora Bora, identifies Qadous as a leader of fighters at Tora

Bora and the former head of the Al Farouq training camp. *See* Ex. 52 (07/01/03, Abdul Latif

Nasir (ISN 244) IIR); Ex. 135 (05/11/02 Abdul Latif Nasir (ISN 244) FD-302); Ex. 136

(03/10/04 Abdul Latif, Nasir (ISN 244) FD-302); *see also* Ex. 14 at 2 (09/19/08 Dec. of ██████

██████████████████████████████████████████████████████ The Court finds

that ISN 244's statements, which consist of admissions against interest based on personal

knowledge, have sufficient indicia of reliability to corroborate Al Kandari's statements as to

Qadous' association with al Qaeda. This is particularly so given that the evidence in the record

demonstrating Qadous' association with al Qaeda is uncontroverted.

**Abu Thabit.** During an interrogation on May 23, 2002, Al Kandari admitted to having

met with an individual named Abu Thabit while in the mountains of Tora Bora. Ex. 74

(05/23/02 Al Kandari FD-302). Al Kandari further stated that Abu Thabit, whom he identified as

a Saudi, was in Tora Bora to help the injured, *id.*, which supports a reasonable inference that Abu

SECRET//NOFORN

Thabit was part of, supported, or otherwise associated with al Qaeda and/or the Taliban during the Battle of Tora Bora. The Court notes that Al Kandari has never denied or recanted this particular admission regarding Abu Thabit. Considering the context in which Al Kandari's admission against interest was made, and that these statements are uncontroverted, the Court finds the statements are both reliable and credible.

This finding is further supported by two additional statements made by Al Kandari to Government interrogators, which statements the Government has submitted to corroborate Al Kandari's admission that he met with Abu Thabit in Tora Bora and that Abu Thabit was, at the time, assisting and/or supporting al Qaeda, the Taliban, or associated enemy forces. First, the Government has submitted an intelligence report containing a statement by Al Kandari confirming that he knew Abu Thabit. Ex. 38 (12/04/03 Al Kandari IIR). While this statement does not contain any specific information as to the circumstances in which Al Kandari knew Abu Thabit, the statement nonetheless corroborates Al Kandari's admission in Exhibit 74 to the extent it confirms that he knew Abu Thabit.



-49-

~~SECRET//NOFORN~~

██████████████████████████

Al Kandari objects to the Court's reliance on this latter exhibit, ██████████ on the basis that the document remains classified and counsel has been unable to either show the document to Al Kandari or to advise Al Kandari about the specific statements contained therein. ████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████████

████████████████████ While the Court understands Petitioner's frustration with the Government's refusal ████████████████████████ the Court finds that Al Kandari is not prejudiced by the Court's reliance on ████████ for the sole purpose of corroborating statements Al Kandari has made ██████████████ statements which Al Kandari has been permitted to see and discuss with his attorneys. In this instance, Al Kandari has had a full opportunity to review and respond to, and to have his counsel investigate, the substantive allegations upon which the Court relies and for which ██████████ is corroborative evidence ████████████████████████████████████████

████████████████████████████ These are not new allegations that Al Kandari has not previously seen, as they are also repeated in other documents to which Al Kandari has had access. The Court therefore shall not exclude from consideration ████████ insofar as the exhibit is relied upon only to corroborate other statements previously disclosed to Al Kandari concerning Abu Thabit.[29] The Court notes, however, that ██████████ is not necessary

---

[29] In addition to Petitioner's general objection to ██████████ based on counsel's inability to show or discuss the document with Al Kandari himself, Al Kandari has attempted to raise a new and slightly more refined objection to the Court's reliance on ████████ in his post-hearing supplemental briefing submitted with respect to the Government's Amended Exhibits.

SECRET//NOFORN

to its finding above regarding the reliability of Al Kandari's admission as to his association with

Abu Thabit while in Tora Bora, and the Court would reach this same decision even if it were to

wholly exclude ▇▇▇▇ from consideration.

**Abu Hamza al-Masri.** In an interrogation in May of 2002, Al Kandari admitted that he

met with an individual named Abu Hamza al-Masri while in Tora Bora. Ex. 74 (05/23/02 Al

Kandari FD-302). Al Kandari indicated in this statement that al-Masri had been injured and that

Al Kandari had been told by Mohammed Taha Malu-Allah, a.k.a. Abu Sulaiman, (*see* discussion

*infra* pp. 53-55), that al-Masri was a member of al Qaeda. *Id.* Al Kandari has never denied his

association with al-Masri in any of his other statements.

To corroborate these admissions, the Government has introduced two additional

---

Specifically, Al Kandari argued for the first time in his post-hearing briefing that he is
particularly prejudiced by the Government's reliance on, and counsel's inability to discuss with
or show to him, statements that he made while detained in Afghanistan, given Al Kandari's
broad claim that he was subject to "especially brutal" abuse while in Bagram and Kandahar.
*See* Ex. 139 at ¶ 8 (03/06/09 Decl. of Al Kandari). The Court finds that this objection is without
merit for three reasons. First, this particular objection to ▇▇▇▇ is untimely. Al Kandari did
not raise this specific objection in any of his pre-hearing motions objecting to ▇▇▇▇ He
instead waited until his post-hearing supplemental briefing to raise this objection. The post-
hearing briefing, however, was explicitly limited by the Court's February 3, 2010 Order to a
discussion of the Government's Amended Exhibits only, which exhibits do *not* include ▇▇▇▇
▇▇ Petitioner's attempt to raise this objection to ▇▇▇▇ in parenthetical citations in his post-
hearing briefing is thus inappropriate. Second, this argument directly conflicts with Petitioner's
counsel's repeated representations to the Court during the Merits Hearing that Al Kandari's
general claims of abuse are not relevant to the Court's decision in this case. *See* discussion *supra*
pp. 20-21. While Al Kandari's counsel attempts to argue in his post-hearing supplemental
briefing that this representation to the Court was limited solely to those statements that Al
Kandari himself has been able to see and discuss with his counsel, and was therefore not
intended to apply to the statements in ▇▇▇▇ this post-hoc characterization of his argument
is without merit. Counsel made no such distinction at the Merits Hearing, and the relevant
statements by counsel explicitly disclaimed any allegation that Al Kandari's statements made to
Government interrogators were the product of abuse. *See* discussion *supra* pp. 20-21. Third and
most importantly, the Court reiterates that although Al Kandari has generally alleged that he was
abused while in United States' custody, and that such alleged abuse was particularly "brutal"
while he was detained in Afghanistan, he has *never* claimed that he made false statements to
Government interrogators as a result of this alleged abuse, and there is no evidence in the record
to support such a claim.

~~SECRET//NOFORN~~

statements from Al Kandari. First, the Government has directed the Court to a statement by Al Kandari confirming that he knew an Egyptian named Hamza. Ex. 38 (12/04/03 Al Kandari IIR). According to the Government's undisputed evidence, "Al-Masri" means "The Egyptian." Ex. 13 (09/19/08 Decl. of ████████████████ App. A (Common Country and Tribal Names). Al Kandari has not disputed that the Abu Hamza al-Masri referenced in Exhibit 74 is the same Hamza, the Egyptian, referenced in Exhibit 38, and the Court finds that this is a reasonable inference. Although Al Kandari's statement in Exhibit 38 that he knew al-Masri does not specify how Al Kandari knew al-Masri or indicate that he met with al-Masri in Tora Bora, it does partially corroborate Al Kandari's admission in Exhibit 74 insofar as it confirms that Al Kandari knew al-Masri.

Second, the Government has submitted a statement ████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

While Al Kandari again objects to the Court's reliance on this latter exhibit, ████████ the Court finds for the reasons explained above that Al Kandari is not prejudiced by the Court's reliance on ████████ for the sole purpose of corroborating statements Al Kandari has made ██ ████████████████ statements which he has been permitted to see and discuss with his attorneys. Al Kandari has had a full opportunity to review and respond to, and to have his counsel investigate, the substantive allegations upon which the Court relies and for which

SECRET//NOFORN

███████ is corroborative evidence. Accordingly, the Court shall not exclude from consideration this exhibit ███████ insofar as it is relied upon only to corroborate other statements previously disclosed to Al Kandari ███████████ The Court notes, however, that ███████ is not necessary to its finding above regarding the reliability of Al Kandari's admission as to his association ███████ while in Tora Bora, and the Court would reach this same decision even if it were to wholly exclude ███████ from consideration.

**Mohammed Taha Malu-Allah, a.k.a. Abu Sulaiman.** Al Kandari also admitted on numerous occasions that he met with a Kuwaiti named Mohammed Taha Malu-Allah, a.k.a. Abu Sulaiman, while in the mountains of Tora Bora. In an interrogation in early May of 2002, Al Kandari admitted that he saw Abu Sulaiman, a Kuwaiti, in the mountains near Jalalabad. Ex. 28 (05/06/02 Al Kandari FD-302).[30] At that time, Abu Sulaiman admitted to Al Kandari that he had traveled to Afghanistan to receive military training. *Id.* In an interrogation later that same month, Al Kandari again confirmed that he had met Abu Sulaiman in the mountains near Jalalabad and that Abu Sulaiman was from Kuwait. Ex. 74 (05/23/02 Al Kandari FD-302). Al Kandari also advised that Abu Sulaiman had told him that Hamza al-Masri, another individual whom Al Kandari had met while in Tora Bora, was a member of al Qaeda. *Id.* In addition to these statements made in May of 2002, the Government has introduced yet another statement by Al Kandari confirming once again that he knew Abu Sulaiman, that Abu Sulaiman was a

---

[30] As reported in Exhibit 28, Al Kandari advised interrogators that he saw a Kuwaiti named saw Abu Sulaiman in a village in the mountains near Jalalabad and that he knew some of the Arabs in the mountains, including Mohammed Taha Malu-Allah; it is unclear if he indicated that both names referred to the same person. *See* Ex. 28 (05/06/02 Al Kandari FD-302). This may be a result of the fact that Exhibit 28 contains Al Kandari's statements from two separate interrogations that occurred in early May of 2002. Regardless, Al Kandari subsequently confirmed that Mohammed Taha Malu-Allah uses the kunya Abu Sulaiman and that the names refer to the same person, a fact that is uncontroverted on the present record. *See* Ex. 32 (11/20/03 Al Kandari IIR); Ex. 38 (12/04/03 Al Kandari IIR); Ex. 74 (05/23/02 Al Kandari FD-302).

SECRET//NOFORN

Kuwaiti, and that Al Kandari had last seen Abu Sulaiman in the Tora Bora mountains near Jalalabad prior to Al Kandari's capture. Ex. 32 (11/20/03 Al Kandari IIR). In this last interrogation, Al Kandari also explained that he knew Abu Sulaiman from Kuwait, having visited his home in Kuwait following Abu Sulaiman's return from Chechnya. *Id.*[31]

In contrast to these admissions, the Court has located one instance in the record in which Al Kandari advised Government interrogators that the last time he had seen Abu Sulaiman was in Kuwait sometime between 1997 and 1999. Ex. 38 (12/04/03 Al Kandari IIR). While this statement confirms that Al Kandari knew Abu Sulaiman and had visited with Abu Sulaiman at his home in Kuwait, it contradicts Al Kandari's previous admissions insofar it states that he last saw Abu Sulaiman in Kuwait and not in Tora Bora. *Id.* Upon considering the totality of the evidence in the record and the parties' arguments thereto, the Court finds that this latter statement contradicting Al Kandari's admissions against interest is not credible. Rather, as between the conflicting statements, the Court finds that Al Kandari's repeated admissions that he met with Abu Sulaiman in Tora Bora are the more credible assertions. Al Kandari's admissions against interest that he met with Abu Sulaiman in Tora Bora are consistent across several interrogations

---

[31] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ For the previously explained reasons, the Court finds that Al Kandari is not prejudiced by the Court's reliance on ████████ solely to corroborate his admissions ████████████████████ admissions which he has been permitted to see and discuss with his attorneys. Al Kandari therefore has had a full opportunity to review and respond to, and to have his counsel investigate, the substantive allegations upon which the Court relies and for which ████████ is corroborative evidence. The Court notes, however, that ████████ is unnecessary to the Court's decision on this point, as it serves only to corroborate Al Kandari's repeated admissions ████████████████████████████████████ and the Court would reach the same findings even if it were to wholly exclude this exhibit from consideration.

SECRET//NOFORN

and, unlike his later exculpatory statement, are not motivated by self-interest. Similarly, the Court finds that Al Kandari's admission that Abu Sulaiman confided that he traveled to Afghanistan to receive military training is also reliable. Given this admission, combined with the fact that Abu Sulaiman subsequently made his way to Tora Bora during the Battle of Tora Bora and was able to recognize and identify al-Masri as a member of al Qaeda, the Court finds it more likely than not that Abu Sulaiman was a member of, or supported, al Qaeda, the Taliban, or associated enemy forces.[32]

* * *

The above discussion supports the following three findings based on Al Kandari's own statements and admissions against interest. First, Al Kandari was in Tora Bora during the most intense portion, if not the entirety, of the Battle of Tora Bora. Second, during that time, he was given a Kalishnikov rifle and provided training on how to use it, more likely than not by an individual who was a member of or otherwise associated with al Qaeda and/or the Taliban. Third, during this time, Al Kandari also met and associated with several members and high-level leaders associated with al Qaeda and/or the Taliban, many of whom were actively engaged in or

---

[32] Al Kandari has also admitted to having seen or met with two additional individuals while in the Tora Bora mountains: (a) Hamed Asulaiman, a.k.a. Abu Hafs, *see* Ex. 28 (05/06/02 Al Kandari FD-302); Ex. 74 (05/23/02 Al Kandari FD-302); and (b) Laith al-Libi, Ex. 38 (12/04/03 Al Kandari IIR). There is insufficient evidence in the record, however, to support a finding that either of these individuals were members of, or otherwise associated with, al Qaeda and/or the Taliban. The Government did not direct the Court to any evidence in the record providing information as to Asulaiman's identity. Although the Government did produce one exhibit indicating that Laith al-Libi is a member of al Qaeda and/or the Taliban, *see* Ex. 123 (9/28/05 ISN 768 IIR), the Court finds that the exhibit does not have sufficient internal indicia of reliability and no external evidence corroborating either the information in the document or the reliability of its source has been provided by the Government. In addition, while Exhibit 38 itself includes a "field comment" that "Laith al Libi is [*sic*] has been associated with Libyan Fighting Group (LIFG) member Abu Al-Layth ((Al-Qasimi))," the document does not provide any indication of the source of this assertion and the Court is therefore unable to assess its reliability. *See* Ex. 38 (12/04/03 Al Kandari IIR).

SECRET//NOFORN

were otherwise supporting those who were fighting the United States and its allies, including: (a)

Ibn Sheik Al Libi; (b) Abdul Qadous; (c) Abu Thabit; (d) Abu Hamza al-Masri; and (e)

Mohammed Taha Malu-Allah. In summary, then, Al Kandari was, by his own admission, in

Tora Bora during the height of the Battle of Tora Bora, carrying a Kalishnikov rifle, and

associating with several members and high-level leaders of al Qaeda, the Taliban, or associated

enemy forces, many of whom were actively engaged in, or were otherwise supporting those who

were, fighting the United States and its allies.[33]

Taken in their totality and considered in context with the Court's determination above

that Al Kandari's explanation for his activities in Afghanistan is implausible, these findings

demonstrate that it is more likely than not that Al Kandari was part of al Qaeda, the Taliban, or

associated enemy forces. Far from constituting mere evidence of "guilt by association," as Al

Kandari's counsel argued at the Merits Hearing, evidence that Al Kandari was given a weapon,

more likely than not by a member of the enemy forces fighting at Tora Bora, and permitted to

associate with high-level leaders of al Qaeda, the Taliban, or their associated forces in Tora Bora,

while these same individuals were actively engaged in fighting the United States and its

Coalition partners, demonstrates that Al Kandari was known to and trusted by al Qaeda and/or

the Taliban (and associated forces). As the Court previously observed, it defies common sense

that al Qaeda, the Taliban, or their associated enemy forces, would permit an unknown and

untested noncombatant, armed with a Kalishnikov rifle, to wander through Tora Bora and to

---

[33] In addition to Al Kandari's own statements and admissions against interest, the Court notes that the Government presented certain other evidence with respect to Al Kandari's alleged activities while in Tora Bora, which the Court does not reach for purposes of this decision. This evidence includes third-party witness statements that, *inter alia*, relay information gained from unidentified second-hand sources, describe individuals who are named only by their kunyas, or otherwise require far more inferences, and are far more attenuated, than the evidence on which the Court has relied in this case.

SECRET//NOFORN

interact with its fighters and their leaders, all the while the Battle of Tora Bora raged on around them. To the contrary, that al Qaeda, the Taliban, and its associated enemy forces, permitted Al Kandari to associate with and be near their members while they were actively engaged in fighting Coalition forces makes it more likely than not that he himself was also part of the forces associated with al Qaeda and/or the Taliban. *Cf. Sulayman*, 2010 WL 3069568 at *18 ("[T]he Court simply cannot fathom a situation whereby Taliban fighters would allow an individual to infiltrate their posts near a battle zone unless that person was understood to be a 'part of' the Taliban."); *Al-Adahi v. Obama*, 698 F. Supp. 2d 48, 65 (D.D.C. 2010) (hereinafter, "*Al-Assani*") ("the fact that Petitioner was clearly accepted by al-Qaida, at a minimum, as a substantial supporter of the organization further supports the conclusion that it is more likely than not that Petitioner knowingly was a part of or substantially supported al-Qaida").

Similarly, it is inconceivable that al Qaeda, the Taliban, or their associated enemy forces, would willingly arm Al Kandari with a Kalishnikov rifle and take the time to train him on its proper use, unless Al Kandari himself was part of these organizations. *Cf. Anam v. Obama*, 696 F. Supp. 2d 1, 16 (D.D.C. 2010) ("Al-Qaida fed, sheltered, and protected [the detainee]. . . . The only logical explanation as to why al-Qaida did all of this for Petitioner is that they considered him a member. Petitioner must have taken some affirmative action to earn that trust and assistance from such a clandestine organization."). The Court emphasizes that the evidence here does not indicate merely that Al Kandari possessed a weapon, but rather supports a reasonable inference that he was given the Kalishnikov rifle while in Tora Bora during the Battle of Tora Bora and was trained on its use by an individual who was more likely than not associated with al Qaeda and/or the Taliban. It is these particular circumstances in which he was given the weapon that support the Court's finding that it is more likely than not that Al Kandari was part of al Qaeda, the Taliban, or their associated enemy forces. *Cf. Al Odah*, 611 F.3d at 15-16 (rejecting

SECRET//NOFORN

petitioner's "attempt to put an innocuous gloss" over fact that he carried an AK-47 in Tora Bora, given the particular circumstances in which he received and maintained the weapon).

While there is no direct evidence in the record that Al Kandari personally used this weapon against the United States or its Coalition partners, such evidence is not required. *Al Bihani*, 590 F.3d at 872-73 (proof that an individual actually fought for or on behalf of al Qaeda or the Taliban, while sufficient, is also not required to demonstrate that an individual is a "part of" such enemy forces); *cf. Khalifh v. Obama*, Civ. Act. No. 05-1189, 2010 WL 2382925, at *6 (D.D.C. May 28, 2010) ("While . . . the government has not shown that Khalifh . . . personally took up arms against U.S. or coalition forces, it is slicing the law too thin to require such proof."). Nonetheless, given the evidence in this case, the Court notes that it is reasonable to infer that Al Kandari, like the other armed combatants around him, was actively engaged in fighting the United States and its allies. Indeed, the alternative — that he himself was armed, in Tora Bora, during the Battle of Tora Bora, in the company of armed al Qaeda, Taliban and associated fighters, but was simply an island unto himself with no involvement in the fighting going on around him — is not credible. *Abdah*, 2010 WL 1798989, at *20 (fact that detainee was with men who were involved in the Battle of Tora Bora supported finding that detainee was more likely than not part of al Qaeda forces at Tora Bora, even though there was no evidence directly showing that this detainee himself engaged in any fighting).

Importantly, by Al Kandari's own admission, he was aware that the individuals he chose to associate with while in Tora Bora were members of and were associated with al Qaeda and/or the Taliban. Though his motives for coming to Afghanistan and his activities prior to the Battle of Tora Bora cannot be conclusively determined on the present record, at a minimum it is clear that Al Kandari knew by the time of his stay in Tora Bora that it was more likely than not that he was joining forces with and lending support to al Qaeda and/or the Taliban. This is all the

SECRET//NOFORN

Government need prove. *Al-Assani*, 698 F. Supp. 2d at 57 ("The fact that an individual may have been initially motivated to travel abroad for innocent reasons, or that an individual's knowledge or intent was less than clear at inception of his journey, does not defeat the Government's case. Instead, it is sufficient for the Government to prove by a preponderance of the evidence that, at some point before capture, it is more likely than not that Petitioner knew he was becoming or intended to become a part of or substantial supporter of al-Qaida and/or the Taliban.").

Given the overwhelming weight of the evidence discussed above, Al Kandari's blanket denials in his declaration that he "never supported al-Qaida or any group that promotes violence" and that he was "not a part of any fighting groups" nor ever "associated in any way with any fighting groups in Tora Bora," are simply not credible. Ex. 139 (03/06/09 Decl. of Al Kandari), ¶¶ 22, 25, 29. In almost every significant respect, Al Kandari has failed to provide plausible explanations for his activities in Afghanistan and the choices he made as to his movements and associations in Tora Bora. Accordingly, taken as a whole, the Court finds that this record makes it more likely than not that Al Kandari became part of al Qaeda, the Taliban, or their associated enemy forces, and is therefore lawfully detained pursuant to the President's authority under the AUMF.

B.    *The Government's Other Evidence*

During the course of the Merits Hearing, the Government presented certain other evidence in support of its position that Al Kandari is lawfully detained pursuant to the President's authority under the AUMF. For the reasons set forth above, the Court finds that this additional evidence submitted by the Government is not necessary to its decision that it is more likely than not that Al Kandari was part of al Qaeda, the Taliban, or associated enemy forces. Nonetheless, the Court shall briefly address such evidence below.

~~SECRET//NOFORN~~



SECRET//NOFORN



-61-

SECRET//NOFORN



Nonetheless, as made clear by the Court's finding above, the Government's evidence regarding ███████████████ is not necessary to the Court's conclusion that Al Kandari is more likely than not part of al Qaeda, the Taliban, or associated enemy forces. The Court therefore need not, and does not, assess the document's reliability or reach the question of what probative value, if any, this evidence is entitled to in the case at hand.

SECRET//NOFORN

2.    The Remaining Evidence

The remaining evidence in the record consists largely of third-party witness statements, newspaper reports, and other documentary evidence.  For the reasons previously explained, this evidence is also unnecessary to the Court's decision.  Moreover, the Court finds that certain of the Government's allegations, such as its assertion that Al Kandari participated in jihad in Bosnia in the middle to late 1990's, are not material to its determination above that Al Kandari is lawfully detained as a result of his activities in Afghanistan in 2001, and therefore need not be reached.  The remainder of the Government's evidence concerns allegations that the Court finds are unnecessary to its determination and which, for a variety of reasons, the Court does not reach.  This includes the Government's allegations that Al Kandari:  made a previous trip (or multiple previous trips) to Afghanistan prior to the undisputed August 2001 trip discussed above, during which trips he stayed at guesthouses and attended training camps related to al Qaeda and/or the Taliban; was a close associate of certain high-level leaders and members of al Qaeda and/or the Taliban, including Usama Bin Laden, Adel bu Hamid, a.k.a. al Qannas, Suleiman Abu Ghaith, and Abu Zubaydah; served as a religious leader and provided religious training to al Qaeda and Taliban members; mentored and advised Anas Al Kandari and other members of the six-person cell that eventually carried out the October 8, 2002 attack on Faylaka Island; and was engaged in the creation and dissemination of propaganda on behalf of al Qaeda and/or the Taliban. The evidence submitted in support of these allegations, *inter alia*: is in equipoise; is based on statements and other evidence that is far more attenuated, and requires far more inferences, than the evidence on which the Court has relied in this case; and consists of information obtained from unknown sources or known sources that the Government refuses to identify, and for which the Government otherwise has not provided sufficient information regarding the circumstances in which the statements were made.

~~SECRET//NOFORN~~

## III. CONCLUSION

Because the Government has met its burden by a preponderance of the evidence in this case, the Court shall DENY Al Kandari's petition for habeas corpus.

Date: September 15, 2010

                              /s/
                              **COLLEEN KOLLAR-KOTELLY**
                              United States District Judge